# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

S. V.,

                Plaintiff,

      v.                                       Case No. 10-C-919

KENNETH R. KRATZ,

                Defendant.

## DECISION AND ORDER

This case raises the question of whether the solicitation by a district attorney of a sexual relationship with the female victim in a domestic violence case he is prosecuting amounts to a violation of her right to equal protection of the laws within the meaning of the Fourteenth Amendment to the United States Constitution. Plaintiff, whose initials are S. V., filed this action for damages against Defendant Kenneth R. Kratz, the former District Attorney of Calumet County, pursuant to 42 U.S.C. § 1983. Plaintiff alleges that Kratz violated her constitutional rights when he repeatedly sent text messages to her over a three-day period following a meeting she had with him to discuss the prosecution of her former live-in partner for attempting to strangle and suffocate her. In the course of his text messaging, Kratz solicited a sexual relationship with Plaintiff.

Given the unusual nature of the case, at least as gleaned from the facts alleged in the complaint, the Court invited the parties to address the threshold issue of whether the complaint stated a constitutional claim before undertaking full discovery. The parties agreed, but instead of

simply filing a Rule 12(b)(6) motion to dismiss, Defendant filed a motion seeking dismissal pursuant to Rule 12(b)(6) and, alternatively, for summary judgment pursuant to Rule 56(b), supported by a set of proposed findings of fact. Plaintiff responded to Defendant's proposed findings and submitted additional proposed findings of fact, supported by her own affidavit. Since a motion for summary judgment encompasses the question raised in a Rule 12(b)(6) motion of whether the Plaintiff has stated a claim in the first place, the motion will be treated as one seeking summary judgment. For the reasons that follow, the defendant's motion will be denied.

## I. Summary Judgment Standard

A motion for summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where factual disputes do exist, the non-movant's version of events is accepted as true at this stage of the proceedings. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a *genuine* issue of *material* fact for the case to survive. *Id.* at 247-48. "Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving

2

party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. Undisputed Facts and Allegations

In this case, the basic facts appear, for the most part, undisputed. After years of living in an abusive relationship with S.K., the father of her child, Plaintiff reported to police an incident where S.K. had beaten and strangled her. On August 12, 2009, S.K. was charged in the Circuit Court for Calumet County with felony strangulation and suffocation under circumstances that constituted domestic abuse as that term is defined in Section 973.055 of the Wisconsin Statutes. Plaintiff had not reported past instances of S.K.'s abuse to the police because she was reluctant to invite law enforcement authorities to intervene in what she considered a private family situation. She was also concerned that reporting S.K. to the police would only anger him and increase the risk of more serious attacks in the future if he was freed before trial or was not successfully prosecuted and sentenced to jail. Her hope in reporting his conduct to the police was that he would be punished for his violent and abusive behavior and prevented from repeating it in the future.

Defendant Kratz, who was then the District Attorney of Calumet County where the offense had occurred, met with Plaintiff three times in October 2009 in connection with the case. In the first two meetings, the office's victim-witness coordinator was present. At the third meeting, which occurred on October 20, 2009, Kratz met alone with Plaintiff in a conference room at his office. In the course of the third meeting, Plaintiff described her relationship with S.K. and his previous abuse. Plaintiff also explained her personal circumstances, telling Kratz she was not in another

3

relationship at that time, that she was living with her mother and struggling to make ends meet while caring for her child, and that she had extremely low self-esteem.

Kratz confirmed at the meeting that he would be in charge of the prosecution, which Plaintiff understood to mean that she would be relying upon him directly for assistance regarding her participation in the process as the victim of the crime and the complaining witness in the prosecution. She also understood that Kratz, as the prosecutor responsible for the case, would have substantial influence and control over whether S.K. would be released before trial and, if so, the conditions under which he would be released. He would determine the conditions of any plea offer by the State or the evidence that would be offered at trial if a plea agreement was not reached, and would have a significant say over the sentence imposed if S.K. was convicted. In fact, Kratz asked Plaintiff at the meeting if she would object to reducing the felony charge against S.K. to a misdemeanor. She stated she would object. Finally, Plaintiff believed that Kratz and law enforcement in general would protect her identity and privacy as much as possible if she cooperated with the prosecution of S.K and that her contact information would be kept confidential and used only for law enforcement purposes.

On October 20, 2009, at 3:45 p.m., shortly after their meeting, Kratz sent a text message to Plaintiff which states: "It was nice talking with you! Feel free to text me (between 8 and 4) if you are bored. You have such potential. See ya, Ken (your favorite DA)." (Decl. of S.V., Ex. A, Doc. 19-1 at 1.) This was the first in a series of thirty text messages that Kratz sent to Plaintiff over the next forty-eight hours. Plaintiff has submitted a transcript showing the date, time, and content of Kratz's text messages to her and a separate transcript of her replies. (S.V. Decl., Ex. A, Doc. 19-1.) Plaintiff replied to twenty-three of Kratz's messages. Although the transcript does not show the

4

date and time of her replies, one can for the most part, determine the messages to which she replied from the content of the message and the reply. It is clear from her replies that at no time did Plaintiff communicate to Kratz that she wanted him to stop sending such messages to her or object to their content. As she later explained, however, this was out of fear that Kratz would retaliate against her by the manner in which he handled the prosecution of S.K., or in some other way.

In apparent response to Kratz's first text message set forth above, Plaintiff replied: "Don't worry about me. My motto is just keep going. And thanks for everything." (*Id*. at 4.) Plaintiff appears to have replied shortly after Kratz sent his first message because at 3:55 p.m., he responded: "I'm not worried . . . well maybe just a little. I'm more curious what made me text you???" (*Id*. at 1.) Plaintiff replied: "Cause you're a nice person." (*Id*. at 4.) At 4:04 p.m., Kratz responded: "Ok. We'll go with that answer. Thanks for putting up with me so far. I wish you weren't one of this offices [sic] clients. You'd be a cool person to know!" (*Id*. at 1.) Plaintiff apparently replied, "Thanks" (*Id*. at 4), and Kratz did not respond further that day.

At 10:48 the following morning, Kratz sent another message to Plaintiff telling her he was feeling bored and inquiring if she was even up yet. (*Id*. at 1.) Plaintiff replied that she had a fever and hoped it was not the H1N1 flu that was in the news at the time. (*Id*. at 4.) At 11:18 a.m., Kratz responded: "Oh no. I hope you feel better. Do you want me to bring you some chicken soup?" (*Id*. at 1.) Plaintiff replied: "Lol", an accepted text message abbreviation for laugh out loud, and continued "no I don't want anything to eat." (*Id*. at 4.) At 11:23, Kratz responded: "How about a margarita? That has some fruit juice in it." (*Id*. at 1.) Plaintiff replied: "Lol too funny" (*Id*. at 4.) Kratz texted back at 11:32 a.m.: "Seriously I hope you feel better soon. Please keep in touch. It's maybe not the wisest thing I can do, but you are awfully sweet. Just don't tell anyone." (*Id*. at 1.)

5

Plaintiff replied: "I'm telling everyone. JK [an abbreviation for "just kidding"] Ha Ha. And thanks." (*Id.* at 4.)

At that point, Kratz's messages began taking on a more personal tone, and it is more difficult to link Plaintiff's replies with his messages. At 11:37 a.m. on October 21, he sent Plaintiff the following message: "I know this is wrong. I am such an honest guy, and straight shooter. . . but I have to know more about you. Does that make sense to you? I bet you get this a lot!" (*Id.* at 1.) At 12:43 p.m., he followed up with a message that reads: "Are you the kind of girl that likes secret contact with an older married elected DA...the riskier the better? Or do you want to stop right now before any issues?" Plaintiff appears to have replied to one of Kratz's messages with "Dono". (*Id.* at 4.) At 1:35 p.m., Kratz sent the following message to Plaintiff: "I need direction from you. Yes you are a risk taker and can keep your mouth shut and you think this is fun ... or you think a man twice your age is creepy so stop." (*Id.* at 1.) Plaintiff replied: "I have to think about that." (*Id.* at 4; Decl. of Kenneth Kratz, ¶ 11.) At 1:40 p.m., Kratz responded: "Ok. No problem. Either way I think you are very nice. I am very smart, but know this is ALL up to you and really does depend how close to the edge you live!" (S.V. Decl., Ex. A. at 1.) Plaintiff replied, "Lol." (*Id.* at 4; Kratz Decl., ¶12.)

In the face of her apparent uncertainty, Kratz continued to send Plaintiff text messages in an effort to persuade her to accept his proposal, and Plaintiff continued to reply to at least some of his messages. At 2:19 p.m., he texted her, "Still wondering if I'm worth it?," and at 2:22 p.m., he asked "Can I help you answer any questions?" (Ex.A. at 1.) At 2:24 p.m., Kratz commented "You don't say much do you?, and followed up at 2:27 p.m. with "When you are that pretty, I guess you don't have to! (now the compliments start)" (*Id.* at 2.) At 2:37 p.m., he asked "Why would such a

6

successful, respected attorney be acting like he's in 7th grade? Are you worried about me?" (*Id.*) Plaintiff appears to have replied, "I won't lie. Yes." (*Id.* at 4.) Kratz responded: "You should never lie to me! Obviously we have talents and this to offer that the other is intrigued by, or you would have called me creepy! You wanna accept." (*Id.* at 2.) As Plaintiff continued to express uncertainty, Kratz became more insistent. At 3:43 p.m., he texted her, "Hey...Miss Communication, what's the sticking point? Your low self-esteem and you fear you can't play in my big sandbox? Or??" (*Id.* at 2.) He sent a final message for the day at 4:14 p.m. that read: "I'm leaving for the day. Let me know after 8 tomorrow. You will either be excited or grossed out about the opportunity you have. But it will only come once." (*Id.*)

Kratz resumed his text messages to Plaintiff at 9:47 the following morning, asking Plaintiff what she hoped her life would look like in five years: "What kind of residence? A job, making how much in the household? A relationship with what kind of guy? $$$?" (*Id.*) Plaintiff replied "No guy, just graduating from college, house that bought for [her child] and I, doing part time work as a park ranger for high cliff maybe." (*Id.* at 4.). At 9:59 a.m., Kratz texted: "How are you feeling today. You stopped talking yesterday." Plaintiff replied "Ok", and at 10:33 a.m., Kratz wrote: "Are you serious? Ok? That's it? Are you in a board meeting? You are beautiful and would make a great young partner some day. But I won't beg." (S.V. Decl. ¶ 12.) Plaintiff replied "Lol." At 11:16 a.m., Kratz continued: "I'm serious! I'm the atty. I have the $350,000 house. I have the 6-figure career. You may be the tall, young, hot nimph, but I am the prize! Start convincing." (S.V. Decl., Ex. A. at 3.) Plaintiff appears to have replied: "I think your wife would have something to say about that. I don't think I could be the other woman." (*Id.* at 4.) Kratz responded: "Finally an opinion. I would not expect you to be the other woman. I would want you to be so hot and treat

7

me so well that you'd be THE woman!  R U that good?"  (*Id.* at 3.)  Kratz sent two more texts at 1:50 p.m. and 1:56 p.m., receiving little or no response.  He sent a final message at 3:25 p.m., just short of forty-eight hours after his first.  It read: "When the case is over, if you change your mind and want to meet for a drink, please tell me.  Otherwise I will respect your desire to be left alone." (*Id.* at 3.)

Unbeknown to Kratz, at the time he was sending his last message to her, Plaintiff was at the Police Department for the City of Kaukauna in Outagamie County with her mother where she had gone to file a complaint.  Even though she had not communicated the fact to Kratz, Plaintiff found his messages and solicitation unwelcome and offensive.  She was upset and felt uncomfortable, injured and humiliated by his behavior.  However, she also felt frightened, threatened, and intimidated by the pressure Kratz was placing on her.  Plaintiff feared that if she confronted Kratz directly it would have an adverse effect on the prosecution of S.K. or would cause Kratz to retaliate against her in some other way.  (Pl.'s Proposed Findings of Fact (PPFOF) ¶¶ 34-39.)  She concluded that she would not be able to trust Kratz or participate in the prosecution of S.K.  Fearing that Kratz's position as District Attorney of Calumet County gave him authority over other law enforcement agencies within the County, she had decided to report his conduct to a law enforcement agency outside of the County.  She also refused thereafter to have any further involvement with the prosecution of S.K.  (*Id.* ¶¶ 40-45.)  As a result of Plaintiff's complaint against Kratz, the prosecution of S.K. was taken over by the Wisconsin Department of Justice.  S.K. eventually entered a no contest plea to the felony charge of strangling and suffocating Plaintiff.  (*Id.* ¶¶ 47-48.)

Plaintiff alleges that as a result of his job, training and experience, Kratz knew that "victims of domestic violence were particularly vulnerable to harm from unwelcome sexual requests and the

abuse of power." (Compl. ¶ 22.) Plaintiff further alleges that Kratz knew that she would be unusually sensitive to sexual requests directed toward her by a person in his position of power and that his solicitation of a sexual relationship with her would likely cause her harm and be perceived by her as a threat of harm. She asserts that his messages were directed to her because of her sex, that he used his power and position as District Attorney to gain access to her and to pressure her to have a sexual relationship with him. (*Id.* ¶¶ 23-24.)

Kratz, on the other hand, denies that he acted with intent to cause Plaintiff harm. He notes that at no time did Plaintiff tell him she wanted him to stop texting him, even when he asked her directly. He contends that he had no idea, based on her responsive text messages to him, that Plaintiff was uncomfortable or wished for the contact to stop. In fact, because she responded promptly to so many of his texts, Kratz states that he thought she wanted to continue communicating with him. (Kratz Decl. ¶ 9.) Finally, he notes that he stopped texting her on his own accord several days before he found out Plaintiff had gone to the Kaukauna Police Department to complain and states that he would have stopped earlier had she told him she was not interested in a relationship. Instead, Kratz contends, Plaintiff "continued our text conversation for days with no indication that it was making her uneasy or that she wanted it to stop." (*Id.* ¶¶ 13–14.)

## ANALYSIS

Liability under 42 U.S.C. § 1983 requires proof that the defendant was acting under color of state law and that his conduct violated the plaintiff's rights, privileges, or immunities secured by the Constitution or laws of the United States. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, 471 (7th Cir. 1997). Kratz does not contest Plaintiff's

9

allegation that he acted under color of state law with respect to the conduct at issue. Instead, Kratz contends that the evidence, even when viewed in a light most favorable to the Plaintiff, does not provide a basis upon which a jury could find that he violated Plaintiff's right to equal protection under the Fourteenth Amendment. Alternatively, he claims he is entitled to absolute or good faith immunity by virtue of his office.

Plaintiff counters that intentional sexual harassment by government actors violates the constitutional right to equal protection under the Fourteenth Amendment and that the evidence in this case, viewed in a light most favorable to her, is sufficient to allow a reasonable jury to find in her favor. Plaintiff further argues that, given the state of the law with respect to sexual harassment, Kratz is not immune from liability for the damages he caused.

**1. Equal Protection Violation**

There is no doubt that sexual harassment is actionable in the employment context under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986). The Seventh Circuit has long held that sexual harassment by government officials can also violate the Equal Protection Clause of the Fourteenth Amendment. This violation is most apparent in the employment context: "[c]reating abusive conditions for female employees and not for male employees is discrimination." *Bohen v. City of East Chicago*, 799 F.2d 1180, 1185 (7th Cir. 1986); *see also Volk v. Coler*, 845 F.2d 1422, 1430–31 (7th Cir. 1988), and *King v. Bd. of Regents of the University of Wisconsin System*, 898 F.2d 533, 537–39 (7th Cir. 1990). But sexual harassment may also violate the Equal Protection Clause outside the employment context. For example, in *Nabozny v. Podlesny*, the Seventh Circuit held the Equal Protection Clause prohibited school officials from denying students, on the basis of sex, protection

from sexual harassment. 92 F.3d 446, 455–56 (7th Cir. 1996). The Equal Protection Clause has also been held to bar sexual abuse and harassment of students by teachers and school personnel. *See, e.g.*, *T.E. v. Grindle*, 599 F.3d 583, 587–88 (7th Cir. 2010), *Doe v. Smith*, 470 F.3d 331, 340–41 (7th Cir. 2006), *Delgado v. Stegall*, 367 F.3d 668, 672–73 (7th Cir. 2004), *Chivers v. Central Noble Community Schools*, 423 F. Supp. 2d 835, 850–53 (N.D. Ind. 2006).

Furthermore, while defendant suggests an individualized case cannot proceed, case law indicates plaintiffs need not show harassment of other females by the same defendant to prove intentional sexual harassment under the Equal Protection Clause. Certainly, harassment of other female employees by the same defendant may be "strong evidence" supporting the claim, but a single harassing act can still be enough to establish discrimination. *Bohen*, 799 F.2d at 1187; *see also King*, 898 F.2d at 528 and *Owens*, 313 F. Supp. 2d at 945–46. Moreover, in this case, Plaintiff alleges that Kratz made similar unwelcome sexual advances over a period of months toward another domestic abuse victim in a case he was prosecuting on a previous occasion. (Compl. ¶¶ 38–39.)

Defendant also argues that in order to state an equal protection claim for sexual harassment outside of the employment context, the defendant must have authority over the plaintiff and threaten to use such authority to coerce the plaintiff into submitting to sexual relations. He contends that proof of an actual threat of denial or actual denial or some tangible benefit in order to coerce compliance is required. Because he had no authority over her and never even suggested that how he handled the prosecution of S.K. depended on her response to his solicitation, Kratz argues that Plaintiff's claim must fail.

But while Kratz may not have had the same kind of authority an employer or teacher has over an employee or student, he did have authority over the prosecution of a man whom he knew

11

posed a serious threat to her safety. Arguably, this gave Kratz far more power over her than either a supervisor at work or a teacher at school. One's supervisor at work can cause economic harm to an employee under his supervision, and a teacher at school can damage a student's academic record. As far as Plaintiff was concerned, Kratz had the power to unleash a serious threat to her physical safety. Moreover, while it may be difficult to change jobs or transfer to a different school, these are steps employees and students can take to avoid the risk that a supervisor or teacher can pose. The risk to her physical safety that Plaintiff feared could not be so avoided.

It is true that Kratz never threatened or even suggested that his handling of S.K.'s prosecution was in any way dependent on Plaintiff's response to his overtures. But as Plaintiff's response highlights, such coercive threats or quid pro quo offers are not required in order to establish an equal protection violation. *Markham v. White*, 172 F.3d 486, 488, 491–93 (7th Cir. 1999), *Delgado*, 367 F.3d at 670, 672–73, and *Chivers*, 423 F. Supp. 2d at 841–48, 851, all lacked the type of coercive threats Defendant claims must be present outside the employment context. Nevertheless, these courts found the sexual conduct in question still constituted sexual harassment in violation of the Equal Protection Clause.

Of course, absent more obvious forms of sexual harassment, an equal protection claim may be more difficult to prove. An equal protection claim based on sexual harassment "generally follows the contours of a Title VII allegation of sexual harassment." *Trautvetter v. Quick*, 916 F.2d 1140, 1149 (7th Cir. 1990). Importantly, not all conduct that can be considered sexual harassment in the employment context is actionable. In order to demonstrate a violation of Title VII, the employee must show the discrimination is of such severity or pervasiveness as to "create[ ] a hostile or abusive work environment." *Id.* at 66–67. Quoting the EEOC Guidelines on workplace sexual

harassment, the Court in *Vinson* explained that "'[u]nwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature,' 29 CFR § 1604.11(a) (1985), constitutes prohibited 'sexual harassment,' whether or not it is directly linked to the grant or denial of an economic quid pro quo, where 'such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.'" § 1604.11(a)(3)." 477 U.S. at 65. "Whether the harassment rises to this level turns on a constellation of factors that include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 685 (7th Cir. 2010) (internal quotations omitted).

Ultimately, the test for whether sexual harassment creates a hostile work environment is both subjective and objective: "the plaintiff must subjectively believe that the harassment was sufficiently severe or pervasive to have altered the working environment, and the harassment must also be sufficiently severe or pervasive, from the standpoint of a reasonable person, to create a hostile work environment." *Id.* While the subjective element is often easily established for summary judgment purposes, determining whether the evidence is sufficient to support a finding that the objective element exists often proves more difficult. *Id.* This is because the line separating behavior that is actionable from what is not is less than clear:

> On one side lie sexual assaults; other physical contact, whether amorous or hostile, for which there is no consent express or implied; uninvited sexual solicitations; intimidating words or acts; obscene language or gestures; pornographic pictures. . . . On the other side lies the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers.

13

*Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995) (citations omitted). The Court in *Baskerville* went on to explain that the line "between a merely unpleasant working environment on the one hand and a hostile or deeply repugnant one on the other" is not "a bright line." *Id.* "[W]hen it is uncertain on which side the defendant's conduct lies, the jury's verdict, whether for or against the defendant, cannot be set aside in the absence of trial error." *Id.*

Although Kratz characterizes his series of text messages to Plaintiff as "asking for a date and, possibly, a relationship," (Reply at 5), a reasonable interpretation, and the interpretation that Plaintiff placed on them, is that he was soliciting a sexual relationship. In other words, the conduct alleged in this case is an uninvited sexual solicitation, which would place it on the clearly actionable side of the line, though it is not clear what would constitute an "invited sexual solicitation" other than a sexual solicitation by the other party. In any event, under *Baskerville,* Kratz's conduct would seem to meet the objective prong of the test for actionable sexual harassment.

The factor most heavily emphasized by the courts in deciding whether the conduct is sufficient to establish a hostile work environment is whether there was inappropriate touching. *Turner*, 595 F.3d at 685–86. It is also clear from the cases, however, that physical touching is not required. In *Markham*, the conduct found sufficient to create a hostile environment in the course of law enforcement training seminars consisted entirely of comments and gestures of the instructors. 172 F. 3d at 488. And in *Chivers*, the court held that a teacher's internet communications with a student that could reasonably be interpreted as soliciting a sexual relationship were sufficient to withstand a motion for summary judgment:

> A jury could also conclude that this pursuit, by a person with authority over Chivers, so undermined and detracted from her educational experience that she was effectively denied equal access to the School's resources and opportunities. Chivers

14

decreased her participation in class, did not seek help in math even though she needed it, and had falling grades and poor attendance. She also felt trapped into continuing to converse with Gillespie for fear that he could affect her grade and other students' perceptions of her. Chivers eventually stopped going to school altogether as a result of the circumstances created by Gillespie's conduct. Whether Gillespie's personal communication with Chivers and his repeated invitations for Chivers to be alone with him at night, either at school or at his apartment, in conjunction with the sexual nature of his screen names, the dirty cartoons, and the request for a picture to rate her as "hot or not," were sufficiently egregious to support a claim for a hostile environment is a question for the finder of fact.

423 F. Supp. 2d at 849. Similarly, in this case, Plaintiff claims that Kratz's sexual solicitation of her destroyed any trust she had in the criminal justice system and led to her refusal to participate further in the prosecution of S.K.

Of course, unlike Chivers, Plaintiff was not a seventeen-year-old high school student at the time Kratz texted her. On the other hand, Plaintiff argues that as a longstanding victim of domestic violence, she was extraordinarily vulnerable and dependent, a fact Kratz was well aware of as a result of his training and experience in prosecuting such cases. Given this vulnerability, Kratz's sexual solicitation and his attempt to pressure her to enter into a sexual relationship with him, even to the extent of using her self-confessed low self-esteem against her, are sufficient to support a finding that her right to equal protection was violated.

The most serious difficulty with Plaintiff's claim would seem to be the fact that she did not tell Kratz that his solicitation was unwelcome, that she regarded his messages as offensive, and that she wanted them to stop. In fact, by repeatedly responding to his message, often within minutes and sometimes with humor, Kratz contends that "she continued our conversation for days with no indication that it was making her uneasy or that she wanted me to stop." (Kratz Decl. ¶ 14.) Indeed, Plaintiff essentially concedes the point, explaining that "I became fearful that if I confronted him

15

too directly it would have an adverse effect on the prosecution or cause him to retaliate against me in some other way." (S.V. Decl. ¶ 17.) In other words, she played along and withheld her true feelings.

This is not to say that Plaintiff did not actually find Kratz's steady stream of messages offensive and unwelcome, or that she did not feel frightened, threatened, and intimidated by the pressure Kratz was putting on her to have a sexual relationship with him. The fact that Plaintiff went with her mother to a law enforcement agency in an adjoining county to report his conduct clearly demonstrates that Plaintiff truly felt pressured by Kratz and feared that he could retaliate against her by handling the prosecution of S.K. in such a way that would continue or increase the danger he posed to her. Even Kratz does not at this point in time dispute these facts. (Def.'s Response to PPFOF ¶¶ 36, 37, 39, 41, 43.)

But is it enough that Kratz's solicitation was unwelcome to Plaintiff? Doesn't she have to tell him to stop or in some way indicate to him that his messages are unwelcome? In *King v. Board of Regents*, the Court explained that sexual harassment as a violation of equal protection differs from sexual harassment under Title VII in that "the defendant must intend to harass under equal protection, . . . but not under Title VII, where the inquiry is solely from the plaintiff's perspective. 898 F.2d at 537–38 (citations omitted). How can Kratz be found to have intended to harass Plaintiff if she never told him to stop sending her messages?

The question of intent is directed to the underlying conduct, however, and the defendant's awareness of what he is doing, not whether he would characterize his conduct as sexual harassment himself. Plaintiff has alleged facts, not refuted by the record before the Court, that would support a finding that Kratz used his position to deliberately solicit a sexual relationship with Plaintiff under

16

circumstances in which he knew that, because of his position and her vulnerability, she would find his solicitation difficult to refuse. The relationship was to be "secret," "the riskier the better" and, as Kratz bluntly stated, "wrong." (S.V. Decl., Ex. A at 1.) This evidence is sufficient to raise a jury question as to whether Kratz had the requisite intent to sexually harass Plaintiff as the courts have defined it.

Though a far cry from the kind of conduct that those who drafted and ratified the Fourteenth Amendment would have understood the Equal Protection Clause of that Amendment to prohibit, the Court cannot say that Plaintiff's claim fails. Given the legal landscape described above and the evidence before the Court, and viewing that evidence in the light most favorable to Plaintiff, Defendant's motion to dismiss or, alternatively, for summary judgment on the merits will be denied.

## 2. Absolute or Qualified Immunity Defense

Defendant also contends that regardless of whether the evidence is sufficient to support such a claim because, as a district attorney, he is entitled to absolute or qualified immunity.

"A prosecutor is shielded by absolute immunity when he acts as an 'advocate for the State.' . . . Moreover, absolute immunity shields prosecutors even if they act 'maliciously, unreasonably, without probable cause, or even on the basis of false testimony or evidence.'" *Smith v. Power*, 346 F.3d 740, 743 (7th Cir. 2003)(quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976), *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993), and *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1238 (7th Cir. 1986)).

Defendant contends that he is entitled to absolute immunity because, in texting Plaintiff, he was in the course of carrying out the "inherently prosecutorial function" of "contacting" her as the complaining witness regarding his domestic abuse prosecution. (Def. Br. 24–25.) However, not

17

all conduct that occurs during the scope of a prosecutor's official duties is necessarily entitled to absolute immunity. *See, e.g.*, *Auriemma v. Montgomery*, 860 F.2d 273, 277 (7th Cir. 1988) ("The fact that government attorneys are entitled to absolute immunity when performing many of the functions of their offices should not, however, be confused with a blanket grant of immunity for government attorneys. Absolute immunity is designed to protect the functions that particular government officials perform, not the government officials themselves."); *see also Odd v. Malone*, 538 F.2d 202, 213 (3d Cir. 2008) ("the prosecutorial nature of an act does not . . . immuniz[e] everything it touches."). Given the broad implications of absolute immunity, federal courts are "quite sparing" in recognizing it and there is a presumption against granting absolute immunity. *Buckley*, 509 U.S. at 269; *Burns v. Reed*, 500 U.S. 478, 486–87 (1991); *see also Houston v. Partee*, 978 F.2d 362, 365 (7th Cir. 1992).

Instead, courts must look to each case's particular circumstances. Simply because conduct falls within the scope of a prosecutor's official duties does not automatically mean said conduct triggers absolute immunity. *See, e.g., Auriemma*, 860 F.3d at 277–78 (government attorneys do not get a "blanket grant" of absolute immunity); *Odd v. Malone*, 528 F.3d 202, 213 (3d. Cir. 2008) ("[t]he prosecutorial nature of an act does not spread backwards like an inkblot, immunizing everything it touches"). Where the challenged conduct occurred while "initiating a prosecution," conduct will be entitled to absolute immunity only if it is shown to have been "intimately associated" with the "judicial phase of the criminal process." *Imbler*, 424 U.S. at 430 (1976). Thus, courts have denied absolute immunity pertaining to conduct which, despite having occurred in the course of the initiation or conduct of a prosecution or other comparable litigation, were not an "advocacy" function satisfying the "intimately associated" test. *See, e.g., Auriemma*, 860 F.3d at

277–78 (obtaining credit reports on opposing parties in violation of the Fair Credit Reporting Act); *Odd*, 528 F.3d at 211–14 (leaving a material witness incarcerated during a lengthy continuance in the criminal trial at which he was to testify); *Gagan v. Norton*, 35 F.3d 1473, 1475–76 (10th Cir. 1994) (countermanding the court-ordered preparation of transcripts from previous criminal proceedings for a pro se petitioner applying for habeas corpus). *See also Chrissy by Medley v. Mississippi Dept. of Public Welfare*, 952 F.2d 844, 850–51 (failing to report child abuse by a criminal defendant); *McDonald v. Doe*, 650 F. Supp. 858, 860 (S.D.N.Y. 1986) (orchestrating police beating of a criminal defendant.)

Secondly, proponents must show that "overriding considerations of public policy require that [he] be exempt from personal liability" for the challenged conduct. *Auriemma*, 860 F.2d at 275; *Finnegan v. Myers*, 2011 WL 781582, *11 (N.D. Ind. Mar. 1, 2011). Plaintiff's brief notes historically three considerations have been particularly important: (1) whether there is any historical or common law basis for absolute immunity in such circumstances (2) whether denying immunity for the challenged conduct poses a substantial risk of "vexatious litigation" that would impair the prosecutor's independence and ability to function and (3) whether other safeguards against the challenged conduct would exist, particularly through the original judicial process, if actions for damages were precluded. *Burns*, 500 U.S. at 489–96; *Houston*, 978 F.2d at 366–67; *Lucien v. Preiner*, 967 F.2d 1166, 1167 (7th Cir. 1993); *Auriemma*, 860 F.2d at 275; *Odd*, 538 F.3d at 216. Courts have also denied absolute immunity for challenged conduct where the risk of impeding "true" prosecutorial functions was insubstantial and other safeguards against such conduct were considered too ineffectual. *See, e.g.*, *Burns*, 500 U.S. at 492–96; *Houston*, 978 F.2d at 367–68; *Auriemma*, 860 F.2d at 278–80; *Odd*, 538 F.3d at 216–17.

19

Given these limits on absolute immunity, and viewed under these standards, Defendant has not established that pressing plaintiff for a sexual relationship through inappropriate text messages is somehow a form of conduct so "intimately associated" with legitimate prosecutorial functions. Furthermore, he has not proposed any meaningful "overriding consideration" of public policy; to the contrary, the public has quite an interest in making sure its prosecutors do not abuse their roles and take advantage of domestic abuse victims. In fact, the grant of immunity to such conduct would not bolster but rather threaten the integrity of the prosecutorial process. Defendant has also failed to demonstrate that permitting damages actions for misconduct of this kind will pose any risk of "vexatious litigation" that would chill prosecutors' willingness to make independent decisions about the actual prosecution of their cases or otherwise impair their exercise of legitimate professional prosecutorial functions "closely related to the judicial process." *Burns*, 500 U.S. at 494. I consequently conclude absolute immunity is not warranted.

Defendant alternatively argues he should be protected by the doctrine of qualified immunity. Qualified immunity protects government officials from liability for civil damages when their conduct does not clearly violate established statutory or constitutional rights of which a reasonable person would have known. *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010); *see also Pearson v. Callahan*, 129 S. Ct. 808 (2009). A court must address two questions when presented with a claim for qualified immunity: whether the plaintiff's allegations make out a deprivation of a constitutional right, and whether the right was clearly established at the time of defendant's alleged misconduct. *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir.2008). A court may address the prongs in whichever order it believes is best suited to the circumstances of the particular case at hand. *Pearson*, 129 S. Ct. at 818.

20

As discussed above, Plaintiff has demonstrated that her evidence and the inferences that can be drawn from it, if accepted by a jury, may establish a plausible claim for relief under the Equal Protection Clause and its relevant precedent. In other words, there is an evidentiary basis for a reasonable jury to find a violation sufficient to deny Kratz's motion for summary judgment on Plaintiff's claim. *See Boyd v. Wexler*, 275 F.3d 642, 647 (7th Cir. 2001).

Defendant may also only be held immune from liability if his conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citations omitted); *Narducci v. Moore*, 572 F.3d 313, 318 (7th Cir. 2009). A constitutional right is "clearly established" if it is "sufficiently clear that a reasonable official would understand that what he is doing violates that right. . . . [I]n light of pre-existing law the unlawfulness must be apparent." *Hope*, 526 U.S. at 739 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Previous cases need not be "fundamentally" nor "materially similar" to the circumstances so long as it is "clear that officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741. Where a constitutional violation is "patently obvious" a plaintiff may not be required to present the court with any analogous cases as "widespread compliance with a clearly apparent law may have prevented the issue from previously being litigated." *Nanda v. Moss*, 412 F.3d 836, 844 (7th Cir. 2005); *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000).

Here there exists enough applicable precedent that Defendant should have been aware of the fact that in the 20 years since *Bohen*, courts have generalized and reinforced the principle that "sexual harassment constitutes sex discrimination in violation of the equal protection clause" even beyond simply the employment context. *See, e.g.*, *King*, 898 F.2d at 527; *Markham*, 172 F.3d at

21

491; *Owens*, 313 F. Supp. 2d at 944; *Nanda*, 412 F.3d at 844; *Chivers*, 423 F. Supp. 2d at 851.

More specifically, cases like *Markham v. White* demonstrate that non-quid pro quo "environmental" harassment from government employees is unconstitutional sex discrimination, even beyond the employment context. Again, that case held that male DEA agents' hostile and unwelcome sexual commentary during a training session for *non-employee* female police officers violated the female officers' right to equal protection and the court specifically rejected claims of qualified immunity. *Markham*, 172 F.3d at 491–92 ("that neither this court nor any other has ever dealt with a situation involving a short training seminar conducted by narcotics officers is of no moment. Under the doctrine of qualified immunity, 'liability is not predicated upon the existence of a prior case that is directly on point.'") (quoting *Nabozny*, 92 F.3d at 456). Given the clear intolerance of sexual harassment in § 1983 case law, as well as the broad language of those opinions and courts' willingness to extend the *Bohen* principles well beyond the original case, the Court cannot conclude Defendant was entitled to qualified immunity for his alleged actions. Although the specific facts of this case appear unique, the applicable principles are neither "novel" nor is their application here contrary to clearly established precedent. Defendant, in other words, should have been on notice as to the potential unconstitutionality of his actions in light of existing case law on sexual harassment and the Equal Protection Clause. Indeed, given his concern that Plaintiff not tell anyone about his contacting her and his acknowledgment that "this is wrong," it is arguable that he actually knew his conduct would be considered sexual harassment.

Consequently, in light of the case law discussed above — most particularly *Markham* — the contours of the Equal Protection Clause's prohibition of sexual harassment were sufficiently clear

so that the "unlawfulness" of Defendant's alleged conduct should have been "apparent." *Hope*, 536 U.S. at 739. Defendant's argument for qualified immunity is therefore denied.

## CONCLUSION

For the reasons set forth above, Defendant's motion to dismiss or, in the alternative, for summary judgment (ECF No. 14) is **DENIED**. The Clerk is directed to set this matter on the Court's calendar for a telephone conference to discuss further scheduling.

Dated this   9th   day of December, 2011.


                                               s/ William C. Griesbach
                                              William C. Griesbach
                                              United States District Judge

23