# EXHIBIT A

UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF WISCONSIN

GREEN BAY DIVISION

---------------------------------------------------------

S.V.,

        Plaintiff,

   -vs-                   Case No. 10-CV-919

KENNETH KRATZ,

        Defendant,
    and

STATE OF WISCONSIN and PEERLESS
INDEMNITY INSURANCE COMPANY,

        Intervenor-Defendants

---------------------------------------------------------

        Examination of KENNETH KRATZ, taken at the
instance of the Plaintiff, under and pursuant to the
Federal Rules of Civil Procedure, before BREAH E. MADSON,
Registered Professional Reporter and Notary Public in and
for the State of Wisconsin, at Borgelt, Powell, Peterson
& Frauen, S.C., 735 North Water Street, Milwaukee,
Wisconsin, on January 8, 2013, commencing at 2:00 p.m.
and concluding at 5:36 p.m.

2

1                    A P P E A R A N C E S

2       FOX & FOX, by
        MR. MICHAEL FOX,
3       124 West Broadway,
        Monona, Wisconsin 53716,
4       appeared on behalf of the Plaintiff.

5       GODFREY & KAHN, S.C., by
        MS. LINDA S. SCHMIDT,
6       One East Main Street, Suite 500,
        Post Office Box 2719,
7       Madison, Wisconsin 53701-2719,
        appeared on behalf of the Intervenor-Defendants Peerless
8       Indemnity Insurance Company.

9       BORGELT, POWELL, PETERSON & FRAUEN, S.C., by
        MR. W. TED TORNEHL,
10      735 North Water Street, 15th Floor,
        Milwaukee, Wisconsin 53202-4188,
11      appeared on behalf of the Defendant.

12                       * * * * *

13                     I N D E X

14

15      Examination:                                    Page

16      By Mr. Fox........................................   4
        By Ms. Schmidt................................... 134
17

18      Exhibit Identified:                             Page

19      No. 1 - Letter Dated September 17th, 2010 From The
                Executive Committee Of The Wisconsin DA's
20              Association..............................  61
        No. 2 - Not Identified............................  --
21      No. 3 - Text Messages Exchanged Between Mr. Kratz
                and Ms. Price............................  80
22      No. 4 - Not Identified............................  --
        No. 5 - Not Identified............................  --
23      No. 6 - Copy Of Insurance Policy.................. 137

24                       * * * * *

25

**3**

1            I N D E X   C O N T ' D

2   Request:                              Page

3   By Mr. Fox - That Mr. Kratz Preserve The Cell
                   Phone That Formerly Contained The

4                    Text Messages That Are The Subject Of
                   This Case............................ 51

5

6                    * * * * *

7   Disposition Of Original Exhibits:

8   Exhibits 1, 2, 3 And 6 Attached To Original Transcript.
    Exhibits 4 And 5 Retained By Attorney Fox.

9

10                   * * * * *

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1          TRANSCRIPT OF PROCEEDINGS

2        KENNETH KRATZ, called as a witness

3   herein, having been first duly sworn on oath, was

4   examined and testified as follows:

5            EXAMINATION

6   BY MR. FOX:

7   Q   Mr. Kratz, could you state your name and give your

8       current residence address for the record, please?

9   **A**   **Kenneth Kratz, K-R-A-T-Z, 228 South University**

10     **Drive, Apartment No. 20, West Bend, Wisconsin**

11     **53095.**

12   Q   What's your date of birth?

13   **A**   **7/23/60.**

14   Q   Are you currently practicing law?

15   **A**   **Yes.**

16   Q   And how long have you been practicing in this most

17       recent stint?

18   **A**   **I opened my practice in August of 2012. Took on my**

19     **first client in the middle of September.**

20   Q   Approximately, when did you initially file a

21       bankruptcy proceeding?

22   **A**   **I believe it was March of 2012.**

23   Q   2012 or 2011?

24   **A**   **No, it was --**

25        MR. TORNEHL: I don't know.

**5**

1        THE WITNESS: '12.

2   BY MR. FOX:

3   Q   Okay.

4   **A**   **I'm sorry. The discharge was, I don't know if you**

5     **need that, but it was in July.**

6        MR. TORNEHL: July of 2012?

7        THE WITNESS: Yes.

8   BY MR. FOX:

9   Q   When did you first graduate from law school?

10   **A**   **1985.**

11   Q   From where did you graduate?

12   **A**   **Marquette.**

13   Q   Prior to coming here today, have you reviewed any

14       documents that might be related to this matter?

15   **A**   **No.**

16   Q   Prior to coming here today, have you had

17       discussions about this matter with anyone other

18       than your counsel?

19   **A**   **No.**

20   Q   What is the last document that you did review that

21       you can recall with regard to this case?

22   **A**   **Pleadings. I know I've reviewed the -- the**

23     **Peerless submissions in anticipation of filing**

24     **response by the 10th.**

25   Q   Is it your current intention to file a response?

**6**

1   **A**   **Yes.**

2   Q   In addition to reviewing the Peerless submissions

3       and some of the pleadings that you've referred to

4       in your preceding answer, did you review an

5       affidavit that you signed and submitted opposing

6       summary judgment by the State of Wisconsin?

7   **A**   **The declaration?**

8   Q   Right. Declaration.

9   **A**   **Yes, yes. Sent to me by my lawyer.**

10   Q   The area that I'm going to question you about right

11       now is going to trace your job history following

12       your graduation from law school in 1985.

13   **A**   **All right.**

14   Q   What was the first job you had after law school?

15   **A**   **I was hired as the assistant city attorney in the**

16     **City of La Crosse. I was promoted to deputy city**

17     **attorney the next year. In 1987, I then joined the**

18     **La Crosse County District Attorney's Office as an**

19     **assistant DA where I worked until 1992.**

20   Q   When you were an assistant city attorney for the

21       City of La Crosse, or when you became the deputy,

22       was Peter Kisken working in the City of La Crosse?

23   **A**   **I don't know. He certainly wasn't in my office.**

24     **And he might have -- he might have taken my job.**

25     **Pat Houlihan was the city attorney at the time.**

## 7

1 Q So Pat Houlihan was the person who hired you?
2 A **Yes.**
3 Q And at that time in the City of La Crosse, were
4 there just two legal counsel employed --
5 A **Yes.**
6 Q -- directly by the City?
7 A **I'm sorry, yes.**
8 Q Okay. When you joined the La Crosse County
9 District Attorney's Office, how many DAs were
10 there?
11 A **Five.**
12 Q And what types of cases did you handle for La
13 Crosse County? All types of criminal cases, or did
14 you tend to emphasize one area or another?
15 A **Yes. I did specialize in drug prosecutions, and**
16 **later became the sensitive crimes prosecutor.**
17 Q And why don't you define for me what a sensitive
18 crime was defined as, as that term was used in your
19 employment?
20 A **Sexual assault, both adult and child victims.**
21 Q Did you handle any domestic abuse prosecutions for
22 La Crosse County?
23 A **I'm sure I did.**
24 Q Did you receive any special training that was
25 related to domestic abuse prosecutions for the

## 8

1 County of La Crosse?
2 A **What do you mean by "special"? There were -- yeah.**
3 Q Training that emphasized that particular area of
4 prosecution and whatever unique considerations
5 there might be in the prosecution of such crimes?
6 A **Yes. In -- typically, in DA trainings, there will**
7 **be a number of topics that are held over a**
8 **several-day training time frame. Domestic abuse**
9 **prosecution issues was certainly included in those.**
10 **I may also have attended domestic violence**
11 **trainings that were held or specific to that issue.**
12 **Certainly, I have over the years, over the 25 years**
13 **of it.**
14 Q I'll probably --
15 A **That I've practiced.**
16 Q I will get into that momentarily. I'm going to try
17 to trace it chronologically, if I can.
18 A **I understand.**
19 Q So you would have, as early as 1987 and 1992, when
20 you worked for the La Crosse County District
21 Attorney's Office, you would have received some
22 specialized training in the area of domestic abuse
23 prosecution?
24 A **I think that's fair.**
25 Q And back in that initial five-year period when you

## 9

1 were involved in public prosecution work on behalf
2 of the district attorney's office, what type of
3 special considerations, if any, were reviewed with
4 you as they might pertain to domestic abuse
5 prosecutions?
6 A **I don't understand. I'm sorry.**
7 Q What, if anything, was unique about domestic abuse
8 prosecutions, or what types of considerations were
9 special to domestic abuse prosecutions that might
10 have been different than other types of
11 prosecutions?
12 A **At that time, in the late '80s, there were various**
13 **advocacy programs that were being developed. And I**
14 **remember in La Crosse, there was a Domestic**
15 **Violence Intervention Project, "DVIP," it was**
16 **called, that -- it was multi-jurisdictional.**
17 **Included law enforcement advocates, prosecutors and**
18 **the like. And so it really was, I guess what I'll**
19 **call, the beginning of the specialized units around**
20 **the state for DV prosecutions and working with DV**
21 **victims and those issues.**
22 **And so the difficulty I'm having,**
23 **Mr. Fox, is, you know, although those -- those**
24 **victim services developments began probably about**
25 **that time, they've certainly morphed, or grown,**

## 10

1 over the years, and really up through -- up through
2 when I left prosecution in 2010.
3 Q Let's talk about that growth then because it might
4 be easier than creating artificial lines of
5 distinction as to when something was -- there was
6 one consideration and there's a definite dividing
7 line, another consideration, et cetera.
8 How did either the specialty or the
9 emphasis of domestic abuse prosecution grow over
10 the years as you have referred to the growth in
11 your last answer?
12 A **Well, I think, systemically, or at least from**
13 **inside DA's offices, there's been the push to have**
14 **prosecutors specialize in those areas so that most**
15 **DA's offices, now, certainly, those that have the**
16 **staff to support it, have one prosecutor, perhaps a**
17 **team of prosecutors, that do nothing but domestic**
18 **violence prosecution.**
19 Q And in your observation, why did that occur? What
20 was special or unique to those types of
21 prosecutions that led to the emphasizing or
22 development of specialized units?
23 A **Well, my personal opinion about why those were**
24 **created was because of funding. There were funding**
25 **initiatives throughout the '80s and '90s that**

Case 1:10-cv-00910-WCG Filed 01/24/14 Page 5 of 56 Document 82-1

**11**

1 created positions for domestic violence, both
2 investigators and prosecutors. And so these
3 specialized units, I think, were created out of the
4 ability to do so. At the same time, that drug
5 unit, multi-jurisdictional drug units, were kind of
6 created, and those were emphasized. And so I don't
7 think it was so much a function of recognizing a
8 particular need to do that, but what resources that
9 were available to create those units.
10 Q And why, in your opinion, were resources created to
11 direct themselves to those types of prosecutions?
12 A I don't know. It was a change -- just a change of
13 -- at least I'm guessing here, a change of,
14 perhaps, political or fiscal priorities within the
15 various levels of government.
16 Q Well, let's talk about, not what you can guess at,
17 but what you may now. Were there unique aspects to
18 the prosecution of domestic abuse cases that did
19 not necessarily or generally apply to the
20 prosecution of other types of criminal cases where
21 there was a perpetrator and a victim?
22 A Yes, I think there are.
23 Q Let's go over those, if you would, please.
24 A Okay.
25 Q Identify those for me.

**12**

1 A Well, the most obvious is the relationship between
2 the victim and the perpetrator. These cases,
3 typically, are not single-event cases. Typically,
4 there is a partner of conduct. Domestic violence,
5 again, typically, is something that is progressive
6 in nature over the years.
7 There's a unique need, or at least I have
8 a sense that the system believes that there's a
9 unique need, for early intervention separation,
10 maybe even calling it a "cooling off period"
11 between a domestic violence event and reunification
12 of a family. Bond conditions, as example, or
13 emphasized -- a heavy emphasis on some immediate,
14 if not consequence, at least an immediate
15 separation, physical separation of a victim and a
16 perpetrator. And so mandatory arrest laws, things
17 like that, were created to encourage or even force
18 law enforcement, as an example, to incarcerate or
19 hold in a custodial setting a perpetrator of
20 domestic violence. Separate than other crimes.
21 Separate than, let's say, you know, property
22 crimes, theft, or something like that. There
23 aren't the same immediacy goals that are -- that
24 are furthered through either investigator or
25 prosecution efforts in other crimes that are in

**13**

1 domestic violence. And so those are the major
2 differences I can think of.
3 Q One of the major differences in domestic abuse was
4 a reluctance of the victim to come forward and
5 prosecute the crime, correct?
6 A It can be. Not always.
7 Q Well, it isn't always the case, but when I speak, I
8 speak generally of why there was a specialized
9 emphasis on domestic abuse, having practiced
10 criminal law for about 15 years before I did all
11 the civil law I did, and maybe even being a little
12 bit older than you are, I do remember the earlier
13 development of this. So correct me if I'm wrong.
14 Initially, it was, years ago, often times domestic
15 -- these crimes were not prosecuted because a
16 spouse was reluctant to prosecute a claim that
17 might put another spouse in criminal jeopardy,
18 correct?
19 A I think that's true.
20 Q And that was something that was more prevalent
21 among the victims of domestic abuse crimes because
22 of the nature of the familial relationship in which
23 domestic abuse crimes often took place, correct?
24 A I think that's true as well.
25 Q And so part of the emphasis in terms of the

**14**

1 specialization with regard to dealing with these
2 particular types of crimes was to set a -- to
3 create a unit that could deal with that reluctance,
4 assure the victim of their safety, and assure that
5 the prosecution would be handled in a very
6 sensitive manner?
7 A I'm sure that's true. I'm sure the collateral
8 benefit of these specialized units was to have the
9 prosecutor handling those particular kinds of cases
10 well aware of the dynamics of domestic violence
11 cases.
12 Q Another unique, or at lease more prevalent aspect
13 of domestic abuse cases, was that there were often
14 times more people involved than just the
15 perpetrator; let's say the physically harmful act,
16 and the victim of that physically harmful act.
17 There would be children potentially involved,
18 family separation potentially involved, correct?
19 A I'm not sure that was an emphasis at all in the --
20 this prosecution model. I think -- I think any
21 crime that happens in the home, there's a potential
22 for impact on children, whether it's domestic
23 violence or sexual assault or really any kind of
24 drug crimes, meth labs, those kind of things.
25 There's always the potential for impact, even

15

1 unintended consequences on children in the home.
2 But to finish my point, I don't think it's at all
3 unique to domestic violence. It's a function of
4 some crime happening that is going to have some
5 impact, financial, emotional or otherwise, on
6 children who might be in that sphere.
7 Q And I didn't say that it was unique to domestic
8 violence crimes. I used my words with great care.
9 I said that it was more prevalent in cases of
10 domestic abuse that a family was involved, that
11 children were involved, on average, than it was for
12 other types of crimes.
13 A And I'm saying I don't think that's true.
14 Q You don't think that's true?
15 A Absolutely not. It's a function of where the crime
16 happens. Crimes that happen in the home are going
17 to have children involved in more than, let's say,
18 an armed robbery at a bank.
19 Q What type of domestic abuse crime do you know of
20 that does not involve a family?
21 A Domestic situations are defined not just as
22 familial relationships. And so there can be a
23 boyfriend/girlfriend situation that certainly
24 aren't part of a same family that are categorized
25 as domestic violence.

16

1 Q What type of domestic abuse crime is defined under
2 the laws of the State of Wisconsin that does not
3 involve a relationship, whether it be a
4 boyfriend/girlfriend relationship, or it be a
5 familial relationship?
6 A There's always a relationship involved. That's the
7 definition. In fact, the word "domestic" describes
8 the relationship between the alleged perpetrator
9 and the victim.
10 Q So it's either a familial relationship or a
11 family-like relationship, such as live-in parties
12 who may live as, in effect, husband and wife?
13 A Most often, yes.
14 Q Is there any other crime that has the frequency of
15 that type of familial relationship that is present
16 by definition as it is present in domestic abuse
17 cases?
18 A Not by definition, no.
19 Q Okay. So would it be true that the domestic abuse
20 cases more often than the general category of other
21 cases involves a familial-type relationship?
22 A I don't know.
23 Q Have you ever taught the prosecution of domestic
24 abuse cases?
25 A As part of other cross-training, if you will, new

17

1 prosecutor training, yes.
2 Q And how often have you taught that?
3 A Less than ten.
4 Q Over what period of time?
5 A After I'd become DA. After 1992 and through,
6 probably, 2008.
7 Q Let me go back and continue on my questions related
8 to your career. Where did you go after you served
9 in your position, as you have identified it, with
10 the County of La Crosse?
11 A I was named by Governor Thompson to assume the
12 position of Calumet County district attorney in
13 1992. Later that same year, I was elected to my
14 first term as elected DA of Calumet County and
15 served in that capacity until 2010.
16 Q And where did you reside when you first took the
17 job as district attorney for Calumet County?
18 A City of Appleton.
19 Q What was your address there?
20 A On Sylvan Drive, S-Y-L-V-A-N. It was a rental. A
21 duplex, as I recall.
22 Q And what was your next address during the time that
23 you worked for Calumet County?
24 A I purchased a house on Diamond Court with my then
25 wife Jane, J-A-N-E.

18

1 Q And where is Diamond Court?
2 A In the town of Harrison, which is an area of --
3 Appleton area called Darboy, D-A-R-B-O-Y. For lack
4 of a better term, a suburb of Appleton.
5 Q That is a suburb of Sherwood. And how long did you
6 live in the home in Darboy?
7 A Until 1994. Excuse me. Let me -- it might have
8 been '95, but it was certainly in that time frame.
9 Q Where did you live after that?
10 A A duplex in the same Darboy area. My wife, Jane,
11 and I had separated, had gotten divorced, and I
12 lived in a duplex.
13 Q In where?
14 A Darboy.
15 Q In either residence that you maintained in Darboy,
16 did you keep any room in the home that was used for
17 either the storage of sexual-related literature or
18 -- let's just start out with that. That was used
19 for the storage of sexual literature?
20 A No.
21 Q Did you ever tell anybody that you had done so,
22 that you had a special room that you kept your sex
23 literature?
24 A No.
25 Q Did you ever tell anybody that you had a black

1   room?

2   A   No.

3   Q   In any home that you've ever existed in?

4   A   No.

5   Q   Did you ever tell anybody that you had a room where

6       you videoed sexual activities?

7   A   No.

8   Q   Do you know a woman named Amy Price?

9   A   Yes.  I'm familiar with her name.

10  Q   And how are you familiar with it?

11  A   She was a woman who had had a case in Calumet

12      County.  I don't know the year.  I think it was,

13      perhaps, '99.

14  Q   What type of case?

15  A   I believe it was a domestic abuse case.

16  Q   Did you prosecute that case?

17  A   I don't recall if I did or if my assistant did.  It

18      was in our office.  I know that.

19  Q   And did you ever speak with Ms. Price about that

20      case?

21  A   After the case was over, I did.  That's why I don't

22      recall having prosecuted it individually.  I just

23      recall my conversations with Ms. Price after the

24      fact.

25  Q   And where did the conversations that you had with

1       Ms. Price after the fact occur?

2   A   There were personal conversations, but also email

3       conversations, email exchanges.

4   Q   And where did Ms. Price live when you had these

5       email exchanges with her?

6   A   I believe she lived in the -- it was a Sherwood

7       area.  I don't know what township that was actually

8       in.

9   Q   Did you ever have sexual contact with her?

10  A   I don't know.  I went to her house on one occasion,

11      and I remember having kissed her.  I don't recall,

12      however, any sexual contact.

13  Q   Are you just saying you don't recall, or are you

14      denying that you had it?

15  A   I don't recall.  If there was sexual contact, it

16      was over the clothing.  There wasn't any

17      intercourse.  You know, I can rule out things that

18      wouldn't have happened, but I don't recall if there

19      may have been some sexual contact related to

20      kissing her on one occasion.

21  Q   Did you -- did she contact you to set up this

22      situation where this kissing and/or sexual contact

23      may have occurred?

24  A   She invited me to her home.

25  Q   And that would be her home in Sherwood?

1   A   Yes.  Well, wherever it is, yes.  She emailed me

2       from, I recall, her work, where she worked as an

3       accountant or some kind of bookkeeper.  I believe

4       she worked in Brillion at the time.

5   Q   Did you ever represent to Ms. Sherwood that you --

6   A   Ms. Price?

7   Q   Excuse me, Ms. Price, that you were involved with a

8       dominatrix, or knew of dominatrixes, and that was

9       an interest of yours?

10  A   I don't recall.

11  Q   Do you deny that you did so?

12  A   I don't recall.

13  Q   Were you ever involved with dominatrixes?

14              MR. TORNEHL:  Object.  I think that's

15      irrelevant, immaterial, and not likely to lead to

16      the discovery of admissible evidence.

17  BY MR. FOX:

18  Q   Were you?

19              MR. TORNEHL:  Don't answer that unless

20      you can tell me why this is relevant.

21              MR. FOX:  It's relevant to his

22      credibility.

23              MR. TORNEHL:  No, it's not.

24              MR. FOX:  Oh, yes, it is.  And there's no

25      exclusion -- he's not privileged to not testify to

1       this.  It's not harassing.  If he did, it's

2       something he's done, it may contradict other

3       statements he has made.  Those statements may be

4       relevant to the way he approached my client, and

5       the proceeding that is at issue in this case.  And

6       I believe I have a full right to ask it, and I will

7       go to the judge and demand that if I need to.  But

8       I don't think there's any reason he has a privilege

9       not to answer that question here.  It is calculated

10      to lead to discovery and that's all it has to be.

11              MR. TORNEHL:  I don't see where it's

12      calculated to lead to discovery.

13              MR. FOX:  How could it not be calculated

14      to lead to the credibility of --

15              MR. TORNEHL:  What does a dominatrix have

16      anything to do with your client and Mr. Kratz's

17      texting relationship?  You know?  Nothing.

18              MR. FOX:  Well, I'm not going to lay out

19      my entire case for you now, and if you want to lay

20      it out, and you want to tell him not to answer, I

21      don't have to make a proffer more than I have.  If

22      you think that the federal rules so narrowly

23      restrict my ability to inquire on a case that

24      involves a sexual approach to my client in his

25      position as district attorney, and I'm asking him

23

1  questions about what he said to another person who
2  was also a domestic abuse victim, and what
3  conversations he had with her, and how they might
4  be relevant to my client, it's your privilege to do
5  so.  We'll see what Judge Griesbach has to say
6  about it.
7          MR. TORNEHL:  Can we take a break and let
8  me talk to my client?
9          MR. FOX:  Sure.
10         (Short recess.)
11         MR. TORNEHL:  On the record, I don't know
12  if we need to hear exactly what the question was,
13  but I would allow questions that you have of
14  Mr. Kratz relating to his interactions with Amy
15  Price.  If it's a general question about other
16  women that have nothing to do with this case in any
17  way, shape or form, I'm not going to allow those.
18  So I forget -- I took it your question was more
19  general.  So I don't know if you want to restate it
20  or --
21         MR. FOX:  Well, my first question was one
22  where he said he didn't recall stating something to
23  her about a dominatrix, if I recall his answer
24  correctly.  I want to corroborate the truthfulness
25  of what she will testify he stated to her by asking

24

1  whether or not that was something that would have
2  been within reason for him to say.
3          MR. TORNEHL:  Okay.  You can ask him
4  that.
5          MR. FOX:  Could you read back my last
6  question?
7          (Last question read.)
8          MR. TORNEHL:  That's not the question I
9  would allow.  That's got nothing to do -- if it's
10  something to do with Amy Price, and you're getting
11  to anything that she may say to contradict the
12  truthfulness of what he may say, that's fine.
13         MR. FOX:  Well, this corroborates the
14  truthfulness of her representation that Mr. Kratz
15  discussed dominatrixes with her.  He cannot hide
16  behind, "I don't recall."  If, in fact, he is
17  involved with dominatrixes, that would lend
18  credence to the truthfulness of her statement that
19  he said that to her.  If he says here, in answer to
20  the question under oath, he's never been involved
21  with dominatrixes, or that wouldn't be a topic he
22  would have even thought of or discussed, then it
23  will potentially undermine her credibility when she
24  testifies that's what he says.  So I guess I'd lay
25  that out pretty clearly.  And I believe it either

25

1  corroborates or doesn't corroborate the
2  truthfulness of her statement regarding her
3  interactions as a domestic assault victim with him
4  in terms of sexual discussions.
5          MR. TORNEHL:  If she wants to testify
6  someday that he said things to her about
7  dominatrixes and he says he doesn't recall, that's
8  going to be the testimony.
9          MR. FOX:  Well, I don't think you can --
10  I'm sorry, Ted.  I don't think you can circumscribe
11  your -- I know you don't want him to testify to
12  this, but that's no reason to instruct him not to
13  testify.  I have a right to inquire into things
14  that affect his credibility, that test his
15  credibility with regard to these types of
16  interactions.  And if he, in fact, answers the
17  question one way, that will mean one thing with
18  regard to his credibility.  If he answers it
19  another way, it will mean another thing with regard
20  to his credibility, as it will mean with regard to
21  her credibility.
22         MR. TORNEHL:  So your question to
23  Mr. Kratz is:  Has he ever discussed dominatrixes
24  with anybody?
25         MR. FOX:  No.  My question is precisely

26

1  the question that I asked.  Have you been involved
2  with dominatrixes?  Precisely that.  Because that
3  will make the likelihood that he made the statement
4  she will testify that he made to her greater.
5          MR. TORNEHL:  I'm not gonna let him
6  answer that.  We can talk to the judge about that.
7          MR. FOX:  Okay.  We will.
8          (Exhibits No. 1 through 5 were marked.)
9  BY MR. FOX:
10  Q  Have you ever talked to anybody about dominatrixes?
11  A  **About dominatrixes or about domination and**
12     **submission?**
13  Q  Let's talk about dominatrixes first, and then we'll
14     talk about domination and submission.
15  A  **I'm sure I have talked to other people sometime in**
16     **my life about that, yes.**
17  Q  And why are you sure of that?
18  A  **I'm just sure I have.  I don't understand your**
19     **question.  I have had those conversations at some**
20     **point in my past.**
21  Q  With whom have you had them?
22  A  **I don't recall.**
23  Q  Have you had them with women?
24  A  **Yes.**
25  Q  Have you had them with women who were women you

27

1 encountered as a result of your prosecutorial
2 duties?
3 A Not that I recall.
4 Q Have you had them with women you haven't
5 encountered as a result of your prosecutorial
6 duties?
7 A Yes.
8 Q And with whom did you have such discussions?
9 A Women I've been in relationships with.
10 Q Have you had any such discussions with men?
11 A No.
12 Q You were disciplined by the state bar, correct?
13 A No, that's not correct.
14 Q Okay. You were charged with disciplinary offenses
15 by the state bar?
16 A They filed a formal complaint against me, yes.
17 Q Okay. And what was the outcome of that formal
18 complaint?
19 A It's still pending.
20 Q Okay. Was there a hearing related to that formal
21 complaint?
22 A Yes.
23 Q And what were the charges that were heard in that
24 hearing? What were you charged with doing that was
25 the subject of the evidence that was introduced at

28

1 that hearing?
2 A I entered no contest pleas to allegations of
3 conflict of interest, of sexual harassment, and of
4 demonstrating an offensive personality. The
5 hearing itself, Mr. Fox, was on the sanctions part
6 of the case, on the remedy, the penalty, if you
7 will.
8 Q Let's talk about what you have entered, a no
9 contest plea, as you've testified to.
10 A All right.
11 Q You said you entered a no contest plea to a
12 conflict of interest. What was the conflict of
13 interest that was the subject of that no contest
14 plea?
15 A It was regarding the text messages here. This -- a
16 conflict or, I guess, it was presented as a
17 potential conflict since there was no actual
18 conflict between my role as prosecutor and your
19 client as victim of a criminal case that I was
20 prosecuting.
21 Q So the no contest plea you entered with regard to a
22 conflict of interest was with regard to a potential
23 conflict of interest or a conflict of interest?
24 A Potential is what I understood. There was no
25 actual conflict as I had withdrawn from the case

29

1 before any -- anything else happened to the
2 prosecution of the case.
3 Q So that, to your understanding, there was no
4 conflict in your approaching somebody who was the
5 complainant in a sexual abuse case that you were
6 prosecuting, and on which that individual is
7 relying on you to prosecute? There was no conflict
8 with your duties and approaching them for a
9 potential sexual relationship?
10 A My understanding was that they -- the theory of
11 their case was whether it was an actual or
12 potential conflict under the rules didn't make any
13 difference. It's under the heading category of
14 "Conflict of Interest."
15 Q Well, let me just ask you this: Do you see a
16 conflict in approaching, if you were the prosecutor
17 in a sexual or a domestic abuse case, in
18 approaching the victim while that case is pending,
19 and you are supposed to be prosecuting the
20 perpetrator of that abuse? Do you see any conflict
21 with approaching that victim for a sexual
22 relationship?
23 A I see a conflict if there was work on the case.
24 That is, if there was something that I did with the
25 file after the -- in this case, electronic

30

1 communication had commenced. So what I'm saying
2 is, if I would have stayed on the case, let's say,
3 while the case was being prosecuted, while the case
4 was either being negotiated or while decisions were
5 being made on the case, that would not just be a
6 potential, that would be an actual conflict. In
7 this case, that didn't happen.
8 Q Okay. In your mind, if you're prosecuting a case,
9 and there was a woman who, as in this particular
10 case, had been abused -- and let's try to give a
11 little background of this case. This is a woman
12 that you understood had been physically attacked,
13 meaning my client?
14 A Yes. That was her allegation. That's right.
15 Q Well, did you disbelieve her allegation?
16 A I had no reason to disbelieve her, no.
17 Q Do you prosecute an allegation that you disbelieve?
18 A No, I had no reason to disbelieve her.
19 Q Okay. So you believed that she had been physically
20 attacked?
21 A I'm telling you that's what she said, and I had no
22 reason not to believe that.
23 Q Well, I'm just --
24 A I don't know whether --
25 Q I'm trying to make this an easy question. Did you

**31**

1   or did you not believe --
2 A   Really?
3 Q   Well, yeah, I am.  Did you or did you not believe
4     that she was physically attacked?
5 A   I believed she was the victim of an attack, yes.
6 Q   Okay.  And did you believe that as a facet of that
7     attack, that hands had been placed around her neck?
8 A   Yes.
9 Q   And did you believe that as a facet of that attack,
10     that in placing hands around her neck, the person
11     who was placing those hands around her neck was
12     attempting to compromise the flow of air into her
13     lungs?
14 A   Yes.
15 Q   So you believe that the person, who is my client,
16     was at least the victim of an attempted
17     strangulation?
18 A   That's correct.
19 Q   And if I understand you correctly, based on your
20     testimony today, what you're saying is that if that
21     person comes to you as a DA and asks you to
22     prosecute the case, it would not be a conflict for
23     you to solicit a sexual relationship with that
24     individual unless you took action on the case,
25     correct?

**32**

1 A   Until I do something with the case, from the point
2     that that communication happens, until I get off
3     the case, I believe it's not an actual conflict.
4     That's correct.  That's my --
5 Q   So as you sit here today, you -- for a victim such
6     as my client in that particular case, you have not
7     violated any conflict provision with her by asking
8     her to have a sexual relationship with you?
9 A   That's an absolutely separate question, Mr. Fox.
10 Q   Well, let me --
11 A   Absolutely different question.
12 Q   I didn't think it was, but I'll defer to your
13     objection.
14 A   Fine.  The rules of professional responsibility as
15     I've explained under the category of "Conflict of
16     Interest" suggest that that kind of behavior,
17     whether it's an actual or potential conflict, is a
18     violation of the rules of professional
19     responsibility.  I agree that, yes, it is.
20 Q   Why?  Why do you think it is?
21 A   Why do I think --
22 Q   It is, as you've just asked.
23 A   Right.  Because a prosecutor in that situation has
24     a personal interest, or the appearance of a
25     personal interest in the outcome of the case

**33**

1     exists, putting his personal interest in a
2     potential personal relationship, at least
3     potentially ahead of or separate from the
4     prosecution of the criminal case.  It's a conflict.
5 Q   And in terms of the personal interest that the
6     prosecutor has, does the prosecutor undertake a
7     prosecution of domestic abuse, such as the
8     prosecution you undertook for my client, have an
9     interest in fully prosecuting the matter to some
10     sort of conclusion that directs itself toward
11     either punishing the individual or acquitting the
12     individual who's accused of the domestic abuse?  Is
13     your interest in acquitting that individual?
14               MR. TORNEHL:  Object.  I've got to object
15     to the form of the question because it ended up
16     being very multiple.
17 BY MR. FOX:
18 Q   Well, let me withdraw that.  Did you have any
19     interest in acquitting the individual who attempted
20     to strangle my client?
21 A   If the evidence didn't support it, absolutely.  My
22     interest was for the search for the truth.  What
23     actually happened.  My interest is that of justice.
24     That is, if he did it, he should be held
25     accountable for it.  If he didn't do it, then he

**34**

1     should be acquitted of any involvement in that
2     prosecution.
3 Q   When you undertake the prosecution as you did in
4     the case involving my client, did you have an
5     interest in convicting the individual whom you
6     charged?
7 A   I don't think so.  We don't seek convictions as
8     prosecutors.  We seek just results.
9 Q   So when you make a prosecutorial decision to charge
10     somebody, you don't believe that you favor
11     conviction versus acquittal, one way or the other?
12 A   I think that's absolutely right.  I think when you
13     charge somebody, you believe the evidence supports
14     that.  If the evidence at some point changes, then
15     you don't continue to prosecute the case.
16 Q   Well, I'm sorry, I'm not following your answer.
17     When you undertake to charge somebody, you believe
18     you have enough evidence to convict that individual
19     of the crime beyond a reasonable doubt?
20 A   I think that's true.  It's only at a probable cause
21     level, but I will admit that when I took cases on,
22     I believed there was evidence available at the time
23     of charging to sustain a conviction beyond a
24     reasonable doubt, yes.
25 Q   So when you texted my client soliciting a sexual

35

1    relationship, you believed at the time you texted
2    my client that you had sufficient evidence to
3    convict him of attempting to strangle her beyond a
4    reasonable doubt?
5  **A    I never solicited a sexual relationship from your**
6    **client.**
7  Q    Okay.  I won't even characterize it.  When you
8    texted my client, and we'll let the jury decide
9    what you were or were not soliciting, when you
10   texted her, you believed you had enough information
11   to convict the alleged perpetrator of having
12   attempted to strangle her beyond a reasonable
13   doubt?
14 **A    Yes.**
15 Q    Putting your prosecutorial duties aside, is it, at
16   least in your opinion, ethical for a lawyer to
17   inquire into a potential sexual relationship with a
18   client they represent?
19 **A    Are you talking about hypothetically?**
20 Q    Right.
21 **A    Since my client was the State of Wisconsin,**
22   **hypothetically, attorney/client relationships are**
23   **prescribed by the rules of professional**
24   **responsibility, yes.**
25 Q    That doesn't answer the question.  Do you believe

36

1    it's ethical or not ethical to inquire into a
2    potential sexual relationship with a client?
3  **A    That is an answer.  By definition, it is an ethical**
4    **violation.**
5  Q    Okay.
6  **A    To -- not to inquire into, but to have a sexual**
7    **relationship with.  That's -- that's the rule, is**
8    **having sexual intercourse with a client.**
9  Q    I see.  So as far as you understand the rules in
10   the State of Wisconsin, the violation would only
11   occur if you had sexual intercourse with the
12   client?
13 **A    I'm saying that particular subsection of the rule**
14   **is only violated when there is sexual intercourse**
15   **between a client and an attorney, yes.**
16 Q    And what subsection are you talking about?
17 **A    I don't know.**
18 Q    Is there any subsection of the rules of ethics that
19   you're aware of that would preclude a lawyer from
20   soliciting a sexual relationship with a client,
21   whether or not they had intercourse?
22 **A    I don't know.  Hypothetically, which is what you**
23   **were asking me, I don't know.**
24 Q    Let me show what I've marked as Exhibit 1.  I'll
25   give you a copy, Ted.  Have you ever seen Exhibit

37

1    No. 1 before?
2  **A    I have.**
3  Q    Did you receive Exhibit No. 1 at any time through
4    the mail or some other way, such as hand delivery
5    or by electronic mail?
6  **A    It was in my office after I had returned from**
7    **inpatient treatment.  So the first time that I had**
8    **seen that this was ever mailed to my office was**
9    **in -- I believe it was November of 2010.  I was**
10   **aware, however, of it -- of its existence and it**
11   **having been drafted.**
12 Q    You mentioned inpatient treatment.  What inpatient
13   treatment were you involved in?
14 **A    The 21st of September, I was admitted to a**
15   **treatment facility in Hattiesburg, Mississippi,**
16   **where I stayed until, I think it was the 30th of**
17   **October.**
18 Q    And what were you being treated for there?
19 **A    A combination of behavioral addiction and chemical**
20   **dependency.**
21 Q    And what were the chemicals on which you were
22   dependent?
23 **A    Diagnosed as alcohol and benzodiazepine dependent.**
24 Q    How long --
25 **A    They might have even named the drugs, and I'm happy**

38

1    to do that if you're interested.
2  Q    Sure.
3  **A    Xanax and Ambien were the two benzodiazepines that**
4    **I had become dependent upon.  There was also, if I**
5    **can just complete the diagnosis, misuse of opiates,**
6    **Vicodin.**
7  Q    And this would have been a program you entered on
8    September 21st of 2010?
9  **A    Yes.**
10 Q    And you would have entered this program after you
11   learned that the texts which you had sent to my
12   client had become public knowledge?
13 **A    I understood those became public on the 15th of**
14   **September.  So in time, yes, it was after.  I mean,**
15   **if that's what you're asking.  Was it after?  Yes.**
16 Q    I think that's just what I asked you.  I said you
17   went into the treatment program after you knew that
18   these texts, which you had sent to my client, had
19   been released to the public, correct?
20 **A    Right.  It was also after the 4th of July, but --**
21   **your suggestion, I suppose, is that those two are**
22   **linked somehow, that those events are somehow**
23   **linked.  It was the 21st, which is after the 15th**
24   **of September, yes.**
25 Q    Correct.  I don't know what you mumbled in terms of

**39**

1 what I didn't ask, but you said something about the
2 4th of July. What are you mumbling about there?
3 What did you say about the 4th of July?
4 A **You asked, was it after these texts became public?**
5 **Yes. It was also after the 4th of July.**
6 Q Okay.
7 A **I didn't know if you're suggesting those two are**
8 **related.**
9 Q Did the 4th of July cause you to enter the program
10 you entered on the 21st?
11 A **It did not, nor did the release of these text**
12 **messages.**
13 Q Had you participated in any such program as the one
14 you entered on the 21st, prior to the 21st?
15 A **I had not.**
16 Q During the course of your treatment in the program
17 that you entered on the 21st, did you discuss the
18 text messages that you sent to my client?
19 A **Yes.**
20 Q And during the course of that treatment, did you
21 offer an explanation as to why you had sent those
22 messages to my client?
23 A **I was -- I don't think so. I was in a poor**
24 **position to know why I had sent them.**
25 Q I'm not interested in whether you were in a poor

**40**

1 position. My only question to you was: Did you,
2 during the course of that treatment, explain why it
3 was that you sent them or not, to your
4 recollection?
5 A **It's not "yes" or "no," Mr. Fox.**
6 Q Did you raise the treatment that you received on
7 the 21st in any way during the course of the --
8 part of the OLR proceeding you've described as a
9 hearing?
10 A **Yes. I told them of my treatment. Yes.**
11 Q And did you introduce your treatment records into
12 that hearing?
13 A **No.**
14 Q And why not?
15 A **They had been sent earlier to the OLR as part of**
16 **consideration of an alternate disposition for the**
17 **underlying causes of the behavior that was**
18 **complained of. In other words, OLR had asked for**
19 **those treatment records when deciding whether I**
20 **would be afforded the same programs that cocaine**
21 **addicted or alcohol dependent lawyers are when they**
22 **involve themselves in behavior. So they asked for**
23 **those as part of that decision, not as part of this**
24 **hearing at all. This hearing never received my**
25 **treatment records.**

**41**

1 Q Okay. Could you have introduced them into your
2 hearing if you wanted to?
3 A **I could have, sure.**
4 Q You could have introduced them as potential --
5 potentially relating to the mitigation in terms of
6 whatever penalty they would recommend for the
7 offenses to which you pled no contest?
8 A **If I decided to disclose those records, I could**
9 **have at that hearing.**
10 Q Who represented you during that hearing?
11 A **During that hearing, I represented myself.**
12 Q Okay.
13 A **I was represented earlier in the process by**
14 **counsel.**
15 Q Well, you did disclose those records to the OLR
16 prior to the hearing, correct?
17 A **That's correct.**
18 Q Let's just track that back. And in fact, let's
19 talk a little bit about where -- let's go back to
20 the texts and what happened after the texts. When
21 did you first become aware that my client had
22 received, or was claiming that she had received
23 texts from you that contained some sort of
24 inappropriate references?
25 A **I think it was the 3rd of November. It might have**

**42**

1 been the 2nd, but 3rd of November of '09.
2 Q '09. And how did you receive that information?
3 A **I was called by two members of the Wisconsin**
4 **Department of Justice.**
5 Q And who were they?
6 A **Kevin Potter and Roy Korte. A conference call.**
7 Q And what did they say to you?
8 A **They told me that a complaint had been made to law**
9 **enforcement that was being investigated. They gave**
10 **me the general nature of the complaint, the person**
11 **that was involved. And the purpose of the call was**
12 **to alert me that a criminal investigation had been**
13 **commenced and that this woman had now indicated the**
14 **communication between she and I was unwanted or**
15 **unwelcomed.**
16 Q And that --
17 A **I'm sorry. I took -- the very first issue that had**
18 **to be addressed was my continued involvement in the**
19 **prosecution, and whether a special prosecutor**
20 **needed to be appointed on the case.**
21 Q This is what Potter's saying to you?
22 A **This is what I said to them.**
23 Q Okay.
24 A **It was my --**
25 Q My question -- let's try to stick to the question

---

43

1 that I asked, and then I'll move onto the question
2 you might want to answer a little bit later. I
3 just asked what Potter said to you. And so I want
4 to make sure I understand the answer. You're
5 familiar with this drill. You've been through it a
6 number of times. You've tried many cases. All I
7 want to know is what he said to you.
8 A Well, then don't invite me to go ahead.
9 Q I didn't invite you to go ahead. I said: What did
10 Potter say to you?
11 A I understood that they told me about the
12 circumstances surrounding the complaint.
13 Q And they told you that my client found the texts
14 that you sent to her to be unwanted?
15 A I don't know if they used those words, but that she
16 had made a complaint to law enforcement and an
17 investigation was being commenced.
18 Q Did they identify the law enforcement agency to
19 which she made the complaint?
20 A I don't know that they did. They said DCI was
21 going to do the investigation.
22 Q Did they tell you anything else other than that my
23 client had complained about texts that you had sent
24 to her and that DCI was going to do an
25 investigation of you for a potential criminal

---

44

1 violation with regard to something?
2 A I don't believe they said anything else.
3 Q Okay. And what did you -- if you did understand,
4 what did you understand the criminal investigation
5 would involve?
6 A I didn't know.
7 Q Okay. What did you say to them?
8 A I asked them what the criminal investigation
9 involved.
10 Q And what did they say?
11 A They said they didn't know at this point.
12 Q What else did you say to them in that conversation?
13 A I told them that a special prosecutor needed to be
14 appointed on the case and that I informed them that
15 I was immediately taking myself off of the
16 prosecution of Mr. Konitzer's case.
17 Q And what was the next communication you had
18 concerning these messages, or the propriety of your
19 conduct, after that conversation you've just
20 described?
21 A I don't know. I don't know what came next.
22 Q What is the next conversation you remember?
23 A I remember a conversation with the lead
24 investigator in the case from DCI.
25 Q Who was that?

---

45

1 A Pete, I think it's Theilen, T-H-E-I-L-E-N, or
2 something like that. I called him and asked what
3 the status of the investigation was, and if he
4 needed to interview me as part of that
5 investigation, that I wanted to make myself
6 available to him.
7 Q So you wanted to be cooperative?
8 A Yes.
9 Q Did he interview you?
10 A He did not. He told me that the investigation was
11 concluded and that he had made his charging
12 recommendation decision.
13 Q Did he tell you what that was?
14 A Yes.
15 Q What did he say?
16 A He told me there is no criminal behavior implicated
17 here.
18 Q And approximately, when did Mr. Theilen convey that
19 to you?
20 A I don't recall. Sometime after the 3rd. I don't
21 know.
22 Q After November 3rd?
23 A Yes.
24 Q Before the end of the year?
25 A Within -- within 48 hours, I'm sure, Mr. Fox.

---

46

1 Q What was the next communication, if any, that you
2 can recall with regard to your having sent these
3 texts to my client?
4 A I recall a series of communications with the
5 Department of Justice employees, most particularly
6 Kevin Potter, head of -- I think it's legal
7 services. It's whatever the boss of criminal lit
8 is. Kevin and I were discussing the potential
9 public reaction should these text messages be, I
10 think the word he used was "leaked" to the media.
11 Kevin expressed -- these are
12 communications between -- after I talked to Pete
13 and before the 3rd of December. So really, through
14 much of November, it was Kevin's opinion that a
15 report needed to be made to the Office of Lawyer
16 Regulation.
17 Q And did you agree that needed to be done?
18 A Eventually, I did, yes. At first, I did not.
19 Q Okay. What did you say at first?
20 A At first, I asked Mr. Potter to identify what rule
21 had been violated. He was unable to do that, and
22 he told me, "I'm unable to do that." He said, "I
23 don't know if there's any rule violation, but that
24 should be up to the Office of Lawyer Regulation."
25 Q Okay. And approximately, when did you have this

---

47

1 conversation with Potter in relation to November
2 3rd? Before the end of the year?
3 **A Before the 3rd of December. Because eventually, I**
4 **made a self-report to the Office of Lawyer**
5 **Regulation. I think it was the 4th of December.**
6 Q And did anybody else urge you to self-report
7 between the time that Mr. Potter initially
8 suggested it and the time that you decided to do
9 it?
10 **A I remember asking several of my peers, prosecutors,**
11 **and members at the AG's office, and former members**
12 **of the AG's office, that, given this fact scenario,**
13 **is there a violation of the rules of professional**
14 **responsibility, No. 1, in their opinion, and No. 2,**
15 **did they believe that I should self-report? I was**
16 **asking for advice from my peers. I think there**
17 **were six or eight of them that I shared the facts**
18 **of this case with and asked for their opinion.**
19 Q And who were the six or eight with whom you shared
20 the facts of this case?
21 **A Do you want the names of them?**
22 Q I do.
23 **A Doug Haag, H-A-A-G, former head of criminal**
24 **litigation at DOJ.**
25 Q Was he working for DOJ at the time you shared this

48

1 with him?
2 **A I don't believe he was. He's retired. Dave**
3 **Wambach, who was working for criminal litigation.**
4 **Dave Perlman, who was working for the Department of**
5 **Justice at the time. Jim Camp, C-A-M-P, who was**
6 **the DA of Green Lake County at the time.**
7 Q Why did you approach Mr. Camp?
8 **A Same reason. I was asking for advice from my**
9 **peers.**
10 Q Was he a person you knew from prior contact?
11 **A Yes. These are all my peers, or at least were**
12 **close friends within the prosecution community.**
13 Q Did Mr. Camp testify for you?
14 **A He did not. Mr. Wambach did at the sanctions**
15 **hearing.**
16 Q I see. Okay.
17 **A Eric Peterson, also was in criminal litigation at**
18 **the time. Tom Fallon, also an attorney at criminal**
19 **lit at the time, and there may have been one or two**
20 **others. They would either be elected DAs or**
21 **somebody at the AG's office. They were all asked**
22 **their opinion.**
23 Q Did you show any of these individuals the text
24 messages which you had sent to my client?
25 **A I may have. I think, by that time, I had received**

49

1 **from Mr. Theilen the actual text messages, or at**
2 **least the -- some version, some written version of**
3 **those messages, and I may have shared them as email**
4 **attachments with one or more than one of these**
5 **people. If I didn't, I certainly described for**
6 **each of them the nature of these text messages.**
7 Q Well, I understand you may have described for them.
8 I'm really only interested --
9 **A I did.**
10 Q -- in whether you, in fact, let them read them for
11 themselves. And you can testify you did or did
12 not.
13 **A I don't recall.**
14 Q All right. So when you were asking -- and by the
15 way, when you were talking with these individuals,
16 Mr. Kratz, you did have the cell phone on which
17 these text messages were recorded, right?
18 **A I'm sorry? I had the cell phone? I don't believe**
19 **I had -- in fact, I'm sure I had not retained those**
20 **text messages. I had the phone. Once text**
21 **messages are deleted, it is virtually impossible to**
22 **resurrect them in cell phones.**
23 Q Really? And who told you that?
24 **A All kinds of forensic officers because that was**
25 **very important to me, to resurrect these. It's**

50

1 **almost impossible, given how they're stored -- not**
2 **that you need to know all this, but it's in these**
3 **giant servers in your phone company. That's where**
4 **text messages are stored. And so to resurrect**
5 **those is virtually impossible. That's what I was**
6 **told.**
7 Q Okay. Who told you that?
8 **A I don't know. I don't recall.**
9 Q When did they tell you that in relation to the text
10 messages we're talking about here, the ones that
11 were sent to my client?
12 **A Much after the fact.**
13 Q Okay.
14 **A When I tried to resurrect them later. It would**
15 **have been after -- it would have been after**
16 **November of 2010. So really, more than a year**
17 **later, I inquired about resurrecting text messages.**
18 Q Okay. I'm more interested in what happened at the
19 time that you were told that you had sent
20 inappropriate text messages, or at least from the
21 standpoint of my client --
22 **A I didn't still have them on my phone. I had**
23 **deleted them. I told you that.**
24 Q Why?
25 **A Because I'm in the habit of deleting all my text**

51

1　messages.

2　Q　Why?

3　A　Storage. The numbers of text messages that I would

4　　have on my phone would be large.

5　Q　So your -- you were told on or about November 3rd

6　　that you -- a person who was a victim of domestic

7　　abuse had complained about text messages that you

8　　had sent to her, correct?

9　A　In October, yes.

10　Q　Right. In October. And by that time, by November

11　　3rd, you had deleted them from your phone?

12　A　Absolutely.

13　Q　Pursuant to your usual and customary practice, in

14　　order to facilitate the storage capacity of your

15　　telephone?

16　A　That's correct.

17　Q　Do you still have that phone?

18　A　I may. The reason I say that is I have boxes of

19　　old junk drawers, and it may be in there.

20　Q　Well, if it is, I would ask that it be preserved

21　　because I'll subpoena it.

22　　　And the -- so as I understand it, since

23　　you had already deleted those text messages --

24　　well, strike that.

25　　　You talked to a number of individuals and

52

1　gave, at least, your descriptions of what it was

2　you were accused of doing to these other people who

3　had experience in prosecution, and they indicated

4　they didn't think there was anything unethical

5　about what you had done; is that correct?

6　A　No, that's not correct.

7　Q　Did any of them indicate that you had behaved

8　unethically?

9　A　Inappropriately. I don't know that they attributed

10　　any ethical violation to it, nor did they think it

11　　mattered. I think that was the consensus. That

12　　whether there is or not, that I should self-report

13　　to OLR. Self-report the behavior to OLR for their

14　　determination of whether it's an ethical violation.

15　Q　So the individuals, eight or so individuals you

16　　have identified for me to whom you gave your

17　　description of what you had done, suggested that

18　　you self-report to OLR?

19　A　I think that was the consensus, yes.

20　Q　Okay. And you also think that, at least the

21　　consensus was, that you had done nothing unethical,

22　　amongst these folks?

23　A　I don't think I said that.

24　Q　Okay. There wasn't a consensus as to what you had

25　　done ethically or not ethically. They were saying,

53

1　We think you ought to report this to OLR?

2　A　Yeah. The other part of that decision is

3　　Mr. Potter said, "If you don't, we're going to."

4　　"We" meaning DOJ. They believed they had a

5　　parallel responsibility to see that matter

6　　reported.

7　Q　Are you familiar with that responsibility?

8　A　I am. If they believed that there was a specific

9　　violation, hence my request of them to identify

10　　that for me please. Identify the violation.

11　　That's how that conversation occurred. He was

12　　unable -- and still to this day, nobody from DOJ,

13　　to me at least, has identified a specific rule

14　　violation.

15　Q　When is the last time you talked to somebody from

16　　DOJ with regard to whether or not they could

17　　identify whether there was a specific rule

18　　violation?

19　A　Sometime before March of 2010 when OLR dismissed

20　　the grievance.

21　Q　Okay.

22　A　That's the last time I believed that question was

23　　up for discussion.

24　Q　And with whom did you discuss it in March of 2010?

25　A　I don't know. I'm saying, up to that point it was

54

1　certainly with Mr. Potter. It was with Roy Korte.

2　　It may have -- and I know that I copied at least

3　　some of this correspondence to the deputy, attorney

4　　general, as well as Mr. Van Hollen himself.

5　Q　And did you ever -- by the way, did you ever show

6　　these actual texts to Doug Haag?

7　A　I don't know if I have or not.

8　Q　Did Doug think the types of texts -- well, I don't

9　　know. I guess he didn't see your texts, but by the

10　　way you were describing them, did he suggest to you

11　　he thought that was a good idea?

12　A　I don't recall what Doug said. I don't. He

13　　thought it was a good idea I self-report.

14　Q　Okay. So what I'm trying to figure out, between

15　　the conversation that you had with Potter, the

16　　initial one that you described, and then March 2010

17　　when you said OLR dismissed the --

18　A　Grievance?

19　Q　Grievance.

20　A　March 5th, they authored a letter.

21　Q　Right. Between that time, you had additional

22　　conversations with either Potter or Korte where you

23　　asked them to identify what specific violation they

24　　thought you were potentially guilty of, ethical

25　　violation, and they wouldn't identify that for you?

55

1  A  I think that's true.
2  Q  And how many times did you have such conversations
3     with them?
4  A  I don't know. And by "conversations," I'm quite
5     certain they would have been electronic in nature.
6     Email messages.
7  Q  At any time after that time, meaning after March
8     5th of 2010, did Mr. Potter, to your knowledge, get
9     involved in asking the OLR to reopen your case?
10 A  Yes.
11 Q  And did he do so, to your knowledge, thinking that
12    he didn't know one way or the other whether or not
13    he thought you had committed any specific ethical
14    violations?
15 A  Are you asking my opinion why he did it or not?
16 Q  Did you see any correspondence from him requesting
17    that the OLR case be reopened?
18 A  Eventually I did, yes.
19 Q  You did. And in that correspondence, did you see
20    that he identified for the OLR what he thought to
21    be specific violations that should be investigated
22    concerning your conduct?
23 A  Yes. He identified potential violations. That's
24    correct.
25 Q  And are they not -- at least among the potential

56

1     violations he identified, are they not three of the
2     violations to which you pleaded no contest?
3  A  I'm not sure. I know that they were among them,
4     yes.
5  Q  Well, let's move -- you say that the grievance was
6     dismissed in March of 2010, at least initially.
7     Did you know whether or not Ms. -- my client was
8     represented by counsel at all in terms of supplying
9     information in support of her grievance?
10 A  I don't know. I don't know the -- she eventually
11    filed her own grievance. This is separate and
12    distinct from my self-report.
13 Q  I understand.
14 A  So both of those were resolved in the same
15    correspondence of March 5th.
16 Q  Both of them were dismissed by the initial
17    investigator at the OLR level, right?
18 A  Yes.
19 Q  Do you know what an initial investigator is at the
20    OLR level?
21 A  Absolutely.
22 Q  Is that person an attorney?
23 A  I don't know.
24 Q  Okay. And that case was eventually reopened, the
25    OLR case, right?

57

1  A  Yes.
2  Q  And who did you believe was responsible for the
3     reopening of that case?
4  A  The director, Mr. Sellen.
5  Q  This would be Keith Sellen?
6  A  Yes.
7  Q  And why do you believe he was responsible for
8     reopening the case?
9  A  Because he said so in a press release. He said,
10    "I've decided to reopen and reconsider the
11    dismissed grievance."
12 Q  And did you believe that was somehow unfair to you?
13 A  Yes.
14 Q  And why?
15 A  It's the first time the OLR had reopened and
16    reconsidered a dismissed grievance of any kind
17    without an additional allegation of misconduct by a
18    lawyer. It was in response, in my opinion, to the
19    intense media frenzy that followed the leak of the
20    OLR decision to Mr. Foley from the AP sometime
21    before the 15th of September of 2010.
22 Q  And did you ever have a belief as to who was
23    responsible for what you have characterized as a
24    leak?
25 A  There were only three or four entities that knew of

58

1     its existence. My opinion was it had to be
2     somebody from within that group.
3  Q  And what groups are you talking about, or group?
4  A  The only people that knew about it was me, your
5     client, and her retained counsel.
6  Q  Who was her retained counsel at the time that the
7     news story came out?
8  A  If we believe her responses to interrogatories, it
9     was you.
10 Q  At the time the news story came out?
11 A  She says she directed all media inquiries to you,
12    Mr. Fox. That's the only reason I say that.
13 Q  Oh.
14 A  That's her interrogatory answer. The other --
15 Q  Oh. We'll have to amend that.
16 A  The other group that I'm talking --
17 Q  I didn't even know about it.
18 A  The other group that I'm talking about is somebody
19    within the Department of Justice.
20 Q  So you think I might have leaked this?
21 A  I don't know. Are you asking me, if you would have
22    known about it, would you have a reason to? Sure.
23    You gave your own little press conferences after
24    that, Mr. Fox.
25 Q  Oh, I did? Okay.

**59**

1 A You did, didn't you? I saw you on TV, despite your
2 client's claim she doesn't want any media
3 attention.
4 Q Right. That strikes you as odd, doesn't it?
5 A It certainly does.
6 Q And is there anything -- when you teach the
7 prosecution of domestic abuse cases, do you talk at
8 all about the desire of domestic abuse victims for
9 privacy?
10 A No. My expertise was not in domestic violence
11 prosecutions. I think I mentioned if I ever taught
12 that, it was in the course of training in a
13 larger -- it's what's called "new prosecutor
14 training." I was assigned by DOJ to teach all the
15 newly elected DAs and had for eight or ten years.
16 Q And are you aware of anybody else talking about the
17 desire for privacy of domestic abuse victims?
18 A Not any more than any other victims, no, sir.
19 Q Okay. Are you aware of any teaching about the
20 desire of any victims for privacy?
21 A Sure. The concept of revictimization is what --
22 Q What's that?
23 A It's when victims don't ask to be involved in the
24 criminal justice process, yet they are, either
25 through publicity in the case or otherwise, subject

**60**

1 to attention, unwanted attention. And usually,
2 that happens in sexual assault cases. Certainly
3 cases involving children is where the
4 revictimization issue comes up most often.
5 Q Do you ever use or recommend the use of initials in
6 the prosecution of cases, criminal cases of some
7 sort?
8 A I have.
9 Q Domestic abuse cases ever?
10 A Almost never.
11 Q Sexual assault cases?
12 A Almost always.
13 Q By the way, how many of the press conferences, as
14 you've described them, that I held, did you see?
15 A I don't recall.
16 Q Five?
17 A I don't know, sir.
18 Q Less than ten?
19 A I don't know.
20 Q Less than a hundred?
21 A You're a handsome man. I would have remembered.
22 Q You mean you would have remembered if I had a
23 hundred?
24 A Yes, I would have remembered that.
25 Q All right.

**61**

1 MR. TORNEHL: Off the record.
2 (Short recess.)
3 BY MR. FOX:
4 Q You had identified -- well, you hadn't identified
5 yet Exhibit 1. Why don't you identify that for us
6 for the record?
7 A Exhibit 1 is a letter dated September 17th, 2010.
8 I don't know who authored it, but it appears to
9 reflect a resolution of the executive committee of
10 the Wisconsin DA's Association.
11 Q Is the executive committee identified on the
12 letter?
13 A Well --
14 Q It doesn't appear so. Did you know who the
15 executive committee was?
16 A The exec board is -- it's the people on the left
17 side of the letterhead. I know that to be the exec
18 board because I was a former president of the DA's
19 Association.
20 Q Okay. And you receive a letter on September 17th,
21 2010, and that letter, as you said -- you did not
22 say you received it. You said you first saw it in
23 November of 2010, right?
24 A Right. I knew of its existence in September, on
25 September 17th.

**62**

1 Q How did you know of its existence?
2 A Media reports.
3 Q Okay.
4 A Mr. Dufour, president-elect, had given an interview
5 to the media about their action, and this letter
6 had been provided to media outlets again before --
7 well before I had ever received it.
8 Q And --
9 A And I know that because I got called at the office
10 on the 17th asking me to comment about it, and I
11 didn't have the letter in front of me. I was
12 irritated about that.
13 Q You had calls at the office on the --
14 A 17th.
15 Q The 17th?
16 A About this letter. I got calls about this letter.
17 The media had it in their hands, and I didn't have
18 it yet.
19 Q And when did you enter treatment?
20 A The 21st.
21 Q I see.
22 A The 17th was a Friday. I actually was on a plane
23 on the 20th, on Sunday the 20th.
24 Q When did you first contact this -- where did you go
25 for rehabilitation?

**63**

1 A Hattiesburg, Mississippi.

2 Q And when did you first contact this facility?

3 A On the 20th.

4 Q Of September?

5 A Yes.

6 Q So you contacted them after you heard about this

7 letter? I'm just saying, after?

8 A Yes. They were contacted after this letter was

9 authored, yes.

10 Q After the letter was authored, and after you heard

11 media comment about the fact that the letter had

12 been authored?

13 A That's right.

14 Q And after you heard media comment about the content

15 of the letter, and the criticism that was levied

16 against you for engaging in this series of text

17 messages with my client?

18 A That's all correct, yes.

19 Q Okay. And what was it that propelled you or

20 spurred you or gave you the impetus to contact

21 Hattiesburg on the 20th?

22 A Well, I didn't. I contacted a psychologist friend

23 of mine on the 20th, Dr. Frank Cummings. On the

24 morning of the 20th of September, I had thoughts of

25 suicide.

**64**

1 Q Okay. And what -- and what was the reason for your

2 thoughts of suicide?

3 A The media attention that had been in existence

4 between the 15th and 20th.

5 Q Okay.

6 A So it was -- it was the -- I'll call it the

7 "firestorm." The media firestorm that was in

8 existence at the time, directly related to me.

9 Q Directly related to you?

10 A Yes, sir.

11 Q And that -- was anything incorrectly reported about

12 your behavior in that media firestorm?

13 A Sure.

14 Q What was incorrectly reported about your behavior?

15 A From the very first headline and the very first

16 article when they used the term "sexting," it

17 mischaracterized my behavior.

18 Q Okay.

19 A And I believed that much of the reporting, much of

20 the comment, much of what's in this letter, much of

21 the criticism that was levied against me, was based

22 upon inaccurate information about what behavior I

23 had actually engaged in.

24 Q Okay.

25 A That having been said, much of it, certainly the

**65**

1 Information that had been leaked from the Office of

2 Lawyer Regulation decision was all accurate

3 information. The actual -- the actual text

4 messages themselves, having been reported at or

5 that time, were all accurate.

6 Q So what, in your mind, caused you the distress to

7 make you suicidal? The messages, or the fact -- or

8 the way they were reported?

9 A Well, really, the consequence upon me, upon my

10 reputation, upon my career. The -- what was, I

11 believed, the series of direct results from that

12 disclosure. It was a lot in a couple-day period to

13 absorb and to emotionally deal with.

14 Q Did you believe that the messages themselves did

15 anything to undercut your public image?

16 A Yes, absolutely.

17 Q And why?

18 A They were inappropriate.

19 Q In what way?

20 A They were insensitive. There's a number of ways

21 that they were inappropriate. They were, I think,

22 crass. I think they were certainly not befitting

23 either somebody who held the position that I held,

24 or from me, personally, or my background,

25 especially as it relates to my work with crime

**66**

1 victims.

2 Q Let's talk about that.

3 A And so -- go ahead.

4 Q I want to know that. What is it about her being a

5 crime victim in the situation you have testified

6 to, which is that you knew her to have been a -- or

7 believed her to have been a victim of domestic

8 abuse whose boyfriend had attempted to strangle

9 her.

10 A Yes.

11 Q What, if any, context did that give those

12 particular text messages that made them more or

13 less negative?

14 A Well, you're asking me about -- on reflection, why

15 was it that her being a crime victim was so

16 distressing to me? Or are you asking something

17 else, Mr. Fox?

18 Q Well, let me try to clarify. What I'm trying to

19 get is your thinking with regard to what makes her

20 different than anybody else in terms of what you

21 would anticipate her reaction would be to your

22 messages? Meaning, as a crime victim, as a person

23 who had come to you as a DA to prosecute somebody

24 she believed had attempted to strangle her to

25 death.

67

1    A    My personal reaction about her being a crime victim
2         was more a function of the work that I've done and
3         had done up to that point, really, in my 25 years
4         of professional life.  But more specifically, the
5         12 years that I've been the chairman of the Crime
6         Victim's Rights Board.  And so her status as a
7         crime victim was particularly distressing to me.
8              And, in fact, it was -- when I was first
9         alerted to this on the 3rd of November 2009, I
10        mentioned that to Mr. Porter and to Mr. Korte, the
11        fact that she was a crime victim and that she was
12        complaining about me was very distressing.  In
13        fact, I used the word "mortified" on that day.
14   Q    I understand you may be mortified for one thing.
15        You may be mortified that she's complaining about
16        you as -- what you perceive yourself to be, an
17        advocate for crime victims, right?  That was
18        mortifying to you, right?
19   A    Yes.
20   Q    Let's look at her side.  As a crime victim, did you
21        understand that she was likely to be more
22        vulnerable to the types of communications that you
23        sent to her as a victim of domestic abuse than
24        somebody who was not?
25   A    No.

68

1    Q    As a person who was reliant on you to the extent
2         she was to prosecute a domestic abuse case against
3         the person who attempted to strangle her to death,
4         did you believe she was more vulnerable than
5         somebody who was not in that position?
6    A    No.  And I can explain why, if you care.
7    Q    Not yet.  Not yet.  You'll get all the time in the
8         world when you're --
9    A    No, but it's specific to your client, not to
10        victims.
11   Q    Okay.  So let's talk about victims generally
12        because you've indicated specific to my client.
13   A    Okay.
14   Q    So generally speaking, you would expect that a
15        person who had been attacked by a significant other
16        who attempted to strangle them to death, who had
17        come to you as a district attorney to prosecute a
18        criminal case against that strangler, would be
19        potentially more vulnerable to communications of
20        the type you sent?
21   A    It depends.  That --
22   A    I understood.
23   A    I'm unwilling to make that link at all.  That isn't
24        -- in fact, it's not factually correct.
25   Q    Okay.  And your database for saying it's not

69

1         factually correct that these kinds of victims are
2         generally more vulnerable to the types of
3         communications that you made to my client, what's
4         your database for that?
5    A    My 25 years of experience.
6    Q    And what types of statistical analysis have you
7         done and/or published concerning your 25 years of
8         experience which suggests that somebody who was
9         reliant on you for a domestic abuse prosecution is
10        not more vulnerable to the types of communications
11        you sent to her?  What's your base for that?
12   A    Anecdotal only.
13   Q    Do you have any scientific base at all for that?
14   A    No, and I don't know that any exists.
15        I'm not asking whether any exists.
16   A    Do I have any?  No.
17   Q    Did you do any kind of a study of people to whom --
18        people who receive the kinds of texts that you sent
19        to my client, and how they reacted to the types of
20        texts that you sent as a prosecutor to my client?
21   A    What's your question?  Is there such a study or am
22        I aware of any?
23        Right.
24   A    Is there such a study?  I'm not aware of any.  No.
25   Q    Okay.  Did you do any?

70

1    A    No.
2    Q    Okay.  Did you send those types of texts to any
3         other person who was in the situation of my client,
4         who had come to you to prosecute somebody she
5         believed had attempted to strangle her to death,
6         another comparator, so to speak?
7    A    Not that I recall.
8    Q    So your conclusion about how people generally react
9         to the types of texts that you sent to her is based upon
10        a single incident, meaning the incident where you
11        sent them to her, which is the only incident you
12        know about, right?
13   A    This is the only fact situation of text messages to
14        a crime victim that I was aware of in my
15        experience, that's correct.
16   Q    Great.  You've had --
17   A    But I am aware of how victims generally respond to
18        communication, and are they more vulnerable.  That,
19        I can comment about.  Not just text messages.
20   Q    You've had 25 years of experience as a district
21        attorney, and you have never heard in those 25
22        years of a single other incident of somebody
23        sending the types of text messages to the victim of
24        a domestic abuse case that you sent to her,
25        correct?

**71**

1   **A**   **I think text messages have been around for, like,**
2       **five or six years, but --**
3   **Q**   Could you answer my question?
4   **A**   **No. Twenty-five years ago, there were no text**
5       **messages.**
6           MR. FOX: Could you read the question
7   back?
8           (Last question read.)
9           THE WITNESS: That's correct.
10 BY MR. FOX:
11   **Q**   Okay. And have you heard of anybody, whether it's
12       text messages, emails, written communications or
13       speeches, have you heard of any other DA speaking
14       to the victim of a crime, such as my client, in the
15       way that you spoke to her in those text messages?
16   **A**   **I'm not aware of any, no.**
17   **Q**   So the basis for your anecdotal conclusion is what?
18   **A**   **Is the 25 years of talking to crime victims and**
19       **assessing their vulnerability to communication.**
20       **Not text messages, to all communication. That, I**
21       **certainly have anecdotal evidence of.**
22   **Q**   And well, I'm not interested in that. I'm
23       interested in communication --
24   **A**   **I don't suppose you are, Mr. Fox.**
25   **Q**   Well, I am interested in communication from a DA.

**72**

1       You would agree with me that a DA who's responsible
2       for prosecuting the perpetrator of a crime is in a
3       different position than somebody else with regard
4       to the crime victim, right?
5   **A**   **I don't know what your -- what does that mean? In**
6       **a different position?**
7   **Q**   Well, tell me what your responsibility is to the
8       crime victim as the DA.
9   **A**   **To prosecute their case or their alleged**
10       **perpetrator.**
11   **Q**   And what, if any, responsibility do you have --
12   **A**   **I wasn't done, Mr. Fox.**
13   **Q**   Oh, I didn't understand. Go ahead.
14   **A**   **There's probably 25 different duties that you have**
15       **in a criminal case.**
16   **Q**   Well, tell me any duty that touches upon the duty
17       to communicate with the victim professionally and
18       in a way that will give the victim confidence in
19       your ability to act professionally.
20   **A**   **That, I'm happy to do. You have a duty as a**
21       **prosecutor to inform victims about the cases that**
22       **are coming up. You have the duty to inform them**
23       **about decisions you're making on the case. Not**
24       **just charging decisions, but plea negotiation**
25       **decisions. You have the duty to confer with a**

**73**

1       **crime victim. That is, to speak directly with a**
2       **crime victim about their feelings about the**
3       **disposition of a case, what they'd like to see**
4       **happen with the case. You have a duty to receive**
5       **from a crime victim their impact statement and**
6       **relay that to the court, if you believe that that**
7       **is something the victim wants to have happen. You**
8       **have obligations in a sentencing scenario to assist**
9       **the victim in providing live testimony at the time**
10       **of sentencing. That is, to provide not just a**
11       **written, but an oral impact statement. You have a**
12       **duty to protect a crime victim from physical harm.**
13       **That might come from the process, from the criminal**
14       **justice process. Precharging, at least some**
15       **counties have a duty to speak with a victim**
16       **regarding the actual charging decision itself.**
17       **They have what are called "charging conferences."**
18       **I never involved myself in those, but that can**
19       **certainly be -- so there are many duties,**
20       **responsibilities that a DA has that touch a crime**
21       **victim. There are also many that have nothing to**
22       **do with the crime victim, but I think I've**
23       **identified the ones that implicate or touch a**
24       **victim of a criminal case.**
25   **Q**   And do you know of any other district attorney

**74**

1       who's performed any of the duties you just
2       enumerated by using the types of communication that
3       you used when you texted my client?
4   **A**   **Do I know of any that have sent those kinds of text**
5       **messages?**
6   **Q**   Right. Those kinds of text messages which talk
7       about having a physical and/or romantic and/or
8       sexual relationship. Do you know of any other DA
9       in your 25 years who's done that?
10   **A**   **Right. None of those messages were the fulfillment**
11       **of any of those job duties that we just talked**
12       **about.**
13   **Q**   Do you know of --
14           MR. FOX: Could you read my question
15   back?
16           (Last question read.)
17           THE WITNESS: That have sent those kind
18   of messages? No.
19 BY MR. FOX:
20   **Q**   It is important that in prosecuting domestic abuse
21       cases, in fact, not only domestic abuse cases, but
22       prosecuting any cases, that you establish a trust
23       relationship between yourself and the victim,
24       correct?
25   **A**   **Most times that's true, yes.**

**75**

1 Q Okay. Is there any situation you can describe for
2 the people that are here present where you don't
3 try to establish a trust relationship between
4 yourself and the victim?
5 A Absolutely.
6 Q Okay. Tell me when you don't try to establish a
7 trust relationship.
8 A When it's clear that the victim is hostile to the
9 prosecution efforts that you have. You make
10 decisions, then, that are most often irrespective
11 of the wishes of that victim.
12 As an example, a woman who has been
13 sexually assaulted, or her child that has been
14 sexually assaulted that would normally, you would
15 think, be supportive of prosecution efforts.
16 Sometimes it presents a case where they try, in
17 fact, to revictimize their child, try to keep the
18 case against their perpetrator from being
19 prosecuted. And in those cases, the trust of that
20 particular woman, who is defined as a crime victim,
21 the mother of a child crime victim, is absolutely
22 irrelevant to prosecution efforts.
23 Q Okay. Other than situations where somebody is not
24 interested in furthering the prosecution, can you
25 name me a situation where you do not seek to

**76**

1 maximize the trust between yourself and a victim
2 who is fully supportive of the prosecution?
3 A No, Mr. Fox. I think trust of the victims, most
4 generally, is very important. I agree with you.
5 Q Okay. So in a situation such as my client, that
6 would be the type of situation where it would be in
7 your professional interest and in part of your
8 professional duty to encourage the trust
9 relationship between the victim and you as the
10 district attorney?
11 A Yes.
12 Q And in sending the text messages that you sent that
13 were the subject of -- the subject of this action,
14 were you attempting to encourage the trust between
15 yourself and my client?
16 A No. As I've mentioned, those text messages were
17 never sent to execute or prosecute, if you will,
18 any duties from within my office.
19 Q Let me show you what's been marked as Exhibit
20 No. 2.
21 A Did you want 1 back?
22 Q Well, actually, before we go off of 1, why don't we
23 go over that in a little bit more detail. Exhibit
24 No. 1, let's identify that for the record. You
25 said it's a Wisconsin District Attorney's

**77**

1 Association. Why don't you describe that
2 association for me.
3 A The DA's Association is a voluntary organization in
4 which most prosecutors, both elected and
5 nonelected, are members of -- they represent and
6 oftentimes advocate for the interests of DAs,
7 assistant DAs and assistant attorneys general in
8 Wisconsin. It is made up, primarily, of elected
9 DAs and assistant DAs, although there are
10 representatives on that organization sometimes in
11 nonvoting capacities from the Department of
12 Justice, from the Department of Administration, at
13 least in the context of the IT people and the like.
14 But generally, it's made up of prosecutors.
15 Q Okay. And to your knowledge, did the letter of
16 September 17th, 2010 address anything other than
17 the text messages you sent to a crime victim?
18 A No.
19 Q And in that letter of September 17th, 2010,
20 paragraph 2, it says, "Your behavior involving a
21 crime victim was repugnant and cannot be
22 countenanced." Do you see that?
23 A I do see that.
24 Q And did you agree with that?
25 A I don't know if I agreed or not.

**78**

1 Q Do you agree with it now?
2 A Yes.
3 Q Then, on the second sentence, it says, "Crime
4 victims have both statutory and constitutional
5 protections and are designed to protect them from
6 systemic or bureaucratic abuses that may
7 unintentionally flow from our criminal justice
8 system." Do you agree with that?
9 A Yes.
10 Q It says, "Our statutes provide sanctions to be
11 imposed upon any prosecutor or judge who does not
12 zealously guard victim's rights." Did you agree
13 with that?
14 A They don't have to zealously, but if you remove the
15 word "zealously," there are remedies for violations
16 of victim's rights, that's correct.
17 Q And it says on that document, "Your behavior was
18 neither unintentional nor innocent." Do you agree
19 with that?
20 A No.
21 Q And what don't you agree with about that?
22 A I think many of my behaviors were unintentional, at
23 least as they are using this word.
24 Q So what about the texts that you sent, if anything,
25 was unintentional?

79

1  A  The results and certainly the consequences that
2     flowed from them. I have to assume for the sake of
3     argument that they had a negative affect or impact
4     upon your client that was unintended.
5  Q  Do you believe that they didn't have a negative or
6     adverse affect on my client?
7  A  Are you asking me if I believe your client,
8     Mr. Fox?
9  Q  No. Do you believe that they didn't have an
10    adverse or negative impact upon her when she
11    received them?
12 A  I believe they did not have a negative impact upon
13    her when she received them. That's correct.
14 Q  Why do you believe she went to the police?
15 A  I can only speculate, sir.
16 Q  Well, why don't you speculate to me what you think
17    is the reason.
18 A  I'm unwilling to do that.
19 Q  Well, just tell me what you believe is the reason.
20 A  I don't know. It -- I don't believe it was because
21    she was fearful.
22 Q  Do you know of any other reason, other than she
23    found your behavior to be inappropriate, that she
24    went to the police to report your behavior with
25    regard to these text messages?

80

1  A  I can only speculate why she did that, sir.
2  Q  I'm asking you: Do you know of any other reason
3     other than the fact that she objected to these
4     messages?
5  A  I don't know. I have no way of knowing.
6  Q  Okay. Well, that's what I want to know. If you
7     know of any other reason, that's fine. But
8     you still -- even though you know of no other
9     reason, you don't believe that she went to the
10    police because she objected to the messages you
11    sent to her; is that correct?
12 A  I didn't say that. I said, at the time she
13    received these messages, I don't believe they were
14    unwelcome. That's what I said. I don't know later
15    or after the fact why she went and reported them to
16    the police. I don't know that. All I can do is
17    comment as to while the text messages were
18    occurring, her responses to my invitations that
19    these communications stop, those responses and the
20    like. That's all I can comment to you, Mr. Fox.
21 Q  Well, why don't we go over those text messages, and
22    then we can address what you claim are her
23    responses or how you characterize them.
24       Here is Exhibit No. 3. Those are the
25    text messages. I believe you've seen those prior

81

1     to today, have you not?
2  A  I have.
3  Q  When is the most recent time you saw them?
4  A  I don't know. It had to be in the course of the
5     OLR case. Although, it was before the hearing; so
6     sometime before June of 2012 is the last time I've
7     seen those.
8  Q  Okay. And the first text message that's on the
9     sheet -- by the way, so you have not seen them
10    within the last couple of weeks; is that correct?
11 A  That's correct.
12 Q  You haven't prepared yourself for this deposition
13    by reviewing those text messages?
14 A  That is correct.
15 Q  So let's go through the text messages themselves.
16    There appears to be a text message of 10/20/09.
17    And this was just -- how much time had -- by the
18    time you sent this text message that is dated
19    10/20/09, how much time had you spent with this
20    woman, my client?
21 A  That day?
22 Q  No, no. Prior to that time, total hours.
23 A  I don't know. Less than two.
24 Q  Less than two hours. Okay. And during the time
25    that you spent to her -- with her, prior to sending

82

1     the text message that is listed as 10/20/09, did
2     you discuss with her anything about her potential?
3  A  I may have on the 20th, in our face-to-face
4     conversation.
5  Q  Okay. And what did you say about her potential to
6     her when you had your face-to-face conversation
7     with her, if anything, that you can recall?
8  A  I don't recall. I said, "I may have."
9  Q  Okay. And when she left the meeting with you, the
10    last meeting that you had with her prior to October
11    20th of '09, did she indicate any desire that you
12    text her?
13 A  Prior to the 20th or on the 20th?
14 Q  Prior to you actually texting her, did she say,
15    "Would you please text me?"
16 A  I don't recall.
17 Q  Did she say, "Would you please contact me by
18    telephone?"
19 A  I believe she did.
20 Q  Okay. Did she -- you believe she did. I want to
21    know: Do you recall, did she say that or not?
22 A  I recall her giving me her private cell phone
23    number.
24 Q  Well --
25 A  But --

83

1 Q Did you ask her, as part of your duties as the DA,
2 for contact information so that if you needed to
3 get ahold of her in the course of your professional
4 duties, you could?
5 A That's right.
6 Q So she gave her telephone number to you in response
7 to your professional request for contact
8 information, correct?
9 A I think that's true, Mr. Fox, yes.
10 Q Okay. And was that -- did you have any obligation,
11 professionally, to keep that information, her
12 contact information, private?
13 A I don't believe so.
14 Q Okay. So could you have disseminated her private
15 phone number on the street?
16 A I don't know. Would I have? No, I never -- never
17 would I do that. Would I be prohibited from doing
18 that? I don't know.
19 Q I'm just talking about you as a professional
20 prosecutor and DA.
21 A I wouldn't do that, no, if that's what you're
22 asking.
23 Q Right. You get a chance to get her phone number
24 because she's come to you as a crime victim, and
25 you request, as part of your duties to serve her

84

1 request that you prosecute the case, "Give me your
2 number," right?
3 A Yes.
4 Q Okay. And but for the fact that you were the DA,
5 and she was a crime victim who had come to you,
6 there would have been no reason you would have had
7 her number. You wouldn't have even known her,
8 right?
9 A I don't know if that's true or not.
10 Q Okay.
11 A The conversation on the 20th was not entirely
12 professional. It was personal in nature as well.
13 Q Well, that wasn't my question. My question is:
14 But for the fact that she had a -- she was
15 reporting a crime to you as a public prosecutor,
16 that would be -- you wouldn't have known her?
17 A That's how I met her.
18 Q Right.
19 A I don't know if I -- I suspect not.
20 Q Right.
21 A I don't know.
22 Q And do you think, and did you believe as a person
23 who is schooled in the law and had this position of
24 public authority, that you were the type of person
25 that someone in the situation of my client would

85

1 likely respect or defer to with regard to
2 prosecutorial decisions?
3 A I don't know if that's true or not.
4 Q Okay. And what, if anything, did she say in any
5 conversation preceding this text message of
6 10/20/09, that in any way indicated an interest in
7 having a relationship with you, other than as the
8 person who was going to do the public's duty to
9 prosecute the crime that had been visited upon her?
10 A Yes. I believed that day that that certainly
11 happened.
12 Q I want to know what happened that you're
13 characterizing as that. And that's the question I
14 asked. What did she say that was any -- that led
15 you to believe that she wanted you to be something
16 other than the person who was going to prosecute
17 her boyfriend for attempting to strangle her to
18 death?
19 A Ms. Van Groll told me that she currently did not
20 have a boyfriend and that was not in relation to a
21 specific question. She volunteered that. I
22 perceived that as being flirtatious, as being
23 something leading to an interest in a personal
24 relationship. She told me what she liked to do
25 when she went out. She told me she went to the

86

1 bars a lot. She told me she drank a lot. She told
2 me that she had been fired recently from her job at
3 Little Hearts Day Care. She told me that she had
4 problems with past relationships. That is, with
5 people that she has dated in the past, with
6 their -- I think we talked about even -- I don't
7 want to guess here, but it was something about her
8 past relationships.
9         She talked about the hope in the future
10 of her going into some kind of a law enforcement
11 capacity. She talked about her wanting to be a
12 park ranger, or something like that, later on in
13 the future. And it was a very personal, very
14 flirtatious manner in which she spoke both to me
15 and with me during that client confer meeting that
16 we had on the 20th.
17 Q So did she tell you she wanted to be a park ranger
18 in a flirtatious way?
19 A I don't know if that --
20 Q Did she tell you she wanted to be a law enforcement
21 officer in a flirtatious way?
22 A I don't know.
23 Q Did she tell you that she drank too much in a
24 flirtatious way?
25 A I think that's fair. I think that was during the

1 course of, Here's what I like to do when I go out,
2 when I socialize. I think her term was, "I like to
3 party. I like to go to bars." I remember her
4 expressing the behavior of what I'll call "bar
5 hopping," but it's going bar to bar, not going to
6 just one bar, and she described her enjoyment in
7 drinking alcohol. I thought she did that in a
8 flirtatious manner, yes.
9 Q   I see. What was flirtatious about describing -- do
10    most people who drink alcohol, at least in your
11    experience, enjoy it? Do they do it because they
12    enjoy it?
13 A   Sometimes. Sometimes they do it to medicate.
14    Sometimes they do it for a lot of reasons. My
15    point is, the manner in which she told me, her body
16    language and her manner about her, I perceived as
17    being flirtatious.
18 Q   I understand. But I want to know, what body
19    language are you talking about that flirted with
20    you?
21 A   I can't identify specific body language. I can
22    only characterize it for you --
23 Q   You answered that question.
24 A   I answered it. I don't know.
25 Q   All right. And anything about her manner that

1 flirted with you?
2 A   I don't know. I don't remember.
3 Q   Okay.
4 A   Giggling, laughing, that kind of nonverbal, if you
5 would, noncommunicative behavior. She was engaged
6 in that during this meeting, during this
7 conversation.
8 Q   Well, giggling and laughing, as you're describing,
9    is noncommunicative behavior?
10 A   Nonverbal.
11 Q   Okay. Do people occasionally giggle and laugh who
12    are nervous because of the situation they're
13    involved in?
14 A   I don't know.
15 Q   Okay. Well, let's talk about the next thing. You
16    write to her, "It was nice talking with you. Feel
17    free to text me between 8 and 4 if you are bored."
18 A   Mm-hmm.
19 Q   Okay. Is that the type of open invitation you had
20    ever given anyone who was a domestic abuse victim
21    prior to talking to my client?
22 A   I've explained that none of these are job-related.
23 Q   I'm not asking the question you are answering. I'm
24    asking these questions so I can get particular
25    answers to the particular text. So please answer

1 my question as I asked it.
2 A   All right. Have I ever sent a text message saying,
3 "Feel free to text me between 8 and 4 if you're
4 bored," to a crime victim before that date?
5 Q   Correct.
6 A   Not that I recall.
7 Q   Have you ever told any other crime victim prior to
8    that day to feel free to contact you between 8 and
9    4 if they're bored?
10 A   I don't know, sir.
11 Q   Okay. Then you said, "You have such potential."
12       Prior to meeting my client, have you ever
13    contacted a crime victim and told them in the first
14    communication you had after your interview with
15    them that they had such potential?
16 A   I don't believe so, but I doubt it.
17 Q   And then it says, "See you. Ken. Your favorite
18    DA."
19 A   Yes.
20 Q   And did she indicate to you prior to leaving your
21    presence, when she was talking to you, that you
22    were her favorite DA?
23 A   No.
24 Q   Did you know whether or not, as a result of the
25    conversation that you had with her, whether she had

1 ever had any encounters with a DA before?
2 A   No.
3 Q   Is one of the duties that you have with regard to
4    vetting a domestic abuse victim is to ask them
5    questions about what prior experience they may or
6    may not have had with the criminal justice system?
7 A   These communications were not part of the vetting
8 process.
9 Q   I'm not asking --
10 A   And I'm not going to have you mix up saying --
11 Q   I'm not asking --
12 A   -- "Here's what you said, and oh, by the way, when
13 you do this with victims." That's unfair, Mr. Fox,
14 and if I have to object to it, I'm going to.
15 Q   Well, you can object to what you want, and then
16    we'll deal with that with the judge, and he'll tell
17    you whether your objections are appropriate. I
18    guess the two of you will make objections. But the
19    question I said: On any occasion prior to this, is
20    one of the duties -- excuse me. That wasn't
21    actually the question I asked.
22       The question I asked was: Your duties as
23    a DA, is one of the things that you explore as a DA
24    when you're vetting a victim of domestic abuse is
25    what, if any, experience they've had in the

91

1   criminal justice system?
2  **A   Sometimes it is, yes.**
3   Q   Isn't that part of the factual information you want
4       to know so that you can be most effective in
5       managing their participation if it's their first
6       time, second time, third time, in the criminal
7       justice system?
8  **A   Sometimes, yes.**
9   Q   Okay.  That's what I'm asking.
10 **A   Sometimes.  Not all the time.**
11  Q   All right.  Did you, in fact, vet her for any prior
12      experience she had with the criminal justice
13      system?
14 **A   I don't recall, no.**
15  Q   Okay.  She responds, "Don't worry about me.  My
16      motto is just keep going.  And thanks for
17      everything."
18 **A   Yes.**
19  Q   Did you believe that was flirtatious?
20 **A   Yes.**
21  Q   Okay.  And then the next one is from you at 3:55.
22      "I'm not worried.  "Well, maybe just a little.  I'm
23      more curious what made me text you?"
24          Why did you write that text to her?
25 **A   I don't know.**

92

1   Q   And she responds, "Cause you're a nice person."
2  **A   Yes.**
3   Q   Now, at that point in time when she's responding to
4       you, you realize that you are the person on whom --
5       in whom she's reposed the trust to prosecute the
6       person who attempted to strangle her to death,
7       right?
8  **A   Yes.**
9   Q   Okay.
10 **A   It had nothing to do with these messages.**
11  Q   Keep adding what you want to add, but I'm going
12      to just --
13 **A   I intend to, Mr. Fox.**
14  Q   -- ask my question.
15 **A   Go ahead.  You keep asking your questions.**
16          MR. TORNEHL:  He's answering the
17      questions.
18          MR. FOX:  Well, he's adding -- he starts
19      to answer the question, and then he adds what he
20      want to add afterwards, which he knows is
21      inappropriate.
22          MR. TORNEHL:  Well, you know --
23          MR. FOX:  It is.
24          MR. TORNEHL:  Well, I object to your
25      comments like that.

93

1           MR. FOX:  Well, I object to him doing
2       this, and if we have to take this in front of a
3       magistrate, I'll go in front of a magistrate so we
4       can just get an answer to the question I asked.
5           MR. TORNEHL:  He answered it.
6           MR. FOX:  I'm perfectly willing to do
7       that.
8           MR. TORNEHL:  He answered it.
9   BY MR. FOX:
10  Q   Well, let's just move on from there.  "Because
11      you're a nice person."
12 **A   Yes.**
13  Q   And you interpreted that as flirtatious?
14 **A   Very much, yes.**
15  Q   Okay.  Ken:  "Okay.  We'll go with that answer.
16      Thanks for putting up with me so far.  I wish you
17      weren't one of this office's clients.  You'd be a
18      cool person to know."
19          That's what you said to her, correct?
20 **A   That's what I texted, yes.**
21  Q   All right.  And she said, "Thanks."
22 **A   She never said anything.  She texted back,
23      "Thanks."**
24  Q   Texted, "Thanks"?
25 **A   Yes.  There were no face-to-face communications.**

94

1   Q   Okay.  And you believe that the "thanks" was
2       flirtatious?
3  **A   I believe it was, yes.**
4   Q   Okay.  And on 10/21/09 at 10:48 a.m., you texted
5       her, "No text yet today?  I'm feeling ignored.  Are
6       you even up yet?"
7           Do you see that?
8  **A   I do see that.**
9   Q   And was that an attempt by you to reconnect with
10      her?
11 **A   It was a personal text message to somebody I was
12      attempting to develop a personal relationship with,
13      yes.**
14  Q   And by the way, you've signed a number of
15      affidavits in this proceeding, haven't you?
16 **A   I've signed a declaration.**
17  Q   You signed a declaration.  And did you sign -- I
18      thought you signed an affidavit initially when you
19      were represented by your prior counsel.  Did you
20      sign an affidavit?
21 **A   It might have been another declaration, but it was
22      something about the factual basis for the --**
23  Q   Summary judgment?
24 **A   -- summary judgment motion.**
25  Q   Okay.  So you signed two declarations where you're

**95**

1　　swearing and/or affirming that the information
2　　there is true on those declarations, correct?
3　A　Yes, sir.
4　Q　And you are still affirming that the information
5　　that you affirmed in those two submissions to the
6　　court is true and correct, right?
7　A　I'm sure I am, yes. Nothing's changed.
8　Q　Okay. Then she says, "Yes, I have a fever. I hope
9　　it's not H1N1."
10　　　What's H1N1?
11　A　I think it's the -- some virus. The swine flu, I
12　　think, if I'm not incorrect in that.
13　Q　Okay.
14　A　But that's what she texted me that morning, that's
15　　correct.
16　Q　And did you believe that that text was flirtatious?
17　A　I believe it was personal in nature. I don't know
18　　if it was flirtatious. It was about a fever.
19　Q　Okay. And you text her back and said, "Oh no. I
20　　hope you feel better. Do you need me to bring you
21　　some chicken soup?"
22　A　Yes.
23　Q　And then she texts back, "Laugh out loud. No I
24　　don't want anything to eat."
25　A　Yes.

**96**

1　Q　Did you believe that was flirtatious?
2　A　Very much, yes.
3　Q　Okay. Then you said at 11:23, "How about a
4　　margarita? That has some fruit juice in it."
5　　　And she said, "Laugh out loud. Too
6　　funny?"
7　　　Did you believe that was flirtatious?
8　A　Yes.
9　Q　Okay. And then you said, "Seriously I hope you
10　　feel better soon. Please keep in touch. It's
11　　maybe not the wisest thing I can do, but you are
12　　awfully sweet. So don't tell anyone, ok?"
13　　　And she responds, "I'm telling everyone.
14　　JK, Haha, and thanks?"
15　　　And you believe that was flirtatious?
16　A　Yes.
17　Q　And did you believe at the time that you were
18　　texting her and getting these responses from her
19　　that she was at all times reliant on you to
20　　be -- on your good will to be the prosecutor of the
21　　person who had attempted to strangle her to death?
22　A　I don't understand your question.
23　Q　At all times while you were exchanging text
24　　messages with her, did you believe she was likely a
25　　person who believed herself to be reliant on you to

**97**

1　　prosecute the person who had attempted to strangle
2　　her to death?
3　A　Do I now believe that, or was I thinking that at
4　　the time?
5　Q　No. Do you believe that now?
6　A　Yes. Now I believe that. Yes.
7　Q　Okay. Now, at 11:37, you write, "I know this is
8　　wrong. I am such an honest guy and straight
9　　shooter. But I have to know more about you. Does
10　　that make sense to you? I bet you get this a lot.
11　　　Do you see that?
12　A　I do see that.
13　Q　And then you write to her, "Are you the kind of
14　　girl that likes secret contact with an older
15　　married elected DA, the riskier the better? Or do
16　　you want to stop right now before any issues?"
17　　　What did you mean by that?
18　A　It's self-explanatory. What do you mean, what did
19　　I mean by that?
20　Q　What did you mean?
21　A　I was asking her if she wanted to stop
22　　communication with me at that moment. Just what it
23　　says. "Do you want to stop right now?"
24　Q　And she said, "Dono."
25　A　That's correct. Immediately.

**98**

1　Q　And you believed that was flirtatious?
2　A　I do believe that was personal in response. She
3　　had the ability to say "No" or "Yes, I want to
4　　stop." I believe very much that response there is
5　　inconsistent with somebody who was claiming an
6　　unwelcome text exchange.
7　Q　Are you familiar with the term "trolling"?
8　A　I've heard of it.
9　Q　What does it mean to you?
10　A　It depends in what context, sir.
11　Q　Well, what are the types of context in which you
12　　have used that term?
13　A　Types of context usually is individuals that are
14　　out looking for individuals to have some kind of
15　　connection or relationship with, or something in a
16　　dating capacity, possibly.
17　Q　And you've engaged in trolling, haven't you?
18　A　I think I have, yes.
19　Q　On how many occasions?
20　A　I don't know.
21　Q　At the time that you were writing to her, how many
22　　occasions had you been trolling?
23　A　I don't know.
24　Q　1:35 p.m. "I need direction from you. You are a
25　　risk taker and can keep your mouth shut and you

99

1  think this is fun."
2  Okay. I want to ask you: What did she
3  say that said she was a risk taker and can keep her
4  mouth shut?
5  A  **That was a question. That's the first half of the**
6  **question. The question is written, "Either you're**
7  **a risk taker and can keep your mouth shut and think**
8  **this is fun, or you think a man twice your age is**
9  **creepy and should stop."**
10  Q  Okay. And she writes back to you, "I have to think
11  about that."
12  A  **That's exactly what she wrote.**
13  Q  Now, did you think, at that point, looking back on
14  that as a prosecutor, that if a prosecutor's
15  writing you that, that it would be reasonable for
16  her to have said, "You know, maybe you better not
17  act as a prosecutor on my case"? By the time you'd
18  written all the things we've gotten up to thus far,
19  do you think that would have been reasonable for
20  her to do?
21  A  **As a victim or as a person who wanted a -- -**
22  Q  As a victim of a prosecution where the prosecutor
23  is writing her these kinds of communications.
24  A  **I don't know.**
25  Q  Do you know whether or not she wanted to curry your

100

1  favor as a result of the fact that you were the
2  prosecutor of the person who attempted to strangle
3  her to death?
4  A  **I don't know.**
5  Q  Did you ask her?
6  A  **I'm sorry?**
7  Q  Did you ask her whether or not --
8  A  **I asked her if she wanted to stop the communication**
9  **as directly as I --**
10  Q  Did you ask her whether or not she felt pressured
11  in any way by you because you were responsible for
12  the prosecution of the perpetrator who had
13  attempted to strangle her to death?
14  A  **No, I never asked her that.**
15  Q  Why not?
16  A  **I don't know. I don't know in -- or where you**
17  **suggest I should have asked that question or even**
18  **thought that she wanted to curry my favor. That**
19  **thought never crossed my mind.**
20  Q  Well, that might clarify whether or not she was
21  flirting with you or just acquiescing to your
22  attempts to start this personal relationship,
23  right?
24  A  **I don't know.**
25  Q  So let's look at this. "Yes, you are a risk taker

101

1  and can keep your mouth shut and you think this is
2  fun, or you think a man twice your age is creepy so
3  stop."
4  She answers, "I have to think about
5  that?"
6  A  **Yes.**
7  Q  And you say, "OK. No problem. Either way I think
8  you are very nice. I am very smart, but know this
9  is all up to you and really does depend how close
10  to the edge you live."
11  First of all, what did you mean you were
12  "very smart"? What were you talking about?
13  A  **I don't know. What do you mean, what am I talking**
14  **about?**
15  Q  Yeah.
16  A  **The words speak for themselves. It says, "I am**
17  **very smart, but I know this is all up to you."**
18  Q  I'm just trying to put "smart" in context. Were
19  you using smart -- were you trying to tell her --
20  A  **Put it in context in your argument then. It speaks**
21  **for itself. I don't know what I was --**
22  Q  Well, some people might think that "smart" means
23  funny. Some people might think it's intelligent.
24  Did you mean funny or intelligent?
25  A  **I don't know. The words speak for themselves.**

102

1  Q  Okay. "But know this is all up to you and really
2  does depend upon how close to the edge you live."
3  How close to the edge had she lived when
4  she came to you telling you that she had been
5  nearly strangled to death?
6  A  **What's your question, Mr. Fox?**
7  Q  How close to the edge did you think she had lived?
8  A  **I don't know.**
9  Q  Okay. She says, "Laugh out loud."
10  A  **She says, "LOL." Or she texts, "LOL" period.**
11  Q  That's what I understand that means. I'm not up
12  with the -- but I think that's what it means.
13  Then you say, "Still wondering if I'm
14  worth it?"
15  She texts back, "Don't know."
16  You say, "Can I help you answer any
17  questions?"
18  What did you mean by that?
19  A  **I don't know.**
20  Q  She answers, "No."
21  Did you think that was flirtatious?
22  A  **No.**
23  Q  Did you think that was inviting further
24  communication from you?
25  A  **I don't know. And she had plenty of opportunities**

**103**

1   to tell me to stop.
2 Q   That's not my question.
3 A   **You're asking what I think, and I'm telling you**
4   **what I think, Mr. Fox.**
5 Q   No, you're telling me --
6 A   **I think at that time she could have stopped the**
7   **communication and chose not to.**
8 Q   No, no. That's not --
9 A   **You said, What do you think --**
10 Q   No. I said, What did you think about using the
11   word "no"?
12 A   **Yes.**
13 Q   I said, Did you think the word "no" meant she was
14   trying to encourage further communication with you?
15 A   **I don't know.**
16 Q   All right. "You don't say much do you?"
17       Then she says, "Never really did."
18       Did you think that was flirtatious?
19 A   **I don't know.**
20 Q   Did you think, in saying, "Never really did," she
21   was trying to encourage more communication with
22   you?
23 A   **I don't know what she was trying to do.**
24 Q   Okay.
25 A   **At the time, if you're asking me what I was**

**104**

1   **thinking at the time --**
2 Q   No. I want to get through this. "When you are
3   that pretty I guess you don't have to. Now the
4   compliments start."
5 A   **Yes.**
6 Q   At that point, what are you trying to do by saying
7   that?
8 A   **I don't know.**
9 Q   She says, "Oh my."
10       Did you think that was flirtatious?
11 A   **Yes.**
12 Q   Okay. So saying "Oh my" to the prosecutor who is
13   in charge of prosecuting the person who attempted
14   to kill her is --
15 A   **Those have nothing to do with each other. These**
16   **are communications, private, between two private**
17   **individuals. That's what I think, Mr. Fox.**
18 Q   It has to do with --
19 A   **It has nothing to do with the prosecution.**
20 Q   It has to do with the context in which these --
21 A   **That's your argument, Mr. Fox. Give it to the**
22   **jury. If you're asking me, I don't know.**
23 Q   Okay. KK: "It's true. Why would such a
24   successful, respected attorney be acting like he's
25   in 7th grade?"

**105**

1       Who are you referring to as the
2   "respected attorney"?
3 A   **Myself.**
4 Q   Okay. "Are you worried about me?"
5       Do you see that?
6 A   **I do see that.**
7 Q   And she answers, "I won't lie. Yes."
8       Did you think that was flirtatious?
9 A   **Yes.**
10 Q   Okay. So her being worried about you, saying "yes"
11   to you, is flirtatious?
12 A   **I took that as a flirtatious response and a**
13   **tongue-in-cheek, "Are you worried about me?" Yes,**
14   **Mr. Fox, that's how I took it. That's how I took**
15   **it at the time.**
16 Q   All right. Question: "You should never lie to me.
17   Obviously we have talents to offer that the other
18   is intrigued by, or you would have called me
19   creepy. You wanna accept?"
20       And this is the crime victim now
21   answering you at the time, right? This is the
22   person who --
23 A   **This is a private communication with --**
24 Q   No.
25 A   **She's not answering as a crime victim.**

**106**

1 Q   I'm not saying she's answering as a crime victim.
2   She is a crime victim at the time she is
3   communicating with you, is she not?
4 A   **She is.**
5 Q   And you are the prosecutor of the crime for which
6   she is a victim at the time she is communicating
7   with you; were you not?
8 A   **That's right, Mr. Fox.**
9 Q   And she says to you, "I don't know how good an idea
10   that would be."
11 A   **Yes.**
12 Q   So you get that from a crime victim; did you think
13   that was flirtatious?
14 A   **I don't know.**
15 Q   Okay. KK --
16 A   **I didn't take that as coming from a crime victim,**
17   **if that was your question, Mr. Fox.**
18 Q   That's not my question. I'm just saying --
19 A   **You just said, "from a crime victim."**
20 Q   I'm not going to argue with you. You've answered
21   the question. Your answer will stand on the
22   record.
23 A   **All right.**
24 Q   You can say whatever it was, and you want to make
25   the argument, you'll get plenty of time to do that.

Case 1:10-cv-00910-WCG  Filed 01/24/13  Page 29 of 56  Document 82-1

## 107

1  KK: "Me either. It's stupid. Have you
2  ever been spoiled by someone? I mean like being
3  taken care of and spoil him with attention in
4  return? Without ever saying no?"
5  And she answers, "I've been with a dick
6  head for ten years. No I don't."
7  Do you know who she was referring to as a
8  "dick head"?
9  **A  I believed it was her ex-boyfriend.**
10  Q  It was the person who she had accused of attempting
11  to strangle her to death, correct?
12  **A  It was her ex-boyfriend.**
13  Q  Was it the person that you were prosecuting?
14  **A  I don't know if she ever said, "Tried to strangle**
15  **me to death," but go ahead. Yes, it was the person**
16  **I was prosecuting. That's who I believed she was**
17  **referring to.**
18  Q  In your records -- you don't know that she ever
19  told you that she thought he was -- he attempted to
20  strangle her to death?
21  **A  I told you, I don't have a recollection of that,**
22  **no.**
23  Q  Okay.
24  **A  If you would like to show me the complaint, I will**
25  **tell you if she said that.**

## 108

1  Q  "Quite frankly I don't know what would happen. It
2  would go slow enough for Shannon's case to get
3  done."
4  **A  Did you not want to ask me if I thought that was**
5  **flirtatious, by the way?**
6  Q  No. I'm asking you the questions I want to ask
7  you.
8  **A  Oh, okay. Go ahead. I'm sorry. You've asked all**
9  **the other ones. You want to skip over that one,**
10  **Mr. Fox, go ahead. I'm sorry to interrupt you.**
11  Q  I don't think you're sorry at all.
12  "Quite frankly I don't know what would
13  happen. It would go slow enough for Shannon's case
14  to get done?"
15  "It would go slow enough." What is "it"?
16  What would go slow enough for Shannon's case to get
17  done?
18  **A  What are you asking me, sir? What do the words --**
19  Q  What did you mean by "it" when you said, "It would
20  go slow enough for Shannon's case to get done"?
21  **A  I don't recall. I can guess what I meant. I don't**
22  **have an independent recollection of what I meant by**
23  **that phrase. I see the words just like you do, and**
24  **this reading to me --**
25  Q  I don't need --

## 109

1  **A  -- is insulting. Because you're gonna read all**
2  **these and say, "What does it say?"**
3  Q  I don't need the speech, and I get a chance to ask
4  the questions.
5  **A  Please ask a question then.**
6  Q  You've been in a --
7  **A  What does "it" mean? I don't know. I've answered**
8  **it, Mr. Fox.**
9  Q  You've been in a courtroom.
10  **A  I've answered it. I don't know.**
11  Q  You've been in a courtroom. You're a lawyer, and
12  you've done a lot of trial work, haven't you?
13  **A  Go ahead.**
14  Q  You know when you should answer a question when
15  it's posed to you, don't you?
16  **A  Ask me a question then.**
17  Q  Okay. You indicated you didn't know what would go
18  slow enough for Shannon's case to get done. Were
19  you talking about a -- is it likely you were
20  talking about some sort of relationship with her?
21  **A  Yes, it appears that from this context.**
22  Q  And is it likely that you were talking about a
23  romantic relationship with her?
24  **A  No.**
25  Q  And is it likely you were talking about a sexual

## 110

1  relationship with her?
2  **A  Absolutely not. Nothing in this communication was**
3  **of a sexual relationship.**
4  Q  And when you say "Shannon's case," I just want to
5  make sure, Shannon is the person you were
6  prosecuting, right?
7  **A  Yes.**
8  Q  And what's the significance in this sentence of
9  Shannon's case getting -- of something going slow
10  enough so Shannon's case could get done? What was
11  the relationship between those two subject matters
12  in this sentence?
13  **A  Are you asking me again to think back and**
14  **speculate? Or I don't know what you're asking me,**
15  **Mr. --**
16  MR. TORNEHL: He's not asking you to
17  speculate, and I don't want you to speculate; so
18  just say you don't know.
19  THE WITNESS: I don't know. I don't
20  know.
21  BY MR. FOX:
22  Q  Okay. That's fine. "Remember it would have to be
23  special enough to risk all."
24  Okay. What was "it"?
25  **A  It appears, if that's what -- it's likely that it**

111

1    was a personal relationship with your client.
2 Q  Well, a personal relationship -- I just want to
3    know what your definitions are.
4 A  Okay.
5 Q  Because a personal relationship with my client
6    could be had by a prosecutor, a DA, without any
7    potential violation of your professional duties.
8    In other words, you could say "hi" to her on the
9    street. She could say "hi" to you. There would be
10    nothing wrong with that type of relationship,
11    right?
12 A  That's correct.
13 Q  Okay. But you're talking about a different kind of
14    a personal relationship, aren't you?
15 A  I am, and I refer to that later, yes.
16 Q  Okay. And when you're talking about "it" -- so the
17    likely type of personal relationship you mean by
18    "it" is a romantic relationship, correct?
19 A  Not necessarily, no.
20 Q  That is the likely relationship you were referring
21    to, is it not?
22 A  No, not necessarily.
23 Q  Okay.
24 A  There's something you don't understand about that
25    answer, Mr. Fox.

113

1 A  I don't believe so, no.
2 Q  Was it likely you were referring to a romantic or
3    sexual passion?
4 A  I don't know.
5 Q  What other passion do you know of other than a
6    romantic or sexual passion that you might have been
7    referring to in this sentence?
8 A  I don't know, sir.
9 Q  Okay. "It's either perfect or I'm not going to do
10    it."
11        Once again, we're back to "it." What is
12    "it"?
13 A  I assume in this context, it's the personal
14    relationship with your client.
15 Q  Okay. But a personal relationship meaning a
16    relationship that is likely romantic or sexual or
17    not?
18 A  I refer to it later, what kind of relationship I
19    was looking for.
20 Q  Well, then tell me what you're referring to later
21    that you were likely looking for.
22 A  I asked her to have a drink with me. That kind of
23    relationship, Mr. Fox.
24 Q  So are you saying that when you said -- when you
25    wrote these texts saying, "Remember it would have

112

1 Q  And then it would say, "It would have to be special
2    enough to risk all."
3        So I want to know, what would be special?
4    What did you mean by the word "special"?
5 A  I don't know.
6 Q  Okay. And what did you mean by the words "risk
7    all"?
8 A  I don't know.
9 Q  Okay. And she said, "I don't know." She answers
10    your text when you say, "Remember it would have to
11    be special enough to risk all," and she says, "I
12    don't know."
13        Did you believe that to be flirtatious?
14 A  She texted back, "I don't know," that's correct.
15 Q  Right. Did you believe her text back to you, "I
16    don't know," in response to your text was
17    flirtatious?
18 A  At the time, I don't know if I perceived that as
19    being flirtatious.
20 Q  Okay. Then you go on to say, "If you are not worth
21    that kind of passion we'll know it right away."
22        What type of passion were you referring
23    to?
24 A  I don't know, sir.
25 Q  Were you referring to a romantic or sexual passion?

114

1    to be special enough to risk all," what you were
2    suggesting to her is that we should have a drink
3    together and that would be special enough to risk
4    all?
5 A  In fact, I say, "Would you like to meet for a
6    drink? Please tell me."
7 Q  No, no. I'm just --
8 A  That's exactly what I say.
9 Q  I'm not talking about your other text. "Remember
10    it would have to be special enough to risk all."
11    When you're referring to --
12 A  What is "it"?
13 Q  Yeah. That was having a drink?
14 A  I don't know. It was a personal relationship. The
15    kind of personal relationship that I later defined
16    for her, yes, Mr. Fox.
17 Q  Okay. Now, the next text you have is, "Hey Miss
18    Communication, what's the sticking point? Your low
19    self-esteem and your fear can't play in my big
20    sandbox?"
21        Now, here's one of the things that I want
22    to ask you about.
23 A  All right.
24 Q  Her low self-esteem. Why did you have reason to
25    write a text that talked about her low self-esteem?

## 115

1　A　**She mentioned that the day before in our**
2　　**face-to-face conversation.**
3　Q　And is it not a common tenant of people who discuss
4　　domestic abuse victims that they often times have
5　　low self-esteem?
6　A　**Not always, no.**
7　Q　I did not say always. I said that they often times
8　　suffer from low self-esteem.
9　A　**I don't attribute low self-esteem as a personal**
10　　**characteristic to a domestic violence victim, no.**
11　Q　Well, when you're a doctor, you don't necessarily
12　　attribute cancer to a patient who exhibits a lump,
13　　but it's something you look for, correct?
14　A　**Right. I don't look for low self-esteem in**
15　　**domestic violence --**
16　Q　So that's not something that, at least you've ever
17　　experienced in the prosecution of domestic violence
18　　cases, that individuals who write about these --
19　　scholars who write about these cases tell you is a
20　　common feature of domestic abuse victims, that they
21　　suffer from low self-esteem? You've never heard
22　　that?
23　A　**I don't recall ever reading or hearing that.**
24　Q　Okay. And you've never heard that from advocacy
25　　groups, right?

## 116

1　A　**I don't recall.**
2　Q　Okay.
3　A　**Certainly, advocacy groups say lots of things.**
4　Q　So you believed that on the basis of what she said
5　　that she might have low self-esteem, right?
6　A　**She told me. Not may have. She told me she did.**
7　Q　So you believed she had low self-esteem?
8　A　**I don't know. I believe she told me that.**
9　Q　Okay. I'm just asking what you believed. Now,
10　　you've told me what she told you, but did you
11　　believe she was telling the truth when she said she
12　　had low self-esteem?
13　A　**Absolutely not. And I can explain that if you'd**
14　　**ever give me the chance to.**
15　Q　No. You can have all the chances you want. You'll
16　　have your full day in court, and you get to explain
17　　all of this in exactly the way you want. I just
18　　want you to answer my questions here.
19　A　**That's fine.**
20　Q　"And your fear you can't play in my big sandbox."
21　　What does that refer to?
22　A　**I don't know. It was being flirtatious with her.**
23　　**I was being flirtatious.**
24　Q　"Or, question mark, question mark, question mark."
25　　What does that refer to?

## 117

1　A　**I don't know.**
2　Q　And what is your "big sandbox"?
3　A　**I don't know. It was being flirtatious.**
4　Q　Okay. And what were you referring to about fear?
5　　Did she indicate to you that she was a person who
6　　might be afraid?
7　A　**Not at all.**
8　Q　Okay. So when she was coming to you for this
9　　domestic abuse situation that you ended up
10　　prosecuting, did she indicate to you that this was
11　　the first time that she had ever been abused by
12　　Shannon?
13　A　**I honestly don't recall. I don't recall the**
14　　**history that she gave me as I sit here today. If**
15　　**she did, I would have it in my file and would have**
16　　**noted that in the prosecution file.**
17　Q　Okay. And then you've got here, "I'm leaving for
18　　the day. Let me know after 8 tomorrow."
19　　　　What did you want her to let you know?
20　A　**I don't know. It appears that I was asking for her**
21　　**response on the possibility of a relationship. I'm**
22　　**guessing that's what I meant by that.**
23　Q　The possibility of playing in your big sandbox?
24　A　**I said the possibility -- maybe you didn't hear me.**
25　　**The possibility of a relationship.**

## 118

1　Q　Okay. I just don't see the relationship word ever
2　　used here.
3　A　**You asked me what "it" meant, and I told you on a**
4　　**number of occasions; so that's what "it" means,**
5　　**Mr. Fox.**
6　Q　Okay. Well, you didn't want her -- well, you told
7　　me at one point that "it" -- at least if I
8　　understood you correctly, and I may be wrong, that
9　　"it" meant having a drink with her.
10　A　**That's correct.**
11　Q　That you wanted her to let you know by 8 tomorrow
12　　whether or not she'd have a drink with you?
13　A　**I said "it" meant a relationship. The kind of**
14　　**relationship that is defined by, like, having a**
15　　**drink with someone.**
16　Q　I see.
17　A　**That kind of relationship. What it doesn't mean is**
18　　**sexting or having sex with her. That's what it**
19　　**doesn't mean, Mr. Fox.**
20　Q　Okay. "You will either be excited or grossed out
21　　about the opportunity you have."
22　　　　So if I understand you correctly, the
23　　opportunity to have a drink with you might either
24　　excite her or gross her out?
25　A　**I said "it" was the personal relationship, Mr. Fox.**

## 119

1 **The kind of which includes having a drink with**
2 **somebody. "It" means relationship, Mr. Fox.**
3 Q "But it will only come once."
4     What will only come once? The chance to
5 have a relationship with you?
6 **A It says, "The opportunity will only come once."**
7 **Yes.**
8 Q Okay. 10/22, the next day. "What do you hope your
9 life looks like in 5 years? What kind of
10 residence? A job, making how much in the
11 household? A relationship with what kind of guy?
12 Dollar signs, question mark."
13     Why did you write that to her?
14 **A They're just questions. They're questions that**
15 **inquire about a personal relationship.**
16 Q And is it --
17 **A The kind of -- I'm sorry.**
18 Q Okay.
19 **A It says, "What kind of residence? What kind of**
20 **relationship? What kind of guy?"**
21 Q I just want to know, the kind of relationship of
22 having a drink with a guy, what would that have to
23 do with her job?
24 **A I asked her what kind of job she would like in five**
25 **years.**

## 120

1 Q And what would having a drink with her, what kind
2 of relationship, have to do with making how much in
3 a household?
4 **A I don't know, Mr. Fox. Those are the kinds of**
5 **things you talk about with people that you have**
6 **drinks with, with that kind of relationship.**
7 Q And what would the kind of relationship with people
8 you have drinks with have to do with dollar signs?
9 **A I don't know, Mr. Fox.**
10 Q Okay. Then the next one is, "What do you hope your
11 life looks" -- excuse me. I'm sorry.
12     "No guy, just graduating from college,
13 house that bought for Shanel" -- is Shanel her
14 daughter?
15 **A I think that's who she's referring to.**
16 Q "And I, doing part time work as a park ranger for
17 High Cliff."
18     Now, did you see that as flirtatious?
19 **A I did.**
20 Q And did you see -- did you think that maybe she
21 wanted you to be a fellow park ranger?
22 **A No.**
23 Q Okay. Then you have, "How are you feeling today?
24 You stopped talking yesterday."
25     Now, did you tell her that -- when you

## 121

1 mentioned that she had stopped talking yesterday,
2 did you feel that she still wanted to be
3 flirtatious with you, but she was just going into
4 radio silence and not flirting anymore or what?
5 **A I was asking.**
6 Q Okay.
7 **A I noted that she stopped.**
8 Q And she says, "OK." And then you say, "Are you
9 serious? OK? That's it? Are you in a board
10 meeting? You are beautiful and would make a great
11 young partner someday. I won't beg."
12     And she responds, "Laugh out loud."
13 **A Yes.**
14 Q And you thought that was flirtatious?
15 **A I did.**
16 Q Did you think she was joking?
17 **A I don't know. I think she was --**
18 Q Did you think she thought you were joking?
19 **A About what, sir?**
20 Q About what you said in that email. "Are you
21 serious? OK? That's it? Are you in a board
22 meeting? You are beautiful and would make a great
23 partner someday. I won't beg." Did you believe
24 that she thought you were joking?
25 **A I don't know, sir.**

## 122

1 Q Well, the next line you say, "I'm serious." Does
2 that indicate to you that you thought she might
3 believe you were joking?
4 **A No, not necessarily.**
5 Q "I'm the attorney. I have the $350,000 house. I
6 have the 6-figure career. You may be the tall,
7 young, hot nymph, but I am the prize."
8     Now, did you say that in order to get her
9 to have a drink with you?
10 **A I wanted her to have a personal relationship with**
11 **me; yes, sir.**
12 Q Well, what would your -- the cost of your house and
13 your 6-figure career have to do with her having a
14 relationship with you?
15 **A I was trying to impress her, sir.**
16 Q And you said, "I'm the attorney."
17 **A That's right.**
18 Q So you knew that you were trying to impress her by
19 the fact you were the attorney?
20 **A The attorney. Not the district attorney. Yes. An**
21 **attorney.**
22 Q I see.
23 **A Impress her with --**
24 Q So this is a victim of -- I just want to say, at
25 the time you write this, this victim of domestic

123

1 abuse, you say, "I'm the attorney," but you
2 expected her to understand that you were just
3 referring to the fact that you were an attorney as
4 opposed to the district attorney prosecuting the
5 person who had attempted to strangle her?
6 A **What's your question, Mr. Fox?**
7 Q Is that true?
8 A **Are you asking me what I expected her to**
9 **understand? I don't know.**
10 Q Okay. And "I am the prize." What was that about?
11 A **That I was being boastful. That I believed that I**
12 **was worthy of having a personal relationship with**
13 **her. That's what that means.**
14 Q Okay. "Start convincing." That's what you told
15 her?
16 A **Yes.**
17 Q "Start convincing." What did you want her to start
18 convincing?
19 A **I don't know.**
20 Q Did you want her to -- well, let me ask you:
21 Aren't you telling her to start convincing you that
22 she wants to have a relationship with you?
23 A **I don't know. There's many facets to that**
24 **statement.**
25 Q And then we have -- the next one is, "I think your

124

1 wife would have something to say about that. I
2 don't think I could be the other woman."
3 A **That's right.**
4 Q Do you think that was flirtatious?
5 A **Yes.**
6 Q Okay. And so you thought she was trying to
7 encourage you to want to have a relationship with
8 her, meaning --
9 A **I think she didn't want to be the other woman. But**
10 **she had no idea, at that point, what the status of**
11 **my marriage was.**
12 Q Well, had you talked to her about the status of the
13 marriage?
14 A **Not yet, no.**
15 Q She apparently knew you were married, correct?
16 A **She believed that I was, yes, that I was married.**
17 **As it turns out, I was separated at the time.**
18 Q Well, why did she believe you were married?
19 A **I think because I had told her that earlier, if she**
20 **liked married guys. Something about that.**
21 Q I see. So you thought when she said, "I don't
22 think I would" -- "I think your wife would have
23 something to say about that," and "I don't think I
24 could be the other woman," your belief was that she
25 was telling you that she could -- that she wouldn't

125

1 be interested in you unless she was gonna be your
2 woman?
3 A **At the time, that's exactly what I thought she**
4 **meant, Mr. Fox.**
5 Q Were you drinking at the time?
6 A **I was not drinking at the time, no.**
7 Q Were you taking drugs at the time?
8 A **I was.**
9 Q What were you taking at the time?
10 A **Ambien, Xanax and Vicodin.**
11 Q Okay. And do you believe it's the Ambien, Xanax
12 and Vicodin that caused you to think the way that
13 you have indicated you thought about these
14 communications as you've testified here today?
15 A **The combination of Ambien and Xanax and Vicodin act**
16 **to, in fact, lower or remove inhibitions. That's**
17 **exactly what I think was happening at the time.**
18 **Those inhibitions, because of my prescription drug**
19 **use, were removed, and that's, in my opinion, as I**
20 **sit here today, what I believe was the contributing**
21 **factor, the largest factor in my poor decision**
22 **making those three days, yes.**
23 Q And did your Ambien and the drug use you've now
24 described in answer to the last question have
25 anything to do with the way you related to Amy

126

1 Price?
2 A **I don't believe so.**
3 Q Did any professional tell you or offer you a
4 professional diagnosis so we can get a medical
5 record where they have diagnosed the reason that
6 you behaved as you did here was because of the use
7 of those drugs?
8 A **I don't think so.**
9 Q Okay. "Finally an opinion. I would not expect you
10 to be the other woman. I would want you to be so
11 hot and treat me so well that you'd be the woman."
12 Now, was that an invitation for her to
13 have a drink with you?
14 A **That wasn't an invitation for anything, sir.**
15 Q Okay.
16 A **It was an invitation to have a personal**
17 **relationship with me.**
18 Q But the personal relationship you've described that
19 you wanted to have with her was the type of
20 relationship where she'd have a drink with you?
21 A **It's vis-à-vis the her not wanting to be the other**
22 **woman. That's what it refers to.**
23 Q Well, when you say, "I want you to be so hot," what
24 does that have to do with having a drink with you?
25 A **I don't know.**

127

1 Q And when you say -- weren't you, in fact, and isn't
2 it reasonable to interpret these communications
3 you're sending to her to believe that you wanted to
4 have a romantic or sexual relationship with her?
5 **A Absolutely not. I would have said so, and I said**
6 **just the opposite later.**
7 Q Okay. "Are you that good?"
8 And what did you mean by, "Are you that
9 good?" Was she a good drinker?
10 **A I don't know, sir.**
11 Q Okay. "You forgot to write me for the last time
12 saying you could never give me enough attention to
13 steal me away, and you are so modest that you
14 wouldn't know how to."
15 What did you mean by that?
16 **A It's convoluted. I have no idea what I meant by**
17 **that.**
18 Q And she says, "Right." If you had no idea what you
19 meant, what did she mean?
20 **A I suspect that's fair. It doesn't make any sense.**
21 Q Okay. And then you said, "And you may look good at
22 first glance, but women that are the blonde, 6ft
23 tall, legs and great bodies don't like to be shown
24 off to please their men."
25 What did you mean by that?

128

1 **A I don't know. It's equally convoluted.**
2 Q And, "When the case is over, if you change your
3 mind and want to meet for a drink, please tell me.
4 Otherwise, I will respect your desire to be left
5 alone."
6 **A Yes, sir.**
7 Q So that's the drink comment you're talking about,
8 right?
9 **A Among other important comments, yes, sir.**
10 Q Okay. Do you mention a drink in any other text
11 message where you talk about either the fact that
12 she's hot, the money you have, the other woman, all
13 those other aspects which might be interpreted as
14 part and parcel of a personal relationship? Do you
15 mention a drink in any of those?
16 **A I believe this is the only place I mention a drink.**
17 Q I see. And isn't it true that by that time, you
18 kind of got the notion that she wasn't too
19 interested in you?
20 **A No.**
21 Q When did you get the notion she wasn't too
22 interested in you?
23 **A On the 3rd of November, two weeks later. That was**
24 **my last text message, so I --**
25 Q Right.

129

1 **A -- stopped communication with her at that time.**
2 Q Well, but, you have indicated to me that you didn't
3 get the notion she wasn't interested in you until
4 the 3rd of November. Why did you stop text
5 messaging her --
6 **A I was no longer interested in her.**
7 Q Ah. Did you ever then -- since you decided in
8 those two weeks that you were no longer interested
9 in her, did you text her and say, "I'm sorry, I'm
10 really not interested in you"? Or not even if
11 you're sorry. Say, "I'm really not interested in
12 you in that -- in the way I may have suggested in
13 the prior texts"? You just went radio silent,
14 right?
15 **A Not at all. That was my last comment because I was**
16 **leaving it up to her. "If you change your mind and**
17 **want to meet for a drink, tell me. Otherwise I**
18 **will respect your desire to be left alone." That's**
19 **as clear as I could make it.**
20 Q Well, no. But you have just testified that the
21 reason you didn't text her in two weeks was because
22 you were no longer interested in her?
23 **A I'm saying, after that point, I did not have any**
24 **contact with her. That's correct. And in fact, I**
25 **was not interested in her any longer. That's**

130

1 **correct.**
2 Q Okay. And what other contact did you have with her
3 in the two weeks between the last text message that
4 you have and the time that you were informed that
5 she had gone to the police and reported these
6 messages?
7 **A I had none.**
8 Q Okay.
9 **A I had no other contact of any kind with your**
10 **client.**
11 Q As you look here -- as you sit here today and you
12 testify, is it conceivable to you that the victim
13 of domestic abuse for whom you are the prosecuting
14 attorney might misconstrue or have some concern
15 about these types of messages being sent to them
16 while prosecution is ongoing?
17 **A Are you talking about some hypothetical victim or**
18 **your client, Mr. Fox?**
19 Q Well, let's talk about a hypothetical victim first.
20 **A Okay. I don't know. I don't know what a**
21 **hypothetical victim might appreciate by these**
22 **texts.**
23 Q Okay. But you believe that my client really was
24 not upset by these texts?
25 **A That's correct.**

131

1 Q  Now, when you said you pled no contest to a number
2    of things with regard to ethical violations, let's
3    review those again.  There were three, I believe,
4    that you said you pled no contest to?
5 A  Yeah.  There were three categories of violation.
6    There's the incident regarding your client, and
7    then there's an incident regarding two social
8    workers as well.
9 Q  And were those two social workers social workers in
10   Chilton?
11 A  Yes.
12 Q  And did those incidents occur before or after the
13   incident that -- the texting with my client?
14 A  I believe it was before.
15 Q  Okay.  And what, if anything, did you understand
16   those two social workers objected to you doing with
17   regard to them?
18 A  One incident was a vulgar comment that I had made
19   to a social worker in a witness prep session when
20   she was about to testify.  And the other was a
21   comment that I had allegedly made, although I don't
22   recall it, and in fact, don't believe it ever
23   occurred; nonetheless, alleged to have made either
24   about a reporter on TV or about a court reporter.
25   It was still unclear who I was alleged to have made

132

1    the comment about.  About a part of her body.  And
2    again, I believe that did not occur, Mr. Fox.  I
3    believe, however, the first incident, the vulgar
4    comment in the witness prep session, did occur.  I
5    recall that occurring, and I admitted my
6    involvement in that behavior.
7 Q  And that was part of the -- did you plead no
8    contest to all of the allegations against you in
9    the OLR proceeding?
10 A  No.
11 Q  How many allegations did you start out with?
12 A  Eleven.
13 Q  And was there some negotiation or bargaining with
14   regard to which of those you were going to plead
15   to?
16 A  There were attempts to negotiate.  It turned out
17   to -- or ended up that the OLR dismissed several of
18   the counts upon their investigation of those
19   allegations.
20 Q  And did the OLR dismiss all but three, or how many
21   were left that the OLR didn't dismiss in their
22   investigation?
23 A  I think it was five.
24 Q  Okay.
25 A  But it was three regarding your client.  Three

133

1    distinct violations, the ones that I have referred
2    to, related to the texting incident.
3 Q  Okay.
4 A  Two; one of harassment, and one of offensive
5    personality was related to the vulgar comment in
6    the witness prep session.
7 Q  Okay.
8 A  And then one violation of offensive personality
9    regarding the comment in the courtroom about the TV
10   reporter.
11 Q  They actually have a category called "offensive
12   personality" for lawyers?
13 A  You'd be surprised what they came up with.  The
14   answer is yes.
15        MR. TORNEHL:  Can we take a break pretty
16   soon?  We've been here for four hours.
17        (Short recess.)
18 BY MR. FOX:
19 Q  What's the recommended suspension, if there is one,
20   for you now?
21 A  The referee recommended a four-month suspension.
22   The Supreme Court has had the case since August and
23   had not yet announced their decision.
24 Q  Okay.  So you don't -- are you contesting the
25   recommended suspension right now?

134

1 A  I am, yes.
2 Q  And this is just helpful to me in assessing this
3    case.  Are you attempting to get no suspension?  Is
4    that what you're fighting for right now?
5 A  Yes.
6 Q  Okay.
7 A  Well, or less than four months.  I had recommended
8    a public reprimand.  OLR had recommended a
9    six-month suspension.  The referee then, after the
10   hearing, recommended the four-month suspension, and
11   ultimately, it's up to the Supreme Court.
12        MR. FOX:  Gotcha.  Okay.  Thanks.  That's
13   all I have for you.
14        EXAMINATION
15 BY MS. SCHMIDT:
16 Q  Mr. Kratz, I have a couple follow-up questions.  My
17   name is Linda Schmidt.  I represent Peerless
18   Indemnity Insurance Company.  And as I understand
19   it --
20        MR. FOX:  Excuse me.  I'm going to step
21   out here.  You can go ahead without me.  I'm just
22   going to return this phone call.  I'm sure the
23   transcript will be the same if I'm here or not
24   here.
25        (Mr. Fox exits the room.)

BY MS. SCHMIDT:
Q I understand you were representing yourself on insurance coverage issues -- on the insurance coverage dispute; is that correct?
**A Presently, yes.**
Q Have you had any communications with plaintiff's counsel, Mr. Fox here, regarding the insurance coverage motion filed by Peerless Indemnity in this action?
**A No.**
Q Okay. Have you had any communications with Mr. Fox or someone from his office about the insurance coverage dispute at all?
**A Only -- only tangentially or even parenthetically through my lawyer. Just, was he was going to be filing a response? Was he going to be taking a position on it? That's the only communication that I had heard from that camp. Does that answer your question?**
Q I believe so. So you have not coordinated providing a declaration to plaintiff's counsel?
**A I have not.**
Q You have not coordinated with plaintiff's counsel on a strategy for a response to the motion?
**A I have not.**



Q You do intend to file your own response to the motion; is that correct?
**A I do.**
MR. TORNEHL: Which I will probably assist only by electronically filing it for Mr. Kratz.
BY MS. SCHMIDT:
Q Understood. Mr. Kratz, is there a distinction to you between performing one's duties as a prosecutor and performing tasks as a prosecutor?
**A I haven't thought about it. I don't know. It seems to be no, but --**
Q So in your mind, if you say I'm performing my duties as a prosecutor, or I'm performing my tasks as a prosecutor, as you sit here today, that would be one in the same thing, correct?
**A I -- now that, you know, the -- duties suggest either a statutory or perhaps even, you know, administrative law-type of responsibilities that you would have, and tasks somehow seem more menial to me, or at least discretionary rather than mandatory. Honestly, that's the first time I've thought of that distinction.**
Q Fair enough. But in either case, if you were performing duties or performing tasks, you would



still see it as something in furtherance of your role as a prosecutor?
**A I think that's true.**
Q Okay.
(Exhibit No. 6 was marked.)
BY MS. SCHMIDT:
Q So Mr. Kratz, in front of you is what's been marked as Exhibit 5. I recognize it's a rather large document, but if you take a look at it, is that something that you can identify?
**A It's Exhibit 6, but yes, I can identify it.**
Q Exhibit 6.
**A I believe this to be the policy, if I'm not mistaken. Is this the thing that you had me sign earlier today?**
Q For the stipulation --
MR. TORNEHL: Is this both policies, by the way? Because there's an umbrella policy in this case.
MS. SCHMIDT: It's part of it. It's a home owner's policy, right. That provides also --
MR. TORNEHL: Umbrella coverage.
MS. SCHMIDT: Correct.
BY MS. SCHMIDT:
Q And when you say "the policy," you're referring to



the Peerless Indemnity policy that was issued to you for the policy period that's indicated on the front page, June 14th, '09 to June 14th, 2010?
**A Yes. Although, I, perhaps like Mr. Tornehl, believed it to be two different policies. But if it's one in the same, that's, I believe, what this is, yes.**
Q And have you had an opportunity to look at the policy since the commencement of this case?
**A I have not -- not in detail where I could find anything for you.**
Q But you have reviewed the policy?
**A I have had it sent to me, I believe, in PDF version.**
THE WITNESS: Is that correct?
MR. TORNEHL: I think so.
THE WITNESS: Yes. I've seen this. So --
BY MS. SCHMIDT:
Q And after it was sent to you --
**A Or you guys maybe did. Maybe early on in the case, a PDF version of it.**
MR. TORNEHL: It might have been an affidavit.
THE WITNESS: Yeah. I'm sorry. Go



Case 1:10-cv-00919-WCG Filed 01/24/13 Page 37 of 56 Document 82-1

1    ahead. Yeah. That was probably an attachment,
2    maybe, to one of your pleadings. Okay. Go ahead.
3  BY MS. SCHMIDT:
4  Q  Right. And when you received that copy as the
5    attachment to the affidavit, or separately, did you
6    look through the policy?
7  A  **Not to any great extent, no.**
8  Q  Have you looked at the policy as you prepared to
9    submit a response to Peerless Indemnity's --
10  A  **Not to --**
11  Q  -- motion on coverage?
12  A  **Not to the extent that I need to, no.**
13  Q  Do you intend to --
14  A  **I intend to, before the end of the day on the 10th.**
15  Q  So sitting here today, is there something that you
16    can point to in the policy that you believe
17    provides coverage for the claims in these actions?
18    In this action?
19  A  **I'm not prepared to answer that. I don't know.**
20  Q  Okay. I'm almost afraid to raise this exhibit
21    again, the text messages, given the amount of time
22    we've spent on it. And I'm sorry, I don't actually
23    know which exhibit number it is, but do you still
24    have that?
25          MR. TORNEHL: Is it 3? I think it's 3.

1          THE WITNESS: Go ahead.
2  BY MS. SCHMIDT:
3  Q  So taking a look at Exhibit 3, on the first page,
4    the third message from you down on the page, the
5    one that's marked 4:04 p.m.?
6  A  **Yes.**
7  Q  You state in that message, "I wish you weren't one
8    of this office's clients."
9          Why do you state that; do you recall?
10  A  **I don't know, but it was -- as I sit here now, it's**
11    **an incorrect assignment of status to her. She was**
12    **not a client of mine at all.**
13  Q  As you stated earlier, the State of Wisconsin or
14    Calumet County was your client?
15  A  **The State of Wisconsin was.**
16  Q  And recognizing that maybe it was an incorrect
17    phrasing of her relationship that she was a crime
18    victim on one of the cases you were prosecuting,
19    correct?
20  A  **Yes. The "I wish you weren't one of these clients"**
21    **is a recognition of an inappropriate current status**
22    **or relationship that we had to pursue a personal**
23    **relationship. Very much, yes.**
24  Q  And why would it be inappropriate?
25  A  **Well, any crime victim, at least while the case is**

1    **pending, I believed at the time had the absolute**
2    **right not to be subjected to any kind of**
3    **relationship. Certainly, none other than just**
4    **casual with the individual responsible for**
5    **prosecuting on that case. It was the appearance of**
6    **conflict. Certainly, what's referred in many cases**
7    **as the "appearance of impropriety" that goes with**
8    **that. I recognized that early on, and really**
9    **throughout these text messages, especially in my**
10    **insistence that any relationship only be developed**
11    **after the case was completed.**
12  Q  You believe in the course of these text messages
13    that you insisted that any relationship only be
14    developed after the completion of the prosecution
15    of the crime against her --
16  A  **That's correct.**
17  Q  Okay. And can you just point me to where you state
18    that to her?
19  A  **Sure. First is on page 2 of when I ask her, "Do**
20    **you want to stop right now before there's any**
21    **issues?" Although, there's a more specific**
22    **reference. On page 3 of the fourth line down is**
23    **the reference to that. "I don't know what would**
24    **happen. It would go slow enough for Shannon's case**
25    **to get done." I think that's the only references**

1    **to that. Unless --**
2  Q  And the last --
3  A  **-- I'm mistaken.**
4  Q  I'm sorry. And the last --
5  A  **And then -- I'm sorry. The very last reference,**
6    **the very last message as well, "When the case is**
7    **over."**
8  Q  Going back to page 2, the text that you just
9    identified in your answer, "Or do you want to stop
10    right now before any issues"?
11  A  **Yes.**
12  Q  There, you don't actually state to her that there
13    will be no relationship until after the case, do
14    you?
15  A  **I do later on, yes.**
16  Q  But in this particular message, you were actually
17    asking her if she wants to stop, correct?
18  A  **Does she want to stop communications is really what**
19    **I was talking about.**
20  Q  But you were asking her, correct?
21  A  **I was asking her if she wanted to stop, yes.**
22  Q  Back to the first page, the last message from you
23    on that page that indicates that it was sent at
24    11:32 a.m.
25  A  **Yes.**

143

1 Q You state in the course of that text message, "It's
2 maybe not the wisest thing I can do, but you are
3 awfully sweet."
4 A **Yes.**
5 Q What did you mean by the "not wisest thing"?
6 A **I don't know. It's, "Please keep in touch. Maybe**
7 **not the wisest things I can do, but you're awfully**
8 **sweet." And then, "Don't tell anyone." I can --**
9 **again, I can speculate or guess what that means.**
10 **It likely refers to my recognition that pursuing a**
11 **personal relationship with her, at least during the**
12 **case prosecution, before it's ended, was not**
13 **appropriate.**
14 Q And you were, in fact, with these text messages,
15 until the very last message, seeking to pursue a
16 relationship with her, correct?
17 A **I'm not sure that's true on the 20th, necessarily.**
18 **The 21st, it is. The early, rather innocuous**
19 **messages seemed kind of just friendly, but**
20 **certainly, that's the clear goal as the text**
21 **messages proceed.**
22 Q And whether we're talking about the text messages
23 on the 20th, or later on the 21st, 22nd, when you
24 were seeking to pursue a relationship with her, you
25 were, at the time, still the prosecutor on the case

144

1 against her ex-boyfriend, right, for which she was
2 a crime victim, correct?
3 A **Yes. I was still the attorney on the case, that's**
4 **correct.**
5 Q And you were sending her those text messages at
6 that time while you were still the prosecutor of --
7 A **While I was the attorney of record, yes.**
8 Q And you recognized that there was maybe something
9 inappropriate about pursuing a relationship at the
10 same time that you were prosecuting the case?
11 A **Absolutely, yes.**
12        MS. SCHMIDT: I don't believe I have any
13 other questions.
14        (Proceedings concluded at 5:36 p.m.)
15
16
17
18
19
20
21
22
23
24
25

145

1 STATE OF WISCONSIN )
            ) SS:
2 COUNTY OF MILWAUKEE )

3
4
5        I, BREAH E. MADSON, Registered
6 Professional Reporter and Notary Public in and for the
7 State of Wisconsin, do hereby certify that the above
8 deposition of KENNETH KRATZ was recorded by me on
9 January 8, 2013, and reduced to writing under my
   personal direction.
10
11        I further certify that I am not a
12 relative or employee or attorney or counsel of any of
13 the parties, or a relative or employee of such attorney
14 or counsel, or financially interested directly or
15 indirectly in this action.
16        In witness whereof I have hereunder set
17 my hand and affixed my seal of office at Milwaukee,
18 Wisconsin, this 14th day of January, 2013.
19
20
21        _____
                    Notary Public
22              In and for the State of Wisconsin
23
24
   My Commission Expires:  June 02, 2013.
25

**$**

**$350,000** [1] - 122:5

**'**

**'09** [4] - 42:1, 42:2, 82:11, 138:3
**'12** [1] - 5:1
**'80s** [2] - 9:12, 10:25
**'90s** [1] - 10:25
**'95** [1] - 18:8
**'99** [1] - 19:13

**0**

**02** [1] - 145:24

**1**

**1** [12] - 2:19, 3:8, 26:8, 36:24, 37:1, 37:3, 47:14, 61:5, 61:7, 76:21, 76:22, 76:24
**10-CV-919** [1] - 1:7
**10/20/09** [1] - 81:16, 81:19, 82:1, 85:6
**10/21/09** [1] - 94:4
**10/22** [1] - 119:8
**10:48** [1] - 94:4
**10th** [2] - 5:24, 139:14
**11:23** [1] - 96:3
**11:32** [1] - 142:24
**11:37** [1] - 97:7
**12** [1] - 67:5
**124** [1] - 2:3
**134** [1] - 2:16
**137** [1] - 2:23
**14th** [3] - 138:3, 145:18
**15** [1] - 13:10
**15th** [5] - 2:10, 38:13, 38:23, 57:21, 64:4
**17th** [10] - 2:19, 61:7, 61:20, 61:25, 62:10, 62:14, 62:15, 62:22, 77:16, 77:19
**1985** [2] - 5:10, 6:12
**1987** [2] - 6:17, 8:19
**1992** [4] - 6:19, 8:19, 17:5, 17:13
**1994** [1] - 18:7
**1:35** [1] - 98:24

**2**

**2** [7] - 2:20, 3:8, 47:14, 76:20, 77:20,
141:19, 142:8
**20** [1] - 4:10
**2008** [1] - 17:6
**2009** [1] - 67:9
**2010** [18] - 2:19, 10:2, 17:15, 37:9, 38:8, 50:16, 53:19, 53:24, 54:16, 55:8, 56:6, 57:21, 61:7, 61:21, 61:23, 77:16, 77:19, 138:3
**2011** [1] - 4:23
**2012** [5] - 4:18, 4:22, 4:23, 5:6, 81:6
**2013** [4] - 1:22, 145:9, 145:18, 145:24
**20th** [15] - 62:23, 63:3, 63:21, 63:23, 63:24, 64:4, 82:3, 82:11, 82:13, 84:11, 86:16, 143:17, 143:23
**21st** [11] - 37:14, 38:8, 38:23, 39:10, 39:14, 39:17, 40:7, 62:20, 143:18, 143:23
**228** [1] - 4:9
**22nd** [1] - 143:23
**25** [9] - 8:12, 67:3, 69:5, 69:7, 70:20, 70:21, 71:18, 72:14, 74:9
**2719** [1] - 2:6
**2:00** [1] - 1:22
**2nd** [1] - 42:1

**3**

**3** [7] - 2:21, 3:8, 80:24, 139:25, 140:3, 141:22
**30th** [1] - 37:16
**3:55** [1] - 91:21
**3rd** [12] - 41:25, 42:1, 45:20, 45:22, 46:13, 47:2, 47:3, 51:5, 51:11, 67:9, 128:23, 129:4

**4**

**4** [6] - 2:16, 2:22, 3:8, 88:17, 89:3, 89:9
**48** [1] - 45:25
**4:04** [1] - 140:5
**4th** [6] - 38:20, 39:2, 39:3, 39:5, 39:9, 47:5

**5**

**5** [5] - 2:22, 3:8,
26:8, 119:9, 137:8
**500** [1] - 2:6
**51** [1] - 3:4
**53095** [1] - 4:11
**53202-4188** [1] - 2:10
**53701-2719** [1] - 2:7
**53716** [1] - 2:3
**5:36** [2] - 1:23, 144:14
**5th** [3] - 54:20, 55:8, 56:15

**6**

**6** [5] - 2:23, 3:8, 137:5, 137:11, 137:12
**6-figure** [1] - 122:6, 122:13
**61** [1] - 2:20
**6ft** [1] - 127:22

**7**

**7/23/60** [1] - 4:13
**735** [2] - 1:21, 2:10
**7th** [1] - 104:25

**8**

**8** [7] - 1:22, 88:17, 89:3, 89:8, 117:18, 118:11, 145:9
**80** [1] - 2:21

**A**

**a.m** [2] - 94:4, 142:24
**ability** [4] - 11:4, 22:23, 72:19, 98:3
**absolute** [1] - 141:1
**absolutely** [14] - 15:15, 32:9, 32:11, 33:21, 34:12, 51:12, 56:21, 65:16, 75:5, 75:21, 110:2, 116:13, 127:5, 144:11
**absorb** [1] - 65:13
**abuse** [47] - 7:21, 7:25, 8:8, 8:22, 9:4, 9:7, 9:9, 10:9, 11:18, 13:3, 13:9, 13:21, 13:23, 14:13, 15:10, 15:19, 16:1, 16:16, 16:19, 16:24, 19:15, 23:2, 29:5, 29:17, 29:20, 33:7, 33:12, 51:7, 59:7, 59:8, 59:17, 60:9, 66:8, 67:23, 68:2, 69:9, 70:24, 74:20,
74:21, 88:20, 90:4, 90:24, 115:4, 115:20, 117:9, 123:1, 130:13
**abused** [2] - 30:10, 117:11
**abuses** [1] - 78:6
**accept** [1] - 105:19
**accountable** [1] - 33:25
**accountant** [1] - 21:3
**accurate** [2] - 65:2, 65:5
**accused** [3] - 33:12, 52:2, 107:10
**acquiescing** [1] - 100:21
**acquittal** [1] - 34:11
**acquitted** [1] - 34:1
**acquitting** [3] - 33:11, 33:13, 33:19
**act** [5] - 14:15, 14:16, 72:19, 99:17, 125:15
**acting** [1] - 104:24
**action** [6] - 31:24, 62:5, 76:13, 135:9, 139:18, 145:15
**actions** [1] - 139:17
**activities** [1] - 19:6
**actual** [1] - 28:17, 28:25, 29:11, 30:6, 32:3, 32:17, 49:1, 54:6, 65:3, 73:16
**add** [2] - 92:11, 92:20
**addicted** [1] - 40:21
**addiction** [1] - 37:19
**adding** [2] - 92:11, 92:18
**addition** [1] - 6:2
**additional** [2] - 54:21, 57:17
**address** [5] - 4:8, 17:19, 17:22, 77:16, 80:22
**addressed** [1] - 42:18
**adds** [1] - 92:19
**Administration** [1] - 77:12
**administrative** [1] - 136:19
**admissible** [1] - 21:16
**admit** [1] - 34:21
**admitted** [2] - 37:14, 132:5
**adult** [1] - 7:20
**adverse** [2] - 79:6, 79:10
**advice** [2] - 47:16, 48:8
**advocacy** [3] - 9:13, 115:24, 116:3
**advocate** [2] - 67:17, 77:6
**advocates** [1] - 9:17
**affect** [3] - 25:14, 79:3, 79:6
**affidavit** [5] - 6:5, 94:18, 94:20, 138:24, 139:5
**affidavits** [1] - 94:15
**affirmed** [1] - 95:5
**affirming** [2] - 95:1, 95:4
**affixed** [1] - 145:17
**afforded** [1] - 40:20
**afraid** [2] - 117:6, 139:20
**afterwards** [1] - 92:20
**AG's** [3] - 47:11, 47:12, 48:21
**age** [2] - 99:8, 101:2
**agency** [1] - 43:18
**ago** [2] - 13:14, 71:4
**agree** [10] - 32:19, 46:17, 72:1, 76:4, 77:24, 78:1, 78:8, 78:12, 78:18, 78:21
**agreed** [1] - 77:25
**ahead** [14] - 33:3, 43:8, 43:9, 66:3, 72:13, 92:15, 107:15, 108:8, 108:10, 109:13, 134:21, 139:1, 139:2, 140:1
**ahold** [1] - 83:3
**air** [1] - 31:12
**alcohol** [4] - 37:23, 40:21, 87:7, 87:10
**alert** [1] - 42:12
**alerted** [1] - 67:9
**allegation** [4] - 30:14, 30:15, 30:17, 57:17
**allegations** [4] - 28:2, 132:8, 132:11, 132:19
**alleged** [5] - 16:8, 35:11, 72:9, 131:23, 131:25
**allegedly** [1] - 131:21
**allow** [3] - 23:13,

Case 1:10-cv-00910-WCG Filed 01/24/13 Page 40 of 56 Document 82-1

**almost** [4] - 50:1, 60:10, 60:12, 139:20
**alone** [2] - 128:5, 129:18
**alternate** [1] - 40:16
**Ambien** [5] - 38:3, 125:10, 125:11, 125:15, 125:23
**amend** [1] - 58:15
**amount** [1] - 139:21
**Amy** [4] - 19:8, 23:14, 24:10, 125:25
**analysis** [1] - 69:6
**anecdotal** [3] - 69:12, 71:17, 71:21
**announced** [1] - 133:23
**answer** [29] - 6:4, 10:11, 21:19, 22:9, 22:20, 23:23, 24:19, 26:6, 34:16, 35:25, 36:3, 43:2, 43:4, 58:14, 71:3, 88:25, 92:19, 93:4, 93:15, 102:16, 106:21, 109:14, 111:25, 116:18, 125:24, 133:14, 135:18, 139:19, 142:9
**answered** [7] - 87:23, 87:24, 93:5, 93:8, 106:20, 109:7, 109:10
**answering** [5] - 88:23, 92:16, 105:21, 105:25, 106:1
**answers** [8] - 25:16, 25:18, 88:25, 101:4, 102:20, 105:7, 107:5, 112:9
**anticipate** [1] - 66:21
**anticipation** [1] - 5:23
**AP** [1] - 57:20
**Apartment** [1] - 4:10
**appear** [1] - 61:14
**appearance** [3] - 32:24, 141:5, 141:7
**appeared** [3] - 2:4, 2:7, 2:11
**Appleton** [3] - 17:18, 18:3, 18:4
**apply** [1] - 11:19
**appointed** [2] - 42:20, 44:14

**appreciate** [1] - 130:21
**approach** [2] - 22:24, 48:7
**approached** [1] - 22:4
**approaching** [5] - 29:4, 29:8, 29:16, 29:18, 29:21
**appropriate** [2] - 90:17, 143:13
**area** [8] - 6:10, 7:14, 8:3, 8:22, 18:2, 18:3, 18:10, 20:7
**areas** [1] - 10:14
**argue** [1] - 106:20
**argument** [4] - 79:3, 101:20, 104:21, 106:25
**armed** [1] - 15:18
**arrest** [1] - 12:16
**article** [1] - 64:16
**artificial** [1] - 10:4
**aside** [1] - 35:15
**aspect** [1] - 14:12
**aspects** [2] - 11:17, 128:13
**assault** [5] - 7:20, 14:23, 25:3, 60:2, 60:11
**assaulted** [2] - 75:13, 75:14
**assessing** [2] - 71:19, 134:2
**assigned** [1] - 59:14
**assignment** [1] - 140:11
**assist** [2] - 73:8, 136:5
**assistant** [7] - 6:15, 6:19, 6:20, 19:17, 77:7, 77:9
**Association** [4] - 61:10, 61:19, 77:1, 77:3
**association** [1] - 77:2
**Association.......... .......................** [1] - 2:20
**assume** [3] - 17:11, 79:2, 113:13
**assure** [2] - 14:4
**Attached** [1] - 3:8
**attachment** [2] - 139:1, 139:5
**attachments** [1] - 49:4
**attack** [3] - 31:5, 31:7, 31:9
**attacked** [4] -

30:12, 30:20, 31:4, 68:15
**attempt** [1] - 94:9
**attempted** [16] - 31:16, 33:19, 35:12, 66:8, 66:24, 68:3, 68:16, 70:5, 92:6, 96:21, 97:1, 100:2, 100:13, 104:13, 107:19, 123:5
**attempting** [7] - 31:12, 35:3, 76:14, 85:17, 94:12, 107:10, 134:3
**attempts** [2] - 100:22, 132:16
**attended** [1] - 8:10
**attention** [6] - 59:3, 60:1, 64:3, 107:3, 127:12
**Attorney** [1] - 3:8
**attorney** [31] - 6:15, 6:17, 6:20, 6:25, 17:12, 17:17, 22:25, 36:15, 48:18, 54:3, 56:22, 68:17, 70:21, 73:25, 76:10, 104:24, 105:2, 122:5, 122:16, 122:19, 122:20, 122:21, 123:1, 123:3, 123:4, 130:14, 144:3, 144:7, 145:12, 145:13
**Attorney's** [4] - 6:18, 7:9, 8:21, 76:25
**attorney's** [1] - 9:2
**attorney/client** [1] - 35:22
**attorneys** [1] - 77:7
**attribute** [2] - 115:9, 115:12
**attributed** [1] - 52:9
**August** [2] - 4:18, 133:22
**authored** [5] - 54:20, 61:8, 63:9, 63:10, 63:12
**authority** [1] - 84:24
**available** [3] - 11:9, 34:22, 45:6
**average** [1] - 15:11
**aware** [11] - 14:10, 36:19, 37:10, 41:21, 59:16, 59:19, 69:22, 69:24, 70:14, 70:17, 71:16
**awfully** [3] - 96:12, 143:3, 143:7

# B

**background** [2] - 30:11, 65:24
**bank** [1] - 15:18
**bankruptcy** [1] - 4:21
**bar** [6] - 27:12, 27:15, 87:4, 87:5, 87:6
**bargaining** [1] - 132:13
**bars** [2] - 86:1, 87:3
**base** [2] - 69:11, 69:13
**based** [3] - 31:19, 64:21, 70:9
**basis** [3] - 71:17, 94:22, 116:4
**BAY** [1] - 1:3
**beautiful** [2] - 121:10, 121:22
**became** [4] - 6:21, 7:16, 38:13, 39:4
**become** [4] - 17:5, 38:4, 38:12, 41:21
**befitting** [1] - 65:22
**beg** [2] - 121:11, 121:23
**began** [1] - 9:24
**beginning** [1] - 9:19
**behalf** [4] - 2:4, 2:7, 2:11, 9:1
**behaved** [2] - 52:7, 126:6
**behavior** [17] - 32:16, 40:17, 40:22, 45:16, 52:13, 64:12, 64:14, 64:17, 64:22, 77:20, 78:17, 79:23, 79:24, 87:4, 88:5, 88:9, 132:6
**behavioral** [1] - 37:19
**behaviors** [1] - 78:22
**behind** [1] - 24:16
**belief** [2] - 57:22, 124:24
**believes** [1] - 12:8
**Bend** [1] - 4:10
**benefit** [1] - 14:8
**benzodiazepine** [1] - 37:23
**benzodiazepines** [1] - 38:3
**bet** [1] - 97:10
**better** [5] - 18:4, 95:20, 96:10, 97:15, 99:16
**Between** [1] - 2:21
**between** [23] -

12:1, 12:11, 16:8, 28:18, 36:15, 42:14, 46:12, 47:7, 54:14, 54:21, 64:4, 74:23, 75:3, 76:1, 76:9, 76:14, 88:17, 89:3, 89:8, 104:16, 110:11, 130:3, 136:9
**beyond** [4] - 34:19, 34:23, 35:3, 35:12
**big** [4] - 114:19, 116:20, 117:2, 117:23
**birth** [1] - 4:12
**bit** [4] - 13:12, 41:19, 43:2, 76:23
**black** [1] - 18:25
**blonde** [1] - 127:22
**Board** [1] - 67:6
**board** [4] - 61:16, 61:18, 121:9, 121:21
**boastful** [1] - 123:11
**bodies** [1] - 127:23
**body** [4] - 87:15, 87:18, 87:21, 132:1
**bond** [1] - 12:12
**bookkeeper** [1] - 21:3
**bored** [3] - 88:17, 89:4, 89:9
**Borgelt** [1] - 1:20
**BORGELT** [1] - 2:9
**boss** [1] - 46:7
**bought** [1] - 120:13
**Box** [1] - 2:6
**boxes** [1] - 51:18
**boyfriend** [6] - 66:8, 85:17, 85:20, 107:9, 107:12, 144:1
**boyfriend/ girlfriend** [2] - 15:23, 16:4
**BREAH** [2] - 1:18, 145:5
**break** [2] - 23:7, 133:15
**Brillion** [1] - 21:4
**bring** [1] - 95:20
**Broadway** [1] - 2:3
**bureaucratic** [1] - 78:6
**BY** [20] - 4:6, 5:2, 5:8, 21:17, 26:9, 33:17, 61:3, 71:10, 74:19, 93:9, 110:21, 133:18, 134:15, 135:1, 136:7, 137:6, 137:24, 138:19, 139:3, 140:2

**C**

**calculated** [3] - 22:9, 22:12, 22:13
**Calumet** [6] - 17:12, 17:14, 17:17, 17:23, 19:11, 140:14
**Camp** [1] - 48:5
**CAMP** [1] - 48:5
**camp** [3] - 48:7, 48:13, 135:18
**cancer** [1] - 115:12
**cannot** [2] - 24:15, 77:21
**capacities** [1] - 77:11
**capacity** [4] - 17:15, 51:14, 86:11, 98:16
**Care** [1] - 86:3
**care** [3] - 15:8, 68:6, 107:3
**career** [4] - 17:8, 65:10, 122:6, 122:13
**case** [91] - 5:21, 13:7, 19:11, 19:14, 19:15, 19:16, 19:20, 19:21, 22:5, 22:19, 22:23, 23:16, 28:6, 28:19, 28:25, 29:2, 29:5, 29:11, 29:17, 29:18, 29:23, 29:25, 30:2, 30:3, 30:5, 30:7, 30:8, 30:10, 30:11, 31:22, 31:24, 32:1, 32:3, 32:6, 32:25, 33:4, 34:4, 34:15, 42:20, 44:14, 44:16, 44:24, 47:18, 47:20, 55:9, 55:17, 56:24, 56:25, 57:3, 57:8, 59:25, 68:2, 68:18, 70:24, 72:9, 72:15, 72:23, 73:3, 73:4, 73:24, 75:16, 75:18, 81:5, 84:1, 99:17, 108:2, 108:13, 108:16, 108:20, 109:18, 110:4, 110:9, 110:10, 128:2, 133:22, 134:3, 136:24, 137:19, 138:9, 138:21, 140:25, 141:5, 141:11, 141:24, 142:6, 142:13, 143:12, 143:25, 144:3, 144:10
**Case** [1] - 1:7
**Case....................
.......** [1] - 3:4

**cases** [32] - 7:12, 7:13, 11:18, 11:20, 12:2, 12:3, 14:9, 14:11, 14:13, 15:9, 16:17, 16:20, 16:21, 16:24, 34:21, 43:6, 59:7, 60:2, 60:3, 60:6, 60:9, 60:11, 72:21, 74:21, 74:22, 75:19, 115:18, 115:19, 140:18, 141:6
**casual** [1] - 141:4
**categories** [1] - 131:5
**categorized** [1] - 15:24
**category** [4] - 16:20, 29:13, 32:15, 133:11
**caused** [2] - 65:6, 125:12
**causes** [1] - 40:17
**cell** [4] - 49:16, 49:18, 49:22, 82:22
**Cell** [1] - 3:3
**certain** [1] - 55:5
**certainly** [21] - 6:23, 8:9, 8:12, 9:25, 10:15, 15:23, 18:8, 49:5, 54:1, 59:5, 60:2, 64:25, 65:22, 71:21, 73:19, 79:1, 85:10, 116:3, 141:3, 141:6, 143:20
**certify** [2] - 145:7, 145:11
**cetera** [1] - 10:7
**chairman** [1] - 67:5
**chance** [4] - 83:23, 109:3, 116:14, 119:4
**chances** [1] - 116:15
**change** [5] - 11:12, 11:13, 128:2, 129:16
**changed** [1] - 95:7
**changes** [1] - 34:14
**characteristic** [1] - 115:10
**characterize** [3] - 35:7, 80:23, 87:22
**characterized** [1] - 57:23
**characterizing** [1] - 85:13
**charge** [4] - 34:9, 34:13, 34:17, 104:13
**charged** [3] - 27:14, 27:24, 34:6

**charges** [1] - 27:23
**charging** [5] - 34:23, 45:11, 72:24, 73:16, 73:17
**cheek** [1] - 105:13
**chemical** [1] - 37:19
**chemicals** [1] - 37:21
**chicken** [1] - 95:21
**child** [4] - 7:20, 75:13, 75:17, 75:21
**children** [7] - 14:17, 14:22, 15:1, 15:6, 15:11, 15:17, 60:3
**Chilton** [1] - 131:10
**chose** [1] - 103:7
**chronologically** [1] - 8:17
**circumscribe** [1] - 25:10
**circumstances** [1] - 43:12
**city** [5] - 6:15, 6:16, 6:20, 6:25, 17:18
**City** [5] - 6:16, 6:21, 6:22, 7:3, 7:6
**Civil** [1] - 1:18
**civil** [1] - 13:11
**claim** [3] - 13:16, 59:2, 80:22
**claiming** [2] - 41:22, 98:5
**claims** [1] - 139:17
**clarify** [2] - 66:18, 100:20
**clear** [3] - 75:8, 129:19, 143:20
**clearly** [1] - 24:25
**client** [67] - 4:19, 22:4, 22:16, 22:24, 23:4, 23:8, 28:19, 30:13, 31:15, 32:6, 33:8, 33:20, 34:4, 34:25, 35:2, 35:6, 35:8, 35:18, 35:21, 36:2, 36:8, 36:12, 36:15, 36:20, 38:12, 38:18, 39:18, 39:22, 41:21, 43:13, 43:23, 46:3, 48:24, 50:11, 50:21, 56:7, 58:5, 63:17, 68:9, 68:12, 69:3, 69:19, 69:20, 70:3, 71:14, 74:3, 76:5, 76:15, 79:4, 79:6, 79:7, 81:20, 84:25, 86:15, 88:21, 89:12, 111:1, 111:5, 113:14, 130:10, 130:18, 130:23, 131:6, 131:13,

132:25, 140:12, 140:14
**client's** [1] - 59:2
**clients** [3] - 93:17, 140:8, 140:20
**Cliff** [1] - 120:17
**close** [5] - 48:12, 101:9, 102:2, 102:3, 102:7
**clothing** [1] - 20:16
**cocaine** [1] - 40:20
**collateral** [1] - 14:7
**college** [1] - 120:12
**combination** [2] - 37:19, 125:15
**coming** [5] - 5:13, 5:16, 72:22, 106:16, 117:8
**commenced** [3] - 30:1, 42:13, 43:17
**commencement** [1] - 138:9
**commencing** [1] - 1:22
**comment** [15] - 62:10, 63:11, 63:14, 64:20, 70:19, 80:17, 80:20, 128:7, 129:15, 131:18, 131:21, 132:1, 132:4, 133:5, 133:9
**comments** [2] - 92:25, 128:9
**Commission** [1] - 145:24
**committed** [1] - 55:13
**Committee** [1] - 2:19
**committee** [3] - 61:9, 61:11, 61:15
**common** [2] - 115:3, 115:20
**communicate** [1] - 72:17
**communicating** [2] - 106:3, 106:6
**communication** [22] - 30:1, 32:2, 42:14, 44:17, 46:1, 70:18, 71:19, 71:20, 71:23, 71:25, 74:2, 89:14, 97:22, 100:8, 102:24, 103:7, 103:14, 103:21, 105:23, 110:2, 129:1, 135:17
**Communication** [1] - 114:18
**communications** [17] - 46:4, 46:12, 67:22, 68:19, 69:3, 69:10, 71:12, 80:19,

90:7, 93:25, 99:23, 104:16, 125:14, 127:2, 135:6, 135:11, 142:18
**community** [1] - 48:12
**Company** [2] - 2:8, 134:18
**COMPANY** [1] - 1:11
**company** [1] - 50:3
**comparator** [1] - 70:6
**complainant** [1] - 29:5
**complained** [3] - 40:18, 43:23, 51:7
**complaining** [2] - 67:12, 67:15
**complaint** [9] - 27:16, 27:18, 27:21, 42:8, 42:10, 43:12, 43:16, 43:19, 107:24
**complete** [1] - 38:5
**completed** [1] - 141:11
**completion** [1] - 141:14
**compliments** [1] - 104:4
**compromise** [1] - 31:12
**conceivable** [1] - 130:12
**concept** [1] - 59:21
**concern** [1] - 130:14
**concerning** [3] - 44:18, 55:22, 69:7
**concluded** [2] - 45:11, 144:14
**concluding** [1] - 1:23
**conclusion** [3] - 33:10, 70:8, 71:17
**conditions** [1] - 12:12
**conduct** [3] - 12:4, 44:19, 55:22
**confer** [2] - 72:25, 86:15
**conference** [1] - 42:6
**conferences** [3] - 58:23, 60:13, 73:17
**confidence** [1] - 72:18
**conflict** [23] - 28:3, 28:12, 28:16, 28:17, 28:18, 28:22, 28:23, 28:25, 29:4, 29:7, 29:12, 29:16, 29:20,

29:23, 30:6, 31:22, 32:3, 32:7, 32:17, 33:4, 141:6

**Conflict** [2] - 29:14, 32:15

**connection** [1] - 98:15

**consensus** [4] - 52:11, 52:19, 52:21, 52:24

**consequence** [2] - 12:14, 65:9

**consequences** [2] - 15:1, 79:1

**consideration** [3] - 10:6, 10:7, 40:16

**considerations** [3] - 8:4, 9:3, 9:8

**constitutional** [1] - 78:4

**contact** [19] - 20:9, 20:12, 20:15, 20:19, 20:21, 20:22, 48:10, 62:24, 63:2, 63:20, 82:17, 83:2, 83:7, 83:12, 89:8, 97:14, 129:24, 130:2, 130:9

**contacted** [4] - 63:6, 63:8, 63:22, 89:13

**Contained** [1] - 3:3

**contained** [1] - 41:23

**content** [1] - 63:14

**contest** [10] - 28:2, 28:9, 28:11, 28:13, 28:21, 41:7, 56:2, 131:1, 131:4, 132:8

**contesting** [1] - 133:24

**context** [10] - 66:11, 77:13, 98:10, 98:11, 98:13, 101:18, 101:20, 104:20, 109:21, 113:13

**continue** [2] - 17:7, 34:15

**continued** [1] - 42:18

**contradict** [2] - 22:2, 24:11

**contributing** [1] - 125:20

**conversation** [14] - 44:12, 44:19, 44:22, 44:23, 47:1, 53:11, 54:15, 82:4, 82:6, 84:11, 85:5, 88:7, 89:25, 115:2

**conversations** [9] - 19:23, 19:25, 20:2,

20:3, 23:3, 26:19, 54:22, 55:2, 55:4

**convey** [1] - 45:18

**convict** [3] - 34:18, 35:3, 35:11

**convicting** [1] - 34:5

**conviction** [2] - 34:11, 34:23

**convictions** [1] - 34:7

**convincing** [4] - 123:14, 123:17, 123:18, 123:21

**convoluted** [2] - 127:16, 128:1

**cool** [1] - 93:18

**cooling** [1] - 12:10

**cooperative** [1] - 45:7

**coordinated** [2] - 135:20, 135:23

**copied** [1] - 54:2

**copy** [2] - 36:25, 139:4

**Copy** [1] - 2:23

**correct** [61] - 13:5, 13:13, 13:18, 13:23, 14:18, 27:12, 27:13, 31:18, 31:25, 32:4, 38:19, 38:25, 41:16, 41:17, 51:8, 51:16, 52:5, 52:6, 55:24, 63:18, 68:24, 69:1, 70:15, 70:25, 71:9, 74:24, 78:16, 79:13, 80:11, 81:10, 81:11, 81:14, 83:8, 89:5, 93:19, 95:2, 95:6, 95:15, 97:25, 107:11, 111:12, 111:18, 112:14, 115:13, 118:10, 124:15, 129:24, 130:1, 130:25, 135:4, 136:2, 136:16, 137:23, 138:15, 140:19, 141:16, 142:17, 142:20, 143:16, 144:2, 144:4

**correctly** [4] - 23:24, 31:19, 118:8, 118:22

**correspondence** [4] - 54:3, 55:16, 55:19, 56:15

**corroborate** [2] - 23:24, 25:1

**corroborates** [2] - 24:13, 25:1

**cost** [1] - 122:12

**counsel** [12] - 5:18,

7:4, 41:14, 56:8, 58:5, 58:6, 94:19, 135:7, 135:21, 135:23, 145:12, 145:14

**countenanced** [1] - 77:22

**counties** [1] - 73:15

**counts** [1] - 132:18

**COUNTY** [1] - 145:2

**County** [14] - 6:18, 7:8, 7:13, 7:22, 8:1, 8:20, 17:10, 17:12, 17:14, 17:17, 17:23, 19:12, 48:6, 140:14

**couple** [2] - 65:12, 81:10, 134:16

**couple-day** [1] - 65:12

**course** [10] - 39:16, 39:20, 40:2, 40:7, 59:12, 81:4, 83:3, 87:1, 141:12, 143:1

**COURT** [1] - 1:1

**Court** [4] - 17:24, 18:1, 133:22, 134:11

**court** [4] - 73:6, 95:6, 116:16, 131:24

**courtroom** [3] - 109:9, 109:11, 133:9

**coverage** [7] - 135:3, 135:4, 135:8, 135:13, 137:22, 139:11, 139:17

**crass** [1] - 65:22

**create** [2] - 11:9, 14:3

**created** [6] - 10:24, 11:1, 11:3, 11:6, 11:10, 12:17

**creating** [1] - 10:4

**credence** [1] - 24:18

**credibility** [8] - 21:22, 22:14, 24:23, 25:14, 25:15, 25:18, 25:20, 25:21

**creepy** [3] - 99:9, 101:2, 105:19

**Crime** [2] - 67:5, 78:3

**crime** [53] - 7:18, 13:5, 14:21, 15:4, 15:15, 15:19, 16:1, 16:14, 34:19, 65:25, 66:5, 66:15, 66:22, 67:1, 67:7, 67:11, 67:17, 67:20, 70:14,

71:14, 71:18, 72:2, 72:4, 72:8, 73:1, 73:2, 73:5, 73:12, 73:20, 73:22, 75:20, 75:21, 77:17, 77:21, 83:24, 84:5, 84:15, 85:9, 89:4, 89:7, 89:13, 105:20, 105:25, 106:1, 106:2, 106:5, 106:12, 106:16, 106:19, 140:17, 140:25, 141:15, 144:2

**crimes** [13] - 7:16, 8:5, 12:20, 12:22, 12:25, 13:15, 13:21, 13:23, 14:2, 14:24, 15:8, 15:12, 15:16

**criminal** [27] - 7:13, 11:20, 13:10, 13:17, 28:19, 33:4, 42:12, 43:25, 44:4, 44:8, 45:16, 46:7, 47:23, 48:3, 48:17, 48:18, 59:24, 60:6, 68:18, 72:15, 73:13, 73:24, 78:7, 90:6, 91:1, 91:6, 91:12

**criticism** [2] - 63:15, 64:21

**cross** [1] - 16:25

**cross-training** [1] - 16:25

**Crosse** [12] - 6:16, 6:18, 6:21, 6:22, 7:3, 7:8, 7:13, 7:22, 8:1, 8:20, 9:14, 17:10

**crossed** [1] - 100:19

**Cummings** [1] - 63:23

**curious** [1] - 91:23

**current** [3] - 4:8, 5:25, 140:21

**curry** [2] - 99:25, 100:18

**custodial** [1] - 12:19

**customary** [1] - 51:13

**D**

**D-A-R-B-O-Y** [1] - 18:3

**DA** [23] - 6:19, 8:6, 17:5, 17:14, 31:21, 48:6, 66:23, 71:13, 71:25, 72:1, 72:8, 73:20, 74:8, 83:1, 83:20, 84:4, 89:18, 89:22, 90:1, 90:23,

97:15, 111:6

**DA's** [6] - 2:19, 10:13, 10:15, 61:10, 61:18, 77:3

**Darboy** [5] - 18:3, 18:6, 18:10, 18:14, 18:15

**DAs** [7] - 7:9, 48:20, 59:15, 77:6, 77:7, 77:9

**database** [2] - 68:25, 69:4

**date** [2] - 4:12, 89:4

**Dated** [1] - 2:19

**dated** [3] - 61:7, 81:18, 86:5

**dating** [1] - 98:16

**daughter** [1] - 120:14

**Dave** [2] - 48:2, 48:4

**days** [1] - 125:22

**DCI** [3] - 43:20, 43:24, 44:24

**deal** [3] - 14:3, 65:13, 90:16

**dealing** [1] - 14:1

**death** [14] - 66:25, 68:3, 68:16, 70:5, 85:18, 92:6, 96:21, 97:2, 100:3, 100:13, 102:5, 107:11, 107:15, 107:20

**December** [3] - 46:13, 47:3, 47:5

**decide** [1] - 35:8

**decided** [4] - 41:8, 47:8, 57:10, 129:7

**deciding** [1] - 40:19

**decision** [9] - 34:9, 40:23, 45:12, 53:2, 57:20, 65:2, 73:16, 125:21, 133:23

**decisions** [6] - 30:4, 72:23, 72:24, 72:25, 75:10, 85:2

**declaration** [6] - 6:7, 6:8, 94:16, 94:17, 94:21, 135:21

**declarations** [2] - 94:25, 95:2

**Defendant** [2] - 1:9, 2:11

**Defendants** [2] - 1:12, 2:7

**defer** [2] - 32:12, 85:1

**define** [1] - 7:17

**defined** [6] - 7:18, 15:21, 16:1, 75:20, 114:15, 118:14

**definite** [1] - 10:6
**definition** [4] -
16:7, 16:16, 16:18,
36:3
**definitions** [1] -
111:3
**deleted** [4] - 49:21,
50:23, 51:11, 51:23
**deleting** [1] - 50:25
**delivery** [1] - 37:4
**demand** [1] - 22:7
**demonstrating** [1]
- 28:4
**deny** [1] - 21:11
**denying** [1] - 20:14
**Department** [6] -
42:4, 46:5, 48:4,
58:19, 77:11, 77:12
**dependency** [1] -
37:20
**dependent** [4] -
37:22, 37:23, 38:4,
40:21
**deposition** [2] -
81:12, 145:8
**deputy** [3] - 6:16,
6:21, 54:3
**describe** [2] - 75:1,
77:1
**described** [9] -
40:8, 44:20, 49:5,
49:7, 54:16, 60:14,
87:6, 125:24,
126:18
**describes** [1] -
16:7
**describing** [3] -
54:10, 87:9, 88:8
**description** [1] -
52:17
**descriptions** [1] -
52:1
**designed** [1] - 78:5
**desire** [6] - 59:8,
59:17, 59:20, 82:11,
128:4, 129:18
**despite** [1] - 59:1
**detail** [2] - 76:23,
138:10
**determination** [1] -
52:14
**develop** [1] - 94:12
**developed** [3] -
9:13, 141:10,
141:14
**development** [2] -
10:22, 13:13
**developments** [1] -
9:24
**diagnosed** [2] -
37:23, 126:5
**diagnosis** [2] -
38:5, 126:4

**Diamond** [2] -
17:24, 18:1
**dick** [2] - 107:5,
107:8
**difference** [1] -
29:13
**differences** [2] -
13:2, 13:3
**different** [8] - 9:10,
32:11, 66:20, 72:3,
72:6, 72:14, 111:13,
138:5
**difficulty** [1] - 9:22
**direct** [2] - 11:11,
65:11
**directed** [1] - 58:11
**direction** [2] -
98:24, 145:10
**directly** [6] - 7:6,
64:8, 64:9, 73:1,
100:9, 145:14
**director** [1] - 57:4
**directs** [1] - 33:10
**disbelieve** [4] -
30:15, 30:16, 30:17,
30:18
**discharge** [1] - 5:4
**disciplinary** [1] -
27:14
**disciplined** [1] -
27:12
**disclose** [2] - 41:8,
41:15
**disclosure** [1] -
65:12
**discovery** [3] -
21:16, 22:10, 22:12
**discretionary** [1] -
136:21
**discuss** [4] - 39:17,
53:24, 82:2, 115:3
**discussed** [3] -
24:15, 24:22, 25:23
**discussing** [1] -
46:8
**discussion** [1] -
53:23
**discussions** [4] -
5:17, 25:4, 27:8,
27:10
**dismiss** [2] -
132:20, 132:21
**dismissed** [7] -
53:19, 54:17, 56:6,
56:16, 57:11, 57:16,
132:17
**Disposition** [1] -
3:7
**disposition** [2] -
40:16, 73:3
**dispute** [2] - 135:4,
135:13
**disseminated** [1] -

83:14
**distinct** [2] - 56:12,
133:1
**distinction** [3] -
10:5, 136:8, 136:23
**distress** [1] - 65:6
**distressing** [3] -
66:16, 67:7, 67:12
**district** [10] - 9:2,
17:12, 17:17, 22:25,
68:17, 70:20, 73:25,
76:10, 122:20,
123:4
**DISTRICT** [2] - 1:1,
1:2
**District** [4] - 6:18,
7:9, 8:20, 76:25
**dividing** [1] - 10:6
**DIVISION** [1] - 1:3
**divorced** [1] -
18:11
**doctor** [1] - 115:11
**document** [3] -
5:20, 78:17, 137:9
**documents** [1] -
5:14
**DOJ** [1] - 47:24,
47:25, 53:4, 53:12,
53:16, 59:14
**dollar** [2] - 119:12,
120:8
**domestic** [65] -
7:21, 7:25, 8:8,
8:10, 8:22, 9:4, 9:7,
9:9, 10:9, 10:17,
11:1, 11:18, 12:4,
12:11, 12:20, 13:1,
13:3, 13:9, 13:14,
13:21, 13:23, 14:10,
14:13, 14:22, 15:3,
15:7, 15:10, 15:19,
15:21, 15:25, 16:1,
16:7, 16:16, 16:19,
16:23, 19:15, 23:2,
25:3, 29:17, 33:7,
33:12, 51:6, 59:7,
59:8, 59:10, 59:17,
60:9, 66:7, 67:23,
68:2, 69:9, 70:24,
74:20, 74:21, 88:20,
90:4, 90:24, 115:4,
115:10, 115:15,
115:17, 115:20,
117:9, 122:25,
130:13
**Domestic** [1] - 9:14
**domination** [2] -
26:11, 26:14
**dominatrix** [3] -
21:8, 22:15, 23:23
**dominatrixes** [11] -
21:8, 21:13, 24:15,
24:17, 24:21, 25:7,

25:23, 26:2, 26:10,
26:11, 26:13
**done** [20] - 18:21,
22:2, 46:17, 52:5,
52:17, 52:21, 52:25,
67:2, 67:3, 69:7,
72:12, 74:9, 108:3,
108:14, 108:17,
108:20, 109:12,
109:18, 110:10,
141:25
**Dono** [1] - 97:24
**doubt** [5] - 34:19,
34:24, 35:4, 35:13,
89:16
**Doug** [4] - 47:23,
54:6, 54:8, 54:12
**down** [2] - 140:4,
141:22
**Dr** [1] - 63:23
**drafted** [1] - 37:11
**drank** [2] - 86:1,
86:23
**drawers** [1] - 51:19
**drill** [1] - 43:5
**drink** [22] - 87:10,
113:22, 114:2,
114:6, 114:13,
118:9, 118:12,
118:15, 118:23,
119:1, 119:22,
120:1, 122:9,
126:13, 126:20,
126:24, 128:3,
128:7, 128:10,
128:15, 128:16,
129:17
**drinker** [1] - 127:9
**drinking** [3] - 87:7,
125:5, 125:6
**drinks** [2] - 120:6,
120:8
**Drive** [2] - 4:10,
17:20
**drug** [6] - 7:15,
11:4, 11:5, 14:24,
125:18, 125:23
**drugs** [3] - 37:25,
125:7, 126:7
**Dufour** [1] - 62:4
**duly** [1] - 4:3
**duplex** [3] - 17:21,
18:10, 18:12
**during** [13] - 17:22,
39:16, 39:20, 40:2,
40:7, 41:10, 41:11,
81:24, 86:15, 86:25,
88:6, 143:11
**duties** [20] - 27:2,
27:6, 29:8, 35:15,
72:14, 73:19, 74:1,
74:11, 76:18, 83:1,
83:4, 83:25, 90:3,

90:20, 90:22, 111:7,
136:9, 136:14,
136:17, 136:25
**duty** [10] - 72:16,
72:20, 72:22, 72:25,
73:4, 73:12, 73:15,
76:8, 85:8
**DV** [2] - 9:20
**DVIP** [1] - 9:15
**dynamics** [1] -
14:10

**E**

**early** [5] - 8:19,
12:9, 138:21, 141:8,
143:18
**easier** [1] - 10:4
**East** [1] - 2:6
**EASTERN** [1] - 1:2
**easy** [1] - 30:25
**eat** [1] - 95:24
**edge** [4] - 101:10,
102:2, 102:3, 102:7
**effect** [1] - 16:12
**effective** [1] - 91:4
**efforts** [4] - 12:25,
75:9, 75:15, 75:22
**eight** [4] - 47:17,
47:19, 52:15, 59:15
**Either** [1] - 99:6
**either** [21] - 10:8,
12:24, 16:10, 18:15,
18:17, 24:25, 30:4,
33:11, 48:20, 54:22,
59:24, 65:23, 101:7,
107:1, 113:9,
118:20, 118:23,
128:11, 131:23,
136:18, 136:24
**elect** [1] - 62:4
**elected** [7] - 17:13,
17:14, 48:20, 59:15,
77:4, 77:8, 97:15
**electronic** [3] -
29:25, 37:5, 55:5
**electronically** [1] -
136:5
**eleven** [1] - 132:12
**email** [6] - 20:2,
20:3, 20:5, 49:3,
55:6, 121:20
**emailed** [1] - 21:1
**emails** [1] - 71:12
**emotional** [1] -
15:5
**emotionally** [1] -
65:13
**emphasis** [5] -
10:9, 12:13, 13:9,
13:25, 14:19
**emphasize** [1] -
7:14
**emphasized** [3] -

8:3, 11:6, 12:13
**emphasizing** [1] -
10:21
**employed** [1] - 7:4
**employee** [2] -
145:12, 145:13
**employees** [1] -
46:5
**employment** [1] -
7:19
**encountered** [1] -
27:1, 27:5
**encounters** [1] -
90:1
**encourage** [6] -
12:17, 76:8, 76:14,
103:14, 103:21,
124:7
**end** [3] - 45:24,
47:2, 139:14
**ended** [4] - 33:15,
117:9, 132:17,
143:12
**enforcement** [7] -
9:17, 12:18, 42:9,
43:16, 43:18, 86:10,
86:20
**engaged** [3] -
64:23, 88:5, 98:17
**engaging** [1] -
63:16
**enjoy** [2] - 87:11,
87:12
**enjoyment** [1] -
87:6
**enter** [2] - 39:9,
62:19
**entered** [9] - 28:2,
28:8, 28:11, 28:21,
38:7, 38:10, 39:10,
39:14, 39:17
**entire** [1] - 22:19
**entirely** [1] - 84:11
**entities** [1] - 57:25
**enumerated** [1] -
74:2
**equally** [1] - 128:1
**Eric** [1] - 48:17
**especially** [2] -
65:25, 141:9
**establish** [3] -
74:22, 75:3, 75:6
**esteem** [11] -
114:19, 114:24,
114:25, 115:5,
115:8, 115:9,
115:14, 115:21,
116:5, 116:7,
116:12
**et** [1] - 10:7
**ethical** [9] - 35:16,
36:1, 36:3, 52:10,
52:14, 54:24, 55:13,

131:2
**ethically** [2] - 52:25
**ethics** [1] - 36:18
**event** [2] - 12:3,
12:11
**events** [1] - 38:22
**eventually** [5] -
46:18, 47:3, 55:18,
56:10, 56:24
**evidence** [9] -
21:16, 27:25, 33:21,
34:13, 34:14, 34:18,
34:22, 35:2, 71:21
**ex** [3] - 107:9,
107:12, 144:1
**ex-boyfriend** [3] -
107:9, 107:12,
144:1
**exactly** [6] - 23:12,
99:12, 114:8,
116:17, 125:3,
125:17
**Examination** [2] -
1:16, 2:15
**EXAMINATION** [2]
- 4:5, 134:14
**examined** [1] - 4:4
**example** [3] -
12:12, 12:18, 75:12
**exchange** [1] - 98:6
**Exchanged** [1] -
2:21
**exchanges** [2] -
20:3, 20:5
**exchanging** [1] -
96:23
**excite** [1] - 118:24
**excited** [1] - 118:20
**exclusion** [1] -
21:25
**excuse** [5] - 18:7,
21:7, 90:20, 120:11,
134:20
**exec** [2] - 61:16,
61:17
**execute** [1] - 76:17
**Executive** [1] -
2:19
**executive** [3] -
61:9, 61:11, 61:15
**exhibit** [2] - 139:20,
139:23
**Exhibit** [14] - 2:18,
36:24, 36:25, 37:3,
61:5, 61:7, 76:19,
76:23, 80:24, 137:5,
137:8, 137:11,
137:12, 140:3
**Exhibits** [4] - 3:7,
3:8, 3:8, 26:8
**exhibits** [1] -
115:12
**existed** [1] - 19:3

**existence** [6] -
37:10, 58:1, 61:24,
62:1, 64:3, 64:8
**exists** [3] - 33:1,
69:14, 69:15
**exits** [1] - 134:25
**expect** [2] - 68:14,
126:9
**expected** [2] -
123:2, 123:8
**experience** [9] -
52:3, 69:5, 69:8,
70:15, 70:20, 87:11,
90:5, 90:25, 91:12
**experienced** [1] -
115:17
**expertise** [1] -
59:10
**Expires** [1] -
145:24
**explain** [4] - 40:2,
68:6, 116:13,
116:16
**explained** [2] -
32:15, 88:22
**explanation** [1] -
39:21
**explanatory** [1] -
97:18
**explore** [1] - 90:23
**expressed** [1] -
46:11
**expressing** [1] -
87:4
**extent** [3] - 68:1,
139:7, 139:12

## F

**face** [8] - 82:3,
82:6, 93:25, 115:2
**face-to-face** [4] -
82:3, 82:6, 93:25,
115:2
**facet** [2] - 31:6,
31:9
**facets** [1] - 123:23
**facilitate** [1] - 51:14
**facility** [2] - 37:15,
63:2
**fact** [34] - 16:7,
19:24, 20:1, 24:16,
25:16, 41:18, 47:12,
49:10, 49:19, 50:12,
63:11, 65:7, 67:8,
67:11, 67:13, 68:24,
70:13, 74:21, 75:17,
80:3, 80:15, 84:4,
84:14, 91:11, 100:1,
114:5, 122:19,
123:3, 125:16,
127:1, 128:11,
129:24, 131:22,
143:14

**factor** [2] - 125:21
**facts** [2] - 47:17,
47:20
**factual** [1] - 91:3,
94:22
**factually** [2] -
68:24, 69:1
**fair** [4] - 8:24,
86:25, 127:20,
136:24
**Fallon** [1] - 48:18
**familial** [6] - 13:22,
15:22, 16:5, 16:10,
16:15, 16:21
**familial-type** [1] -
16:21
**familiar** [5] - 19:9,
19:10, 43:5, 53:7,
98:7
**family** [6] - 12:12,
14:18, 15:10, 15:20,
15:24, 16:11
**family-like** [1] -
16:11
**far** [3] - 36:9, 93:16,
99:18
**favor** [3] - 34:10,
100:1, 100:18
**favorite** [2] - 89:17,
89:22
**fear** [3] - 114:19,
116:20, 117:4
**fearful** [1] - 79:21
**feature** [1] - 115:20
**federal** [1] - 22:22
**Federal** [1] - 1:18
**feelings** [1] - 73:2
**fellow** [1] - 120:21
**felt** [1] - 100:10
**fever** [2] - 95:8,
95:18
**fighting** [1] - 134:4
**figure** [1] - 54:14
**file** [6] - 4:20, 5:25,
29:25, 117:15,
117:16, 136:1
**filed** [2] - 27:16,
56:11, 135:8
**filing** [3] - 5:23,
135:16, 136:5
**finally** [1] - 126:9
**financial** [1] - 15:5
**financially** [1] -
145:14
**fine** [5] - 24:12,
32:14, 80:7, 110:22,
116:19
**finish** [1] - 15:2
**fired** [1] - 86:2
**firestorm** [3] - 64:7,
64:12
**first** [34] - 4:3, 4:19,
5:9, 6:14, 17:14,

17:16, 23:21, 26:13,
37:7, 41:21, 42:17,
46:18, 46:19, 46:20,
57:15, 61:22, 62:24,
63:2, 64:15, 67:8,
81:8, 89:13, 91:5,
99:5, 101:11,
117:11, 127:22,
130:19, 132:3,
136:22, 140:3,
141:19, 142:22
**fiscal** [1] - 11:14
**five** [7] - 7:11, 8:25,
60:16, 71:2, 71:4,
119:24, 132:23
**five-year** [1] - 8:25
**flirtatious** [35] -
85:22, 86:14, 86:18,
86:21, 86:24, 87:8,
87:9, 87:17, 91:19,
93:13, 94:2, 95:16,
95:18, 96:1, 96:7,
96:15, 98:1, 102:21,
103:18, 104:10,
105:8, 105:11,
105:12, 106:13,
108:5, 112:13,
112:17, 112:19,
116:22, 116:23,
117:3, 120:18,
121:3, 121:14,
124:4
**flirted** [2] - 87:19,
88:1
**flirting** [2] - 100:21,
121:4
**Floor** [1] - 2:10
**flow** [2] - 31:12,
78:7
**flowed** [1] - 79:2
**flu** [1] - 95:11
**Foley** [1] - 57:20
**folks** [1] - 52:22
**follow** [1] - 134:16
**follow-up** [1] -
134:16
**followed** [1] -
57:19
**following** [2] -
6:11, 34:16
**follows** [1] - 4:4
**FOR** [1] - 1:1
**force** [1] - 12:17
**forensic** [1] - 49:24
**forget** [1] - 23:18
**forgot** [1] - 127:11
**form** [2] - 23:17,
33:15
**formal** [1] - 27:16,
27:17, 27:20
**former** [3] - 47:11,
47:23, 61:18
**Formerly** [1] - 3:3

forward - 13:4
four [5] - 57:25, 133:16, 133:21, 134:7, 134:10
four-month [2] - 133:21, 134:10
fourth [1] - 141:22
fox [35] - 9:23, 28:5, 32:9, 40:5, 45:25, 58:12, 58:24, 66:17, 71:24, 76:3, 80:20, 83:9, 90:13, 92:13, 103:4, 104:17, 104:21, 105:14, 106:8, 108:10, 109:8, 111:25, 113:23, 114:16, 118:5, 118:25, 119:2, 120:4, 120:9, 123:6, 125:4, 130:18, 132:2, 135:7, 135:11
FOX [34] - 2:2, 2:2, 4:6, 5:2, 5:8, 21:17, 21:21, 21:24, 22:13, 22:18, 23:9, 23:21, 24:5, 24:13, 25:9, 25:25, 26:7, 26:9, 33:17, 61:3, 71:6, 71:10, 74:14, 74:19, 92:18, 92:23, 93:1, 93:6, 93:9, 110:21, 133:18, 134:12, 134:20
Fox [8] - 3:3, 3:8, 72:12, 79:8, 102:6, 106:17, 118:19, 134:25
Fox.......................
................. [1] - 2:16
frame [2] - 8:8, 18:8
Frank [1] - 63:23
frankly [2] - 108:1, 108:12
FRAUEN [1] - 2:9
Frauen [1] - 1:21
free [3] - 88:17, 89:3, 89:8
frenzy [1] - 57:19
frequency [1] - 16:14
Friday [1] - 62:22
friend [1] - 63:22
friendly [1] - 143:19
friends [1] - 48:12
front [1] - 62:11, 93:2, 93:3, 137:7, 138:3
fruit [1] - 96:4
fulfillment [1] -

74:10
full [1] - 22:6, 116:16
fully [2] - 33:9, 76:2
fun [1] - 99:1, 99:8, 101:2
function [4] - 11:7, 15:3, 15:15, 67:2
funding [2] - 10:24
funny [1] - 96:6, 101:23, 101:24
furtherance [1] - 137:1
furthered [1] - 12:24
furthering [1] - 75:24
future [2] - 86:9, 86:13

## G

general [6] - 16:20, 23:15, 23:19, 42:10, 54:4, 77:7
generally [9] - 11:19, 13:8, 68:11, 68:14, 69:2, 70:8, 70:17, 76:4, 77:14
giant [1] - 50:3
giggle [1] - 88:11
giggling [2] - 88:4, 88:8
girl [1] - 97:14
given [5] - 47:12, 50:1, 62:4, 88:20, 139:21
glance [1] - 127:22
goal [1] - 143:20
goals [1] - 12:23
GODFREY [1] - 2:5
gonna [3] - 26:5, 109:1, 125:1
Gotcha [1] - 134:12
government [1] - 11:15
Governor [1] - 17:11
grade [1] - 104:25
graduate [2] - 5:9, 5:11
graduating [1] - 120:12
graduation [1] - 6:12
great [6] - 15:8, 70:16, 121:10, 121:22, 127:23, 139:7
greater [1] - 26:4
GREEN [1] - 1:3
Green [1] - 48:6
Griesbach [1] - 23:5

grievance [8] - 53:20, 54:18, 54:19, 56:5, 56:9, 56:11, 57:11, 57:16
Groll [1] - 85:19
gross [1] - 118:24
grossed [1] - 118:20
group [4] - 58:2, 58:3, 58:16, 58:18
groups [3] - 58:3, 115:25, 116:3
grow [1] - 10:9
grown [1] - 9:25
growth [2] - 10:3, 10:10
guard [1] - 78:12
guess [10] - 9:18, 11:16, 24:24, 28:16, 54:9, 86:7, 90:18, 104:3, 108:21, 143:9
guessing [2] - 11:13, 117:22
guilty [1] - 54:24
guy [5] - 97:8, 119:11, 119:20, 119:22, 120:12
guys [2] - 124:20, 138:21

## H

H1N1 [2] - 95:9, 95:10
Haag [2] - 47:23, 54:6
HAAG [1] - 47:23
habit [1] - 50:25
Haha [1] - 96:14
half [1] - 99:5
hand [2] - 37:4, 145:17
handle [2] - 7:12, 7:21
handled [1] - 14:5
handling [1] - 14:9
hands [4] - 31:7, 31:10, 31:11, 62:17
handsome [1] - 60:21
happy [2] - 37:25, 72:20
harassing [1] - 22:1
harassment [2] - 28:3, 133:4
harm [1] - 73:12
harmful [2] - 14:15, 14:16
Harrison [1] - 18:2
Hattiesburg [3] - 37:15, 63:1, 63:21
head [1] - 46:6,

47:23, 107:6, 107:8
heading [1] - 29:13
headline [1] - 64:15
hear [2] - 23:12, 117:24
heard [11] - 27:23, 63:6, 63:10, 63:14, 70:21, 71:11, 71:13, 98:8, 115:21, 115:24, 135:18
hearing [17] - 27:20, 27:24, 28:1, 28:5, 40:9, 40:12, 40:24, 41:2, 41:9, 41:10, 41:11, 41:16, 48:15, 81:5, 115:23, 134:10
Hearts [1] - 86:3
heavy [1] - 12:13
held [6] - 8:7, 8:11, 33:24, 60:14, 65:23
help [1] - 102:16
helpful [1] - 134:2
hence [1] - 53:9
hereby [1] - 145:7
herein [1] - 4:3
hereunder [1] - 145:16
herself [1] - 96:25
hi [2] - 111:8, 111:9
hide [1] - 24:15
High [1] - 120:17
himself [1] - 54:4
hired [2] - 6:15, 7:1
history [2] - 6:11, 117:14
hmm [1] - 88:18
hold [1] - 12:19
Hollen [1] - 54:4
home [9] - 14:21, 15:1, 15:16, 18:6, 18:16, 19:3, 20:24, 20:25, 137:21
honest [1] - 97:8
honestly [2] - 117:13, 136:22
hope [6] - 86:9, 95:8, 95:20, 96:9, 119:8, 120:10
hopping [1] - 87:5
hostile [1] - 75:8
hot [4] - 122:7, 126:11, 126:23, 128:12
Houlihan [2] - 6:25, 7:1
hours [4] - 45:25, 81:22, 81:24, 133:16
house [5] - 17:24, 20:10, 120:13, 122:5, 122:12
household [1] -

119:11, 120:3
hundred [2] - 60:20, 60:23
husband [1] - 16:12
hypothetical [3] - 130:17, 130:19, 130:21
hypothetically [3] - 35:19, 35:22, 36:22

## I

idea [6] - 54:11, 54:13, 106:9, 124:10, 127:16, 127:18
Identified [1] - 2:18
identified [11] - 17:9, 52:16, 53:13, 55:20, 55:23, 56:1, 61:4, 61:11, 73:23, 142:9
Identified..............
............... [3] - 2:20, 2:22, 2:22
identify [13] - 11:25, 43:18, 46:20, 53:9, 53:10, 53:17, 54:23, 54:25, 61:5, 76:24, 87:21, 137:10, 137:11
ignored [1] - 94:5
image [1] - 65:15
immaterial [1] - 21:15
immediacy [1] - 12:23
immediate [2] - 12:13, 12:14
immediately [2] - 44:15, 97:25
impact [8] - 14:22, 14:25, 15:5, 73:5, 73:11, 79:3, 79:10, 79:12
impetus [1] - 63:20
implicate [1] - 73:23
implicated [1] - 45:16
important [4] - 49:25, 74:20, 76:4, 128:9
imposed [1] - 78:11
impossible [3] - 49:21, 50:1, 50:5
impress [3] - 122:15, 122:18, 122:23
impropriety [1] - 141:7
inaccurate [1] -

64:22
**inappropriate** [9] - 41:24, 50:20, 65:18, 65:21, 79:23, 92:21, 140:21, 140:24, 144:9
**inappropriately** [1] - 52:9
**incarcerate** [1] - 12:18
**incident** [10] - 70:10, 70:11, 70:22, 131:6, 131:7, 131:13, 131:18, 132:3, 133:2
**incidents** [1] - 131:12
**included** [2] - 8:9, 9:17
**includes** [1] - 119:1
**inconsistent** [1] - 98:5
**incorrect** [3] - 95:12, 140:11, 140:16
**incorrectly** [2] - 64:11, 64:14
**Indemnity** [4] - 2:8, 134:18, 135:8, 138:1
**INDEMNITY** [1] - 1:11
**Indemnity's** [1] - 139:9
**independent** [1] - 108:22
**indicate** [6] - 52:7, 82:11, 89:20, 117:5, 117:10, 122:2
**indicated** [8] - 42:13, 52:3, 68:12, 85:6, 109:17, 125:13, 129:2, 138:2
**indicates** [1] - 142:23
**indirectly** [1] - 145:15
**individual** [9] - 29:6, 31:24, 33:11, 33:12, 33:13, 33:19, 34:5, 34:18, 141:4
**individually** [1] - 19:22
**individuals** [9] - 48:23, 49:15, 51:25, 52:15, 98:13, 98:14, 104:17, 115:18
**inform** [2] - 72:21, 72:22
**Information** [1] - 65:1
**information** [12] -

35:10, 42:2, 56:9, 64:22, 65:3, 83:2, 83:8, 83:11, 83:12, 91:3, 95:1, 95:4
**informed** [2] - 44:14, 130:4
**inhibitions** [2] - 125:16, 125:18
**initial** [4] - 8:25, 54:16, 56:16, 56:19
**initials** [1] - 60:5
**initiatives** [1] - 10:25
**innocent** [1] - 78:18
**innocuous** [1] - 143:18
**inpatient** [3] - 37:7, 37:12
**inquire** [6] - 22:23, 25:13, 35:17, 36:1, 36:6, 119:15
**inquired** [1] - 50:17
**inquiries** [1] - 58:11
**insensitive** [1] - 65:20
**inside** [1] - 10:13
**insisted** [1] - 141:13
**insistence** [1] - 141:10
**instance** [1] - 1:17
**instruct** [1] - 25:12
**insulting** [1] - 109:1
**insurance** [4] - 135:3, 135:7, 135:12
**Insurance** [3] - 2:8, 2:23, 134:18
**INSURANCE** [1] - 1:11
**intelligent** [2] - 101:23, 101:24
**intend** [4] - 92:13, 136:1, 139:13, 139:14
**intense** [1] - 57:19
**intention** [1] - 5:25
**interactions** [2] - 23:14, 25:3, 25:16
**intercourse** [5] - 20:17, 36:8, 36:11, 36:14, 36:21
**Interest** [2] - 29:14, 32:16
**interest** [20] - 21:9, 28:3, 28:12, 28:13, 28:22, 28:23, 32:24, 32:25, 33:1, 33:5, 33:9, 33:13, 33:19, 33:22, 33:23, 34:5,

76:7, 85:6, 85:23
**interested** [19] - 38:1, 39:25, 49:8, 50:18, 71:22, 71:23, 71:25, 75:24, 125:1, 128:19, 128:22, 129:3, 129:6, 129:8, 129:10, 129:11, 129:22, 129:25, 145:14
**interests** [1] - 77:6
**interpret** [1] - 127:2
**interpreted** [2] - 93:13, 128:13
**interrogatories** [1] - 58:8
**interrogatory** [1] - 58:14
**interrupt** [1] - 108:10
**Intervenor** [2] - 1:12, 2:7
**Intervenor-Defendants** [2] - 1:12, 2:7
**intervention** [1] - 12:9
**Intervention** [1] - 9:15
**interview** [4] - 45:4, 45:9, 62:4, 89:14
**intrigued** [1] - 105:18
**introduce** [1] - 40:11
**introduced** [3] - 27:25, 41:1, 41:4
**investigated** [2] - 42:9, 55:21
**investigation** [11] - 42:12, 43:17, 43:21, 43:25, 44:4, 44:8, 45:3, 45:5, 45:10, 132:18, 132:22
**investigator** [4] - 12:24, 44:24, 56:17, 56:19
**investigators** [1] - 11:2
**invitation** [4] - 88:19, 126:12, 126:14, 126:16
**invitations** [1] - 80:18
**invite** [2] - 43:8, 43:9
**invited** [1] - 20:24
**inviting** [1] - 102:23
**involved** [20] - 9:1, 14:14, 14:17, 14:18,

15:10, 15:11, 15:17, 16:6, 21:7, 21:13, 24:17, 24:20, 26:1, 37:13, 42:11, 44:9, 55:9, 59:23, 73:18, 88:13
**involvement** [3] - 34:1, 42:18, 132:6
**involves** [2] - 16:21, 22:24
**involving** [3] - 34:4, 60:3, 77:20
**irrelevant** [2] - 21:15, 75:22
**irrespective** [1] - 75:10
**irritated** [1] - 62:12
**issue** [4] - 8:11, 22:5, 42:17, 60:4
**issued** [1] - 138:1
**issues** [6] - 8:9, 9:21, 97:16, 135:3, 141:21, 142:10
**IT** [1] - 77:13
**itself** [4] - 28:5, 33:10, 73:16, 101:21

## J

**J-A-N-E** [1] - 17:25
**Jane** [2] - 17:25, 18:10
**January** [3] - 1:22, 145:9, 145:18
**jeopardy** [1] - 13:17
**Jim** [1] - 48:5
**JK** [1] - 96:14
**job** [10] - 6:11, 6:14, 6:24, 17:17, 74:11, 86:2, 88:22, 119:10, 119:23, 119:24
**job-related** [1] - 88:22
**joined** [2] - 6:17, 7:8
**joking** [4] - 121:16, 121:18, 121:24, 122:3
**Judge** [1] - 23:5
**judge** [4] - 22:7, 26:6, 78:11, 90:16
**judgment** [3] - 6:6, 94:23, 94:24
**juice** [1] - 96:4
**July** [7] - 5:5, 5:6, 38:20, 39:2, 39:3, 39:5, 39:9
**June** [4] - 81:6, 138:3, 145:24
**junk** [1] - 51:19
**jurisdictional** [2] -

9:16, 11:5
**jury** [2] - 35:8, 104:22
**Justice** [5] - 42:4, 46:5, 48:5, 58:19, 77:12
**justice** [8] - 33:23, 59:24, 73:14, 78:7, 90:6, 91:1, 91:7, 91:12

## K

**KAHN** [1] - 2:5
**keep** [12] - 18:16, 75:17, 83:11, 91:16, 92:11, 92:15, 96:10, 98:25, 99:3, 99:7, 101:1, 143:6
**Keith** [1] - 57:5
**Ken** [2] - 89:17, 93:15
**Kenneth** [1] - 4:9
**KENNETH** [4] - 1:8, 1:16, 4:2, 145:8
**kept** [1] - 18:22
**Kevin** [4] - 42:6, 46:6, 46:8, 46:11
**Kevin's** [1] - 46:14
**kill** [1] - 104:14
**kind** [35] - 11:5, 14:23, 14:24, 21:3, 32:16, 57:16, 69:17, 74:17, 86:10, 88:4, 97:13, 98:14, 111:13, 112:21, 113:18, 113:22, 114:15, 118:13, 118:17, 119:1, 119:9, 119:11, 119:17, 119:19, 119:20, 119:21, 119:24, 120:1, 120:6, 120:7, 128:18, 130:9, 141:2, 143:19
**kinds** [8] - 14:9, 49:24, 69:1, 69:18, 74:4, 74:6, 99:23, 120:4
**Kisken** [1] - 6:22
**kissed** [1] - 20:11
**kissing** [2] - 20:20, 20:22
**KK** [3] - 104:23, 106:15, 107:1
**knowing** [1] - 80:5
**knowledge** [4] - 38:12, 55:8, 55:11, 77:15
**known** [3] - 58:22, 84:7, 84:16
**knows** [1] - 92:20
**Konitzer's** [1] -

44:16
**Korte** [4] - 42:6, 54:1, 54:22, 67:10
**KRATZ** [5] - 1:8, 1:16, 4:2, 4:9, 145:8
**Kratz** [12] - 2:21, 3:3, 4:7, 4:9, 23:14, 24:14, 25:23, 49:16, 134:16, 136:6, 136:8, 137:7
**Kratz's** [1] - 22:16

**L**

**labs** [1] - 14:24
**lack** [1] - 18:3
**Lake** [1] - 48:6
**language** [3] - 87:16, 87:19, 87:21
**large** [1] - 51:4, 137:8
**larger** [1] - 59:13
**largest** [1] - 125:21
**last** [22] - 5:20, 10:11, 24:5, 24:7, 53:15, 53:22, 71:8, 74:16, 81:6, 81:10, 82:10, 125:24, 127:11, 128:24, 129:15, 130:3, 142:2, 142:4, 142:5, 142:6, 142:22, 143:15
**late** [1] - 9:12
**laugh** [1] - 88:11
**Laugh** [4] - 95:23, 96:5, 102:9, 121:12
**laughing** [2] - 88:4, 88:8
**law** [15] - 4:14, 5:9, 6:12, 6:14, 9:17, 12:18, 13:10, 13:11, 42:8, 43:16, 43:18, 84:23, 86:10, 86:20, 136:19
**law-type** [1] - 136:19
**laws** [2] - 12:16, 16:2
**Lawyer** [4] - 46:15, 46:24, 47:4, 65:2
**lawyer** [6] - 6:9, 35:16, 36:19, 57:18, 109:11, 135:15
**lawyers** [2] - 40:21, 133:12
**lay** [3] - 22:18, 22:19, 24:24
**lead** [5] - 21:15, 22:10, 22:12, 22:14, 44:23
**leading** [1] - 85:23
**leak** [2] - 57:19, 57:24

**leaked** [3] - 46:10, 58:20, 65:1
**learned** [1] - 38:11
**lease** [1] - 14:12
**least** [25] - 10:12, 11:13, 12:7, 12:14, 31:16, 33:2, 35:16, 48:11, 49:2, 50:20, 52:1, 52:20, 53:13, 54:2, 55:25, 56:6, 73:14, 77:13, 78:23, 87:10, 115:16, 118:7, 136:21, 140:25, 143:11
**leaving** [3] - 89:20, 117:17, 129:16
**led** [2] - 10:21, 85:14
**left** [6] - 10:2, 61:16, 82:9, 128:4, 129:18, 132:21
**legal** [2] - 7:4, 46:6
**legs** [1] - 127:23
**lend** [1] - 24:17
**less** [7] - 17:3, 60:18, 60:20, 66:13, 81:23, 81:24, 134:7
**Letter** [1] - 2:19
**letter** [17] - 54:20, 61:7, 61:12, 61:20, 61:21, 62:5, 62:11, 62:16, 63:7, 63:8, 63:10, 63:11, 63:15, 64:20, 77:15, 77:19
**letterhead** [1] - 61:17
**level** [3] - 34:21, 56:17, 56:20
**levels** [1] - 11:15
**levied** [2] - 63:15, 64:21
**lie** [2] - 105:7, 105:16
**life** [4] - 26:16, 67:4, 119:9, 120:11
**likelihood** [1] - 26:3
**likely** [14] - 21:15, 67:21, 85:1, 96:24, 109:19, 109:22, 109:25, 110:25, 111:17, 111:20, 113:2, 113:16, 113:21, 143:10
**LINDA** [1] - 2:5
**Linda** [1] - 134:17
**line** [3] - 10:7, 122:1, 141:22
**lines** [1] - 10:4
**link** [1] - 68:23
**linked** [2] - 38:22, 38:23
**listed** [1] - 82:1

**lit** [2] - 46:7, 48:19
**literature** [3] - 18:17, 18:19, 18:23
**litigation** [3] - 47:24, 48:3, 48:17
**live** [8] - 16:11, 16:12, 18:6, 18:9, 20:4, 73:9, 101:10, 102:2
**live-in** [1] - 16:11
**lived** [4] - 18:12, 20:6, 102:3, 102:7
**LOL** [2] - 102:10
**look** [10] - 67:20, 100:25, 115:13, 115:14, 127:21, 130:11, 137:9, 138:8, 139:6, 140:3
**looked** [1] - 139:8
**looking** [4] - 98:14, 99:13, 113:19, 113:21
**looks** [2] - 119:9, 120:11
**loud** [4] - 95:23, 96:5, 102:9, 121:12
**low** [11] - 114:18, 114:24, 114:25, 115:5, 115:8, 115:9, 115:14, 115:21, 116:5, 116:7, 116:12
**lower** [1] - 125:16
**lump** [1] - 115:12
**lungs** [1] - 31:13

**M**

**Madison** [1] - 2:7
**MADSON** [2] - 1:18, 145:5
**magistrate** [2] - 93:3
**mail** [2] - 37:4, 37:5
**mailed** [1] - 37:8
**Main** [1] - 2:6
**maintained** [1] - 18:15
**major** [2] - 13:1, 13:3
**man** [3] - 60:21, 99:8, 101:2
**managing** [1] - 91:5
**mandatory** [2] - 12:16, 136:22
**manner** [6] - 14:6, 86:14, 87:8, 87:15, 87:16, 87:25
**March** [8] - 4:22, 53:19, 53:24, 54:16, 54:20, 55:7, 56:6, 56:15
**margarita** [1] - 96:4

**mark** [4] - 116:24, 119:12
**marked** [6] - 26:8, 36:24, 76:19, 137:5, 137:7, 140:5
**Marquette** [1] - 5:12
**marriage** [2] - 124:11, 124:13
**married** [5] - 97:15, 124:15, 124:16, 124:18, 124:20
**matter** [4] - 5:14, 5:17, 33:9, 53:5
**mattered** [1] - 52:11
**matters** [1] - 110:11
**maximize** [1] - 76:1
**mean** [29] - 8:2, 25:17, 25:19, 25:20, 38:14, 60:22, 72:5, 97:17, 97:18, 97:19, 97:20, 98:9, 101:11, 101:13, 101:24, 102:18, 107:2, 108:19, 109:7, 111:17, 112:4, 112:6, 118:17, 118:19, 127:8, 127:15, 127:19, 127:25, 143:5
**meaning** [7] - 30:13, 53:4, 55:7, 66:22, 70:10, 113:15, 124:8
**means** [2] - 101:22, 102:11, 102:12, 118:4, 119:2, 123:13, 143:9
**meant** [10] - 103:13, 108:21, 108:22, 117:22, 118:3, 118:9, 118:13, 125:4, 127:16, 127:19
**media** [13] - 46:10, 57:19, 58:11, 59:2, 62:2, 62:5, 62:6, 62:17, 63:11, 63:14, 64:3, 64:7, 64:12
**medical** [1] - 126:4
**medicate** [1] - 87:13
**meet** [3] - 114:5, 128:3, 129:17
**meeting** [7] - 82:9, 82:10, 86:15, 88:6, 89:12, 121:10, 121:22
**members** [4] - 42:3, 47:11, 77:5
**men** [2] - 27:10,

127:24
**menial** [1] - 136:20
**mention** [3] - 128:10, 128:15, 128:16
**mentioned** [6] - 37:12, 59:11, 67:10, 76:16, 115:1, 121:1
**message** [17] - 81:8, 81:16, 81:18, 82:1, 85:5, 89:2, 94:11, 128:11, 128:24, 130:3, 140:4, 140:7, 142:6, 142:16, 142:22, 143:1, 143:15
**Messages** [2] - 2:21, 3:4
**messages** [64] - 28:15, 39:12, 39:18, 39:22, 44:18, 46:9, 48:24, 49:1, 49:3, 49:6, 49:17, 49:20, 49:21, 50:4, 50:10, 50:17, 50:20, 51:1, 51:3, 51:7, 51:23, 55:6, 63:17, 65:4, 65:7, 65:14, 66:12, 66:22, 70:13, 70:19, 70:23, 71:1, 71:5, 71:12, 71:15, 71:20, 74:5, 74:6, 74:10, 74:18, 76:12, 76:16, 77:17, 79:25, 80:4, 80:10, 80:13, 80:17, 80:21, 80:25, 81:13, 81:15, 92:10, 96:24, 130:6, 130:15, 139:21, 141:9, 141:12, 143:14, 143:19, 143:21, 143:22, 144:5
**messaging** [1] - 129:5
**met** [1] - 84:17
**meth** [1] - 14:24
**MICHAEL** [1] - 2:2
**middle** [1] - 4:19
**might** [29] - 5:14, 6:24, 8:5, 9:4, 9:9, 10:3, 13:17, 15:6, 18:7, 23:3, 37:25, 41:25, 43:2, 58:20, 73:13, 94:21, 100:20, 101:22, 101:23, 113:6, 116:5, 117:6, 118:23, 122:2, 128:13, 130:14, 130:21, 138:23
**Milwaukee** [3] - 1:21, 2:10, 145:17
**MILWAUKEE** [1] - 145:2

Case 1:10-cv-00910-WCG   Filed 01/24/13   Page 48 of 56   Document 82-1

**mind** [6] - 30:8, 65:6, 100:19, 128:3, 129:16, 136:13
**mine** [2] - 63:23, 140:12
**mischaracterized** [1] - 64:17
**misconduct** [1] - 57:17
**misconstrue** [1] - 130:14
**Miss** [1] - 114:17
**Mississippi** [2] - 37:15, 63:1
**mistaken** [2] - 137:14, 142:3
**misuse** [1] - 38:5
**mitigation** [1] - 41:5
**mix** [1] - 90:10
**model** [1] - 14:20
**modest** [1] - 127:13
**moment** [1] - 97:22
**momentarily** [1] - 8:16
**money** [1] - 128:12
**Monona** [1] - 2:3
**month** [3] - 133:21, 134:9, 134:10
**months** [1] - 134:7
**morning** [2] - 63:24, 95:14
**morphed** [1] - 9:25
**mortified** [3] - 67:13, 67:14, 67:15
**mortifying** [1] - 67:18
**most** [13] - 4:16, 10:14, 12:1, 16:13, 46:5, 60:4, 74:25, 75:10, 76:3, 77:4, 81:3, 87:10, 91:4
**mother** [1] - 75:21
**motion** [5] - 94:24, 135:8, 135:24, 136:2, 139:11
**motto** [1] - 91:16
**mouth** [4] - 98:25, 99:4, 99:7, 101:1
**move** [3] - 43:1, 56:5, 93:10
**MR** [62] - 2:2, 2:9, 4:6, 4:25, 5:2, 5:6, 5:8, 21:14, 21:17, 21:19, 21:21, 21:23, 21:24, 22:11, 22:13, 22:15, 22:18, 23:7, 23:9, 23:11, 23:21, 24:3, 24:5, 24:8, 24:13, 25:5, 25:9, 25:22, 25:25, 26:5, 26:7, 26:9, 33:14,

33:17, 61:1, 61:3, 71:6, 71:10, 74:14, 74:19, 92:16, 92:18, 92:22, 92:23, 92:24, 93:1, 93:5, 93:6, 93:8, 93:9, 110:16, 110:21, 133:15, 133:18, 134:12, 134:20, 136:4, 137:17, 137:22, 138:16, 138:23, 139:25
**MS** [12] - 2:5, 134:15, 135:1, 136:7, 137:6, 137:20, 137:23, 137:24, 138:19, 139:3, 140:2, 144:12
**multi** [2] - 9:16, 11:5
**multi-jurisdictional** [2] - 9:16, 11:5
**multiple** [1] - 33:16
**mumbled** [1] - 38:25
**mumbling** [1] - 39:2

## N

**name** [4] - 4:7, 19:9, 75:25, 134:17
**named** [3] - 17:11, 19:8, 37:25
**names** [1] - 47:21
**narrowly** [1] - 22:22
**nature** [7] - 12:6, 13:22, 42:10, 49:6, 55:5, 84:12, 95:17
**nearly** [1] - 102:5
**necessarily** [6] - 11:19, 111:19, 111:22, 115:11, 122:4, 143:17
**neck** [3] - 31:7, 31:10, 31:11
**need** [12] - 5:5, 11:8, 12:7, 12:9, 22:7, 23:12, 50:2, 95:20, 98:24, 108:25, 109:3, 139:12
**needed** [6] - 42:20, 44:13, 45:4, 46:15, 46:17, 83:2
**negative** [5] - 66:13, 79:3, 79:5, 79:10, 79:12
**negotiate** [1] - 132:16
**negotiated** [1] -

30:4
**negotiation** [2] - 72:24, 132:13
**nervous** [1] - 88:12
**Never** [2] - 103:17, 103:20
**never** [16] - 24:20, 35:5, 40:24, 60:10, 70:21, 73:18, 76:17, 83:16, 93:22, 100:14, 100:19, 105:16, 115:21, 115:24, 127:12
**new** [2] - 16:25, 59:13
**newly** [1] - 59:15
**news** [2] - 58:7, 58:10
**next** [13] - 6:17, 17:22, 44:17, 44:21, 44:22, 46:1, 88:15, 91:21, 114:17, 119:8, 120:10, 122:1, 123:25
**nice** [4] - 88:16, 92:1, 93:11, 101:8
**nobody** [1] - 53:12
**noncommunicative** [2] - 88:5, 88:9
**none** [4] - 74:10, 88:22, 130:7, 141:3
**nonelected** [1] - 77:5
**nonetheless** [1] - 131:23
**nonverbal** [2] - 88:4, 88:10
**nonvoting** [1] - 77:11
**normally** [1] - 75:14
**North** [2] - 1:21, 2:10
**Notary** [3] - 1:19, 145:6, 145:21
**noted** [2] - 117:16, 121:7
**nothing** [11] - 10:17, 22:17, 23:16, 24:9, 52:21, 73:21, 92:10, 104:15, 104:19, 110:2, 111:10
**nothing's** [1] - 95:7
**notion** [3] - 128:18, 128:21, 129:3
**November** [13] - 37:9, 41:25, 42:1, 45:22, 46:14, 47:1, 50:16, 51:5, 51:10, 61:23, 67:9, 128:23, 129:4
**number** [14] - 8:7,

43:6, 51:25, 65:20, 82:23, 83:6, 83:15, 83:23, 84:2, 84:7, 94:14, 118:4, 131:1, 139:23
**numbers** [1] - 51:3
**nymph** [1] - 122:7

## O

**oath** [2] - 4:3, 24:20
**object** [7] - 21:14, 33:14, 90:14, 90:15, 92:24, 93:1
**objected** [3] - 80:3, 80:10, 131:16
**objection** [1] - 32:13
**objections** [2] - 90:17, 90:18
**obligation** [1] - 83:10
**obligations** [1] - 73:8
**observation** [1] - 10:19
**obvious** [1] - 12:1
**obviously** [1] - 105:17
**occasion** [3] - 20:10, 20:20, 90:19
**occasionally** [1] - 88:11
**occasions** [3] - 98:19, 98:22, 118:4
**occur** [6] - 10:19, 20:1, 36:11, 131:12, 132:2, 132:4
**occurred** [3] - 20:23, 53:11, 131:23
**occurring** [2] - 80:18, 132:5
**October** [4] - 37:17, 51:9, 51:10, 82:10
**odd** [1] - 59:4
**OF** [5] - 1:2, 1:10, 4:1, 145:1, 145:2
**offenses** [2] - 27:14, 41:7
**offensive** [4] - 28:4, 133:4, 133:8, 133:11
**offer** [1] - 39:21, 105:17, 126:3
**office** [13] - 6:23, 9:2, 19:18, 37:6, 37:8, 47:11, 47:12, 48:21, 62:9, 62:13, 76:18, 135:12, 145:17
**Office** [8] - 2:6, 6:18, 7:9, 8:21,

46:15, 46:24, 47:4, 65:1
**office's** [2] - 93:17, 140:8
**officer** [1] - 86:21
**officers** [1] - 49:24
**offices** [2] - 10:13, 10:15
**often** [10] - 13:14, 13:23, 14:13, 16:13, 16:20, 17:2, 60:4, 75:10, 115:4, 115:7
**oftentimes** [1] - 77:6
**OK** [4] - 101:7, 121:8, 121:9, 121:21
**old** [1] - 51:19
**older** [2] - 13:12, 97:14
**OLR** [24] - 40:8, 40:15, 40:18, 41:15, 52:13, 52:18, 53:1, 53:19, 54:17, 55:9, 55:17, 55:20, 56:17, 56:20, 56:25, 57:15, 57:20, 81:5, 132:9, 132:17, 132:20, 132:21, 134:8
**once** [5] - 49:20, 113:11, 119:3, 119:4, 119:6
**one** [40] - 7:14, 10:6, 10:16, 13:3, 20:10, 20:20, 23:21, 25:17, 34:11, 39:13, 48:19, 49:4, 54:16, 55:12, 67:14, 87:6, 90:3, 90:20, 90:23, 91:21, 93:17, 108:9, 114:21, 118:7, 120:10, 123:25, 131:18, 133:4, 133:8, 133:19, 136:16, 138:6, 139:2, 140:5, 140:7, 140:18, 140:20
**One** [1] - 2:6
**one's** [1] - 136:9
**ones** [4] - 50:10, 73:23, 108:9, 133:1
**ongoing** [1] - 130:16
**open** [1] - 88:19
**opened** [1] - 4:18
**opiates** [1] - 38:5
**opinion** [12] - 10:23, 11:10, 35:16, 46:14, 47:14, 47:18, 48:22, 55:15, 57:18, 58:1, 125:19, 126:9
**opportunities** [1] - 102:25

**opportunity** [4] - 118:21, 118:23, 119:6, 138:8
**opposed** [1] - 123:4
**opposing** [1] - 6:5
**opposite** [1] - 127:6
**oral** [1] - 73:11
**order** [2] - 51:14, 122:8
**organization** [2] - 77:3, 77:10
**Original** [2] - 3:7, 3:8
**otherwise** [4] - 15:5, 59:25, 128:4, 129:17
**ought** [1] - 53:1
**outcome** [2] - 27:17, 32:25
**outlets** [1] - 62:6
**own** [3] - 56:11, 58:23, 136:1
**owner's** [1] - 137:21

**P**

**p.m** [5] - 1:22, 1:23, 98:24, 140:5, 144:14
**Page** [3] - 2:15, 2:18, 3:2
**page** [8] - 138:3, 140:3, 140:4, 141:19, 141:22, 142:8, 142:22, 142:23
**paragraph** [1] - 77:20
**parallel** [1] - 53:5
**parcel** [1] - 128:14
**parenthetically** [1] - 135:14
**park** [4] - 86:12, 86:17, 120:16, 120:21
**part** [20] - 13:25, 15:24, 16:25, 28:5, 40:8, 40:15, 40:23, 45:4, 53:2, 76:7, 83:1, 83:25, 90:7, 91:3, 120:16, 128:14, 132:1, 132:7, 137:20
**participated** [1] - 39:13
**participation** [1] - 91:5
**particular** [12] - 8:3, 11:8, 14:2, 14:9, 30:9, 32:6, 36:13, 66:12, 75:20,

88:24, 88:25, 142:16
**particularly** [2] - 46:5, 67:7
**parties** [2] - 16:11, 145:13
**partner** [3] - 12:4, 121:11, 121:23
**party** [1] - 87:3
**passion** [6] - 112:21, 112:22, 112:25, 113:3, 113:5, 113:6
**past** [4] - 26:20, 86:4, 86:5, 86:8
**pat** [1] - 6:25
**Pat** [1] - 7:1
**patient** [1] - 115:12
**PDF** [2] - 138:13, 138:22
**PEERLESS** [1] - 1:10
**Peerless** [7] - 2:7, 5:23, 6:2, 134:17, 135:8, 138:1, 139:9
**peers** [4] - 47:10, 47:16, 48:9, 48:11
**penalty** [2] - 28:6, 41:6
**pending** [3] - 27:19, 29:18, 141:1
**people** [19] - 14:14, 26:15, 49:5, 52:2, 58:4, 61:16, 69:17, 69:18, 70:8, 75:2, 77:13, 86:5, 87:10, 88:11, 101:22, 101:23, 115:3, 120:5, 120:7
**perceive** [1] - 67:16
**perceived** [3] - 85:22, 87:16, 112:18
**perfect** [1] - 113:9
**perfectly** [1] - 93:6
**performed** [1] - 74:1
**performing** [6] - 136:9, 136:10, 136:13, 136:14, 136:25
**perhaps** [5] - 10:16, 11:14, 19:13, 136:18, 138:4
**period** [6] - 8:25, 12:10, 17:4, 65:12, 102:10, 138:2
**Perlman** [1] - 48:4
**perpetrator** [12] - 11:21, 12:2, 12:16, 12:19, 14:15, 16:8, 29:20, 35:11, 72:2, 72:10, 75:18,

100:12
**person** [36] - 7:1, 23:1, 31:10, 31:15, 31:21, 42:10, 48:10, 51:6, 56:22, 66:22, 68:1, 68:3, 68:15, 70:3, 84:22, 84:24, 85:8, 85:16, 92:1, 92:4, 92:6, 93:11, 93:18, 96:21, 96:25, 97:1, 99:21, 100:2, 104:13, 105:22, 107:10, 107:13, 107:15, 110:5, 117:5, 123:5
**personal** [36] - 10:23, 20:2, 32:24, 32:25, 33:1, 33:2, 33:5, 67:1, 84:12, 85:23, 86:13, 94:11, 94:12, 95:17, 98:2, 100:22, 111:1, 111:2, 111:5, 111:14, 111:17, 113:13, 113:15, 114:14, 114:15, 115:9, 118:25, 119:15, 122:10, 123:12, 126:16, 126:18, 128:14, 140:22, 143:11, 145:10
**personality** [4] - 28:4, 133:5, 133:8, 133:12
**personally** [1] - 65:24
**pertain** [1] - 9:4
**Pete** [2] - 45:1, 46:12
**Peter** [1] - 6:22
**PETERSON** [1] - 2:9
**Peterson** [2] - 1:20, 48:17
**phone** [12] - 49:16, 49:18, 49:20, 50:3, 50:22, 51:4, 51:11, 51:17, 82:22, 83:15, 83:23, 134:22
**Phone** [1] - 3:3
**phones** [1] - 49:22
**phrase** [1] - 108:23
**phrasing** [1] - 140:17
**physical** [3] - 12:15, 73:12, 74:7
**physically** [5] - 14:15, 14:16, 30:12, 30:19, 31:4
**place** [2] - 13:23, 128:16
**placed** [1] - 31:7

**placing** [2] - 31:10, 31:11
**Plaintiff** [3] - 1:6, 1:17, 2:4
**plaintiff's** [3] - 135:6, 135:21, 135:23
**plane** [1] - 62:22
**play** [2] - 114:19, 116:20
**playing** [1] - 117:23
**plea** [5] - 28:9, 28:11, 28:14, 28:21, 72:24
**plead** [2] - 132:7, 132:14
**pleaded** [1] - 56:2
**pleadings** [3] - 5:22, 6:3, 139:2
**pleas** [1] - 28:2
**pled** [3] - 41:7, 131:1, 131:4
**plenty** [2] - 102:25, 106:25
**point** [17] - 15:2, 26:20, 32:1, 34:14, 44:11, 53:25, 67:3, 87:15, 92:3, 99:13, 104:6, 114:18, 118:7, 124:10, 129:23, 139:16, 141:17
**police** [5] - 79:14, 79:24, 80:10, 80:16, 130:5
**policies** [2] - 137:17, 138:5
**policy** [11] - 137:13, 137:18, 137:21, 137:25, 138:1, 138:2, 138:9, 138:12, 139:6, 139:8, 139:16
**Policy**.................. [1] - 2:23
**political** [1] - 11:14
**poor** [3] - 39:23, 39:25, 125:21
**porter** [1] - 67:10
**posed** [1] - 109:15
**position** [11] - 17:9, 17:12, 22:25, 39:24, 40:1, 65:23, 68:5, 72:3, 72:6, 84:23, 135:17
**positions** [1] - 11:1
**possibility** [4] - 117:21, 117:23, 117:24, 117:25
**possibly** [1] - 98:16
**Post** [1] - 2:6
**potential** [22] - 14:21, 14:25, 28:17,

28:22, 28:24, 29:9, 29:12, 30:6, 32:17, 33:2, 35:17, 36:2, 41:4, 43:25, 46:8, 55:23, 55:25, 82:2, 82:5, 89:11, 89:15, 111:7
**potentially** [7] - 14:17, 14:18, 24:23, 33:3, 41:5, 54:24, 68:19
**Potter** [8] - 42:6, 43:3, 43:10, 46:6, 47:1, 54:15, 54:22, 55:8
**potter** [1] - 46:20, 47:7, 53:3, 54:1
**Potter's** [1] - 42:21
**POWELL** [1] - 2:9
**Powell** [1] - 1:20
**practice** [2] - 4:18, 51:13
**practiced** [2] - 8:15, 13:9
**practicing** [2] - 4:14, 4:16
**preceding** [2] - 6:4, 85:5
**precharging** [1] - 73:14
**precisely** [2] - 25:25, 26:2
**preclude** [1] - 36:19
**prep** [3] - 131:19, 132:4, 133:6
**prepared** [3] - 81:12, 139:8, 139:19
**prescribed** [1] - 35:23
**prescription** [1] - 125:18
**presence** [1] - 89:21
**present** [3] - 16:15, 16:16, 75:2
**presented** [1] - 28:16
**presently** [1] - 135:5
**presents** [1] - 75:16
**Preserve** [1] - 3:3
**preserved** [1] - 51:20
**president** [2] - 61:18, 62:4
**president-elect** [1] - 62:4
**press** [3] - 57:9, 58:23, 60:13
**pressured** [1] -

**pretty** [3] - 24:25, 104:3, 133:15
**prevalent** [3] - 13:20, 14:12, 15:9
**Price** [4] - 19:8, 23:15, 24:10, 126:1
**price** [6] - 19:19, 19:23, 20:1, 20:4, 21:6, 21:7
**Price.................... ........** [1] - 2:21
**primarily** [1] - 77:8
**priorities** [1] - 11:14
**privacy** [3] - 59:9, 59:17, 59:20
**private** [6] - 82:22, 83:12, 83:14, 104:16, 105:23
**privilege** [2] - 22:8, 23:4
**privileged** [1] - 21:25
**prize** [2] - 122:7, 123:10
**probable** [1] - 34:20
**problem** [1] - 101:7
**problems** [1] - 86:4
**Procedure** [1] - 1:18
**proceed** [1] - 143:21
**proceeding** [5] - 4:21, 22:5, 40:8, 94:15, 132:9
**PROCEEDINGS** [1] - 4:1
**Proceedings** [1] - 144:14
**process** [5] - 41:13, 59:24, 73:13, 73:14, 90:8
**professional** [14] - 32:14, 32:18, 35:23, 47:13, 67:4, 76:7, 76:8, 83:3, 83:7, 83:19, 84:12, 111:7, 126:3, 126:4
**Professional** [2] - 1:19, 145:6
**professionally** [3] - 72:17, 72:19, 83:11
**proffer** [1] - 22:21
**program** [6] - 38:7, 38:10, 38:17, 39:9, 39:13, 39:16
**programs** [2] - 9:13, 40:20
**progressive** [1] - 12:5
**prohibited** [1] -

83:17
**Project** [1] - 9:15
**promoted** [1] - 6:16
**propelled** [1] - 63:19
**property** [1] - 12:21
**propriety** [1] - 44:18
**prosecute** [18] - 13:5, 13:16, 19:16, 29:7, 30:17, 31:22, 34:15, 66:23, 68:2, 68:17, 70:4, 72:9, 76:17, 84:1, 85:9, 85:16, 92:5, 97:1
**prosecuted** [4] - 13:15, 19:22, 30:3, 75:19
**prosecuting** [18] - 28:20, 29:6, 29:19, 30:8, 33:9, 72:2, 74:20, 74:22, 104:13, 107:13, 107:16, 110:6, 117:10, 123:4, 130:13, 140:18, 141:5, 144:10
**prosecution** [40] - 8:4, 8:5, 8:9, 8:23, 9:1, 10:2, 10:9, 10:18, 11:18, 11:20, 12:25, 14:5, 14:20, 16:23, 29:2, 33:4, 33:7, 33:8, 34:2, 34:3, 42:19, 44:16, 48:12, 52:3, 59:7, 60:6, 69:9, 75:9, 75:15, 75:22, 75:24, 76:2, 99:22, 100:12, 104:19, 115:17, 117:16, 130:16, 141:14, 143:12
**prosecutions** [11] - 7:15, 7:21, 7:25, 9:5, 9:8, 9:9, 9:11, 9:20, 10:21, 11:11, 59:11
**prosecutor** [32] - 7:16, 10:16, 14:9, 17:1, 28:18, 29:16, 32:23, 33:6, 42:19, 44:13, 59:13, 69:20, 72:21, 78:11, 83:20, 84:15, 96:20, 99:14, 99:17, 99:22, 100:2, 104:12, 106:5, 111:6, 136:9, 136:10, 136:14, 136:15, 137:2, 143:25, 144:6
**prosecutor's** [1] - 99:14
**prosecutorial** [5] - 27:1, 27:5, 34:9,

35:15, 85:2
**prosecutors** [8] - 9:17, 10:14, 10:17, 11:2, 34:8, 47:10, 77:4, 77:14
**protect** [2] - 73:12, 78:5
**protections** [1] - 78:5
**provide** [2] - 73:10, 78:10
**provided** [1] - 62:6
**provides** [2] - 137:21, 139:17
**providing** [2] - 73:9, 135:21
**provision** [1] - 32:7
**psychologist** [1] - 63:22
**public** [10] - 9:1, 38:12, 38:13, 38:19, 39:4, 46:9, 65:15, 84:15, 84:24, 134:8
**Public** [3] - 1:19, 145:6, 145:21
**public's** [1] - 85:8
**publicity** [1] - 59:25
**published** [1] - 69:7
**punishing** [1] - 33:11
**purchased** [1] - 17:24
**purpose** [1] - 42:11
**pursuant** [2] - 1:17, 51:13
**pursue** [3] - 140:22, 143:15, 143:24
**pursuing** [2] - 143:10, 144:9
**push** [1] - 10:13
**put** [3] - 13:17, 101:18, 101:20
**putting** [3] - 33:1, 35:15, 93:16

## Q

**questions** [15] - 17:7, 23:1, 23:13, 88:24, 90:5, 92:15, 92:17, 102:17, 108:6, 109:4, 116:18, 119:14, 134:16, 144:13
**quite** [3] - 55:4, 108:1, 108:12

## R

**radio** [2] - 121:4, 129:13

**raise** [2] - 40:6, 139:20
**ranger** [4] - 86:12, 86:17, 120:16, 120:21
**rather** [3] - 136:21, 137:8, 143:18
**react** [1] - 70:8
**reacted** [1] - 69:19
**reaction** [3] - 46:9, 66:21, 67:1
**read** [8] - 24:5, 24:7, 49:10, 71:6, 71:8, 74:14, 74:16, 109:1
**reading** [2] - 108:24, 115:23
**realize** [1] - 92:4
**Really** [1] - 31:2
**really** [18] - 9:18, 10:1, 14:23, 46:13, 49:8, 49:23, 50:16, 65:9, 67:3, 101:9, 102:1, 103:17, 103:20, 129:10, 129:11, 130:23, 141:8, 142:18
**reason** [21] - 22:8, 24:2, 25:12, 30:16, 30:18, 30:22, 48:8, 51:18, 58:12, 58:22, 64:1, 79:17, 79:19, 79:22, 80:2, 80:7, 80:9, 84:6, 114:24, 126:5, 129:21
**reasonable** [7] - 34:19, 34:24, 35:4, 35:12, 99:15, 99:19, 127:2
**reasons** [1] - 87:14
**receive** [6] - 7:24, 37:3, 42:2, 61:20, 69:18, 73:4
**received** [12] - 8:21, 40:6, 40:24, 41:22, 48:25, 61:22, 62:7, 79:11, 79:13, 80:13, 139:4
**recent** [2] - 4:17, 81:3
**recently** [1] - 86:2
**recess** [3] - 23:10, 61:2, 133:17
**recognition** [2] - 140:21, 143:10
**recognize** [1] - 137:8
**recognized** [2] - 141:8, 144:8
**recognizing** [2] - 11:7, 140:16
**recollection** [3] - 40:4, 107:21,

108:22
**recommend** [2] - 41:6, 60:5
**recommendation** [1] - 45:12
**recommended** [6] - 133:19, 133:21, 133:25, 134:7, 134:8, 134:10
**reconnect** [1] - 94:9
**reconsider** [1] - 57:10
**reconsidered** [1] - 57:16
**record** [8] - 4:8, 23:11, 61:1, 61:6, 76:24, 106:22, 126:5, 144:7
**recorded** [2] - 49:17, 145:8
**records** [6] - 40:11, 40:19, 40:25, 41:8, 41:15, 107:18
**reduced** [1] - 145:9
**refer** [4] - 111:15, 113:18, 116:21, 116:25
**referee** [2] - 133:21, 134:9
**reference** [3] - 141:22, 141:23, 142:5
**references** [2] - 41:24, 141:25
**referred** [4] - 6:3, 10:10, 133:1, 141:6
**referring** [14] - 105:1, 107:7, 107:17, 111:20, 112:22, 112:25, 113:2, 113:7, 113:20, 114:11, 117:4, 120:15, 123:3, 137:25
**refers** [2] - 126:22, 143:10
**reflect** [1] - 61:9
**reflection** [1] - 66:14
**regard** [19] - 5:21, 14:1, 25:15, 25:18, 25:19, 25:20, 28:21, 28:22, 44:1, 46:2, 53:16, 66:19, 72:3, 79:25, 85:1, 90:3, 131:2, 131:17, 132:14
**regarding** [8] - 25:2, 28:15, 73:16, 131:6, 131:7, 132:25, 133:9, 135:7

**Registered** [2] - 1:19, 145:5

**Regulation** [4] - 46:16, 46:24, 47:5, 65:2

**rehabilitation** [1] - 62:25

**related** [13] - 5:14, 7:25, 17:7, 18:17, 20:19, 27:20, 39:8, 64:8, 64:9, 88:22, 125:25, 133:2, 133:5

**relates** [1] - 65:25

**relating** [2] - 23:14, 41:5

**relation** [3] - 47:1, 50:9, 85:20

**relationship** [90] - 12:1, 13:22, 16:3, 16:4, 16:5, 16:6, 16:8, 16:10, 16:11, 16:15, 16:21, 22:17, 29:9, 29:22, 31:23, 32:8, 33:2, 35:1, 35:5, 35:17, 36:2, 36:7, 36:20, 74:8, 74:23, 75:3, 75:7, 76:9, 85:7, 85:24, 94:12, 98:15, 100:22, 109:20, 109:23, 110:1, 110:3, 110:11, 111:1, 111:2, 111:5, 111:10, 111:14, 111:17, 111:18, 111:20, 113:14, 113:15, 113:16, 113:18, 113:23, 114:14, 114:15, 117:21, 117:25, 118:1, 118:13, 118:14, 118:17, 118:25, 119:2, 119:5, 119:11, 119:15, 119:20, 119:21, 120:2, 120:6, 120:7, 122:10, 122:14, 123:12, 123:22, 124:7, 126:17, 126:18, 126:20, 127:4, 128:14, 140:17, 140:22, 140:23, 141:3, 141:10, 141:13, 142:13, 143:11, 143:16, 143:24, 144:9

**relationships** [5] - 15:22, 27:9, 35:22, 86:4, 86:8

**relative** [2] - 145:12, 145:13

**relay** [1] - 73:6

**release** [2] - 39:11, 57:9

**released** [1] - 38:19

**relevant** [4] - 21:20, 21:21, 22:4, 23:4

**reliant** [4] - 68:1, 69:9, 96:19, 96:25

**reluctance** [2] - 13:4, 14:3

**reluctant** [1] - 13:16

**relying** [1] - 29:7

**remedies** [1] - 78:15

**remedy** [1] - 28:6

**remember** [10] - 9:14, 13:12, 20:11, 44:22, 44:23, 47:10, 87:3, 88:2, 110:22, 114:9

**Remember** [2] - 112:10, 113:25

**remembered** [3] - 60:21, 60:22, 60:24

**remove** [2] - 78:14, 125:16

**removed** [1] - 125:19

**rental** [1] - 17:20

**reopen** [2] - 55:9, 57:10

**reopened** [3] - 55:17, 56:24, 57:15

**reopening** [2] - 57:3, 57:8

**report** [11] - 46:15, 47:4, 47:6, 47:15, 52:12, 52:13, 52:18, 53:1, 54:13, 56:12, 79:24

**reported** [7] - 53:6, 64:11, 64:14, 65:4, 65:8, 80:15, 130:5

**Reporter** [2] - 1:19, 145:6

**reporter** [3] - 131:24, 133:10

**reporting** [2] - 64:19, 84:15

**reports** [1] - 62:2

**reposed** [1] - 92:5

**represent** [4] - 21:5, 35:18, 77:5, 134:17

**representation** [1] - 24:14

**representatives** [1] - 77:10

**represented** [5] - 41:10, 41:11, 41:13, 56:8, 94:19

**representing** [1] - 135:2

**reprimand** [1] - 134:8

**repugnant** [1] - 77:21

**reputation** [1] - 65:10

**Request** [1] - 3:2

**request** [4] - 53:9, 83:7, 83:25, 84:1

**requesting** [1] - 61:9

**reside** [1] - 17:16

**residence** [4] - 4:8, 18:15, 119:10, 119:19

**resolution** [1] - 61:9

**resolved** [1] - 56:14

**resources** [2] - 11:8, 11:10

**respect** [3] - 85:1, 128:4, 129:18

**respected** [2] - 104:24, 105:2

**respond** [1] - 70:17

**responding** [1] - 92:3

**responds** [4] - 91:15, 92:1, 96:13, 121:12

**response** [13] - 5:24, 5:25, 57:18, 83:6, 98:2, 98:4, 105:12, 112:16, 117:21, 135:16, 135:24, 136:1, 139:9

**responses** [5] - 58:8, 80:18, 80:19, 80:23, 96:18

**responsibilities** [2] - 73:20, 136:19

**responsibility** [8] - 32:14, 32:19, 35:24, 47:14, 53:5, 53:7, 72:7, 72:11

**responsible** [6] - 57:2, 57:7, 57:23, 72:1, 100:11, 141:4

**restate** [1] - 23:19

**restrict** [1] - 22:23

**result** [4] - 27:1, 27:5, 89:24, 100:1

**results** [3] - 34:8, 65:11, 79:1

**resurrect** [4] - 49:22, 49:25, 50:4, 50:14

**resurrecting** [1] - 50:10

**Retained** [1] - 3:8

**retained** [3] - 49:19, 58:5, 58:6

**retired** [1] - 48:2

**return** [2] - 107:4, 134:22

**returned** [1] - 37:6

**reunification** [1] - 12:11

**revictimization** [2] - 59:21, 60:4

**revictimize** [1] - 75:17

**review** [3] - 5:20, 6:4, 131:3

**reviewed** [4] - 5:13, 5:22, 9:3, 138:12

**reviewing** [2] - 6:2, 81:13

**Rights** [1] - 78:12, 78:16

**rights** [2] - 78:12, 78:16

**risk** [11] - 98:25, 99:3, 99:7, 100:25, 110:23, 112:2, 112:6, 112:11, 114:1, 114:3, 114:10

**riskier** [1] - 97:15

**robbery** [1] - 15:18

**role** [2] - 28:18, 137:2

**romantic** [8] - 74:7, 109:23, 111:18, 112:25, 113:2, 113:6, 113:16, 127:4

**room** [5] - 18:16, 18:22, 19:1, 19:5, 134:25

**Roy** [2] - 42:6, 54:1

**rule** [7] - 20:17, 36:7, 36:13, 46:20, 46:23, 53:13, 53:17

**rules** [8] - 22:22, 29:12, 32:14, 32:18, 35:23, 36:9, 36:18, 47:13

**Rules** [1] - 1:18

## S

**S-Y-L-V-A-N** [1] - 17:20

**S.C** [3] - 1:21, 2:5, 2:9

**S.V** [1] - 1:5

**safety** [1] - 14:4

**sake** [1] - 79:2

**sanctions** [3] - 28:5, 48:14, 78:10

**sandbox** [4] - 114:20, 116:20, 117:2, 117:23

**saw** [3] - 59:1, 61:22, 81:3

**scenario** [2] - 47:12, 73:8

**SCHMIDT** [12] - 2:5, 134:15, 135:1, 136:7, 137:6, 137:20, 137:23, 137:24, 138:19, 139:3, 140:2, 144:12

**Schmidt** [1] - 134:17

**Schmidt.................................** [1] - 2:16

**scholars** [1] - 115:19

**school** [3] - 5:9, 6:12, 6:14

**schooled** [1] - 84:23

**scientific** [1] - 69:13

**seal** [1] - 145:17

**search** [1] - 33:22

**second** [2] - 78:3, 91:6

**secret** [1] - 97:14

**see** [32] - 22:11, 23:5, 29:15, 29:20, 29:23, 36:9, 48:16, 53:5, 54:9, 55:16, 55:19, 60:14, 62:21, 73:3, 77:22, 77:23, 87:9, 94:7, 94:8, 97:11, 97:12, 105:5, 105:6, 108:23, 118:1, 118:16, 120:18, 120:20, 122:22, 124:21, 128:17, 137:1

**See** [1] - 89:17

**seek** [3] - 34:7, 34:8, 75:25

**seeking** [2] - 143:15, 143:24

**seem** [1] - 136:20

**self** [20] - 47:4, 47:6, 47:15, 52:12, 52:13, 52:18, 54:13, 56:12, 97:18, 114:19, 114:24, 114:25, 115:5, 115:8, 115:9, 115:14, 115:21, 116:5, 116:7, 116:12

**self-esteem** [11] - 114:19, 114:24, 114:25, 115:5, 115:8, 115:9, 115:14, 115:21,

116:5, 116:7, 116:12
**self-explanatory** [1] - 97:18
**self-report** [8] - 47:4, 47:6, 47:15, 52:12, 52:13, 52:18, 54:13, 56:12
**Sellen** [2] - 57:4, 57:5
**send** [1] - 70:2
**sending** [5] - 70:23, 76:12, 81:25, 127:3, 144:5
**sense** [3] - 12:8, 97:10, 127:20
**sensitive** [3] - 7:16, 7:17, 14:6
**sent** [36] - 6:9, 38:11, 38:18, 39:18, 39:21, 39:24, 40:3, 40:15, 43:14, 43:23, 46:2, 48:24, 50:11, 50:19, 51:8, 67:23, 68:20, 69:11, 69:18, 69:20, 70:9, 70:11, 70:24, 74:4, 74:17, 76:12, 76:17, 77:17, 78:24, 80:11, 81:18, 89:2, 130:15, 138:13, 138:20, 142:23
**sentence** [4] - 78:3, 110:8, 110:12, 113:7
**sentencing** [2] - 73:8, 73:10
**separate** [5] - 12:20, 12:21, 32:9, 33:3, 56:11
**separated** [2] - 18:11, 124:17
**separately** [1] - 139:5
**separation** [4] - 12:9, 12:15, 14:18
**September** [15] - 2:19, 4:19, 37:14, 38:8, 38:14, 38:24, 57:21, 61:7, 61:20, 61:24, 61:25, 63:4, 63:24, 77:16, 77:19
**series** [3] - 46:4, 63:16, 65:11
**serious** [3] - 121:9, 121:21, 122:1
**Seriously** [1] - 96:9
**serve** [1] - 83:25
**served** [2] - 17:8, 17:15
**servers** [1] - 50:3
**services** [2] - 9:24, 46:7

**session** [3] - 131:19, 132:4, 133:6
**set** [3] - 14:2, 20:21, 145:16
**setting** [1] - 12:19
**several** [3] - 8:8, 47:10, 132:17
**several-day** [1] - 8:8
**sex** [2] - 18:22, 118:18
**sexting** [2] - 64:16, 118:18
**sexual** [38] - 7:20, 14:23, 18:17, 18:19, 19:6, 20:9, 20:12, 20:15, 20:19, 20:22, 22:24, 25:4, 28:3, 29:5, 29:9, 29:17, 29:21, 31:23, 32:8, 34:25, 35:5, 35:17, 36:2, 36:6, 36:8, 36:11, 36:14, 36:20, 60:2, 60:11, 74:8, 109:25, 110:3, 112:25, 113:3, 113:6, 113:16, 127:4
**sexual-related** [1] - 18:17
**sexually** [2] - 75:13, 75:14
**Shanel** [2] - 120:13
**Shannon** [2] - 110:5, 117:12
**Shannon's** [9] - 108:2, 108:13, 108:16, 108:20, 109:18, 110:4, 110:9, 110:10, 141:24
**shape** [1] - 23:17
**shared** [4] - 47:17, 47:19, 47:25, 49:3
**sheet** [1] - 81:9
**Sherwood** [4] - 18:5, 20:6, 20:25, 21:5
**shooter** [1] - 97:9
**short** [3] - 23:10, 61:2, 133:17
**show** [5] - 36:24, 48:23, 54:5, 76:19, 107:24
**shown** [1] - 127:23
**shut** [4] - 98:25, 99:4, 99:7, 101:1
**side** [2] - 61:17, 67:20
**sign** [3] - 94:17, 94:20, 137:14
**signed** [6] - 6:5,

94:14, 94:16, 94:17, 94:18, 94:25
**significance** [1] - 110:8
**significant** [1] - 68:15
**signs** [2] - 119:12, 120:8
**silence** [1] - 121:4
**silent** [1] - 129:13
**single** [3] - 12:3, 70:10, 70:22
**single-event** [1] - 12:3
**sit** [6] - 32:5, 117:14, 125:20, 130:11, 136:15, 140:10
**sitting** [1] - 139:15
**situation** [13] - 15:23, 20:22, 32:23, 66:5, 70:3, 70:13, 75:1, 75:25, 76:5, 76:6, 84:25, 88:12, 117:9
**situations** [2] - 15:21, 75:23
**six** [4] - 47:17, 47:19, 71:2, 134:9
**six-month** [1] - 134:9
**skip** [1] - 108:9
**slow** [8] - 108:2, 108:13, 108:15, 108:16, 108:20, 109:18, 110:9, 141:24
**smart** [6] - 101:8, 101:12, 101:17, 101:18, 101:19, 101:22
**social** [5] - 131:7, 131:9, 131:16, 131:19
**socialize** [1] - 87:2
**solicit** [1] - 31:23
**solicited** [1] - 35:5
**soliciting** [3] - 34:25, 35:9, 36:20
**someday** [3] - 25:6, 121:11, 121:23
**someone** [4] - 84:25, 107:2, 118:15, 135:12
**sometime** [5] - 26:15, 45:20, 53:19, 57:20, 81:6
**sometimes** [8] - 75:16, 77:10, 87:13, 87:14, 91:2, 91:8, 91:10
**soon** [2] - 96:10, 133:16

**sorry** [19] - 5:4, 7:7, 9:6, 25:10, 34:16, 42:17, 49:18, 100:6, 108:8, 108:10, 108:11, 119:17, 120:11, 129:9, 129:11, 138:25, 139:22, 142:4, 142:5
**sort** [4] - 33:10, 41:23, 60:7, 109:20
**soup** [1] - 95:21
**South** [1] - 4:9
**speaking** [2] - 68:14, 71:13
**speaks** [1] - 101:20
**special** [16] - 7:24, 8:2, 9:3, 9:9, 10:20, 18:22, 42:19, 44:13, 110:23, 112:1, 112:3, 112:4, 112:11, 114:1, 114:3, 114:10
**specialization** [1] - 14:1
**specialize** [2] - 7:15, 10:14
**specialized** [6] - 8:22, 9:19, 10:22, 11:3, 13:8, 14:8
**specialty** [1] - 10:8
**specific** [12] - 8:11, 53:8, 53:13, 53:17, 54:23, 55:13, 55:21, 68:9, 68:12, 85:21, 87:21, 141:21
**specifically** [1] - 67:4
**speculate** [7] - 79:15, 79:16, 80:1, 110:14, 110:17, 143:9
**speech** [1] - 109:3
**speeches** [1] - 71:13
**spent** [3] - 81:19, 81:25, 139:22
**sphere** [1] - 15:6
**spoil** [1] - 107:3
**spoiled** [1] - 107:2
**spouse** [2] - 13:16, 13:17
**spurred** [1] - 63:20
**sS** [1] - 145:1
**staff** [1] - 10:16
**stand** [1] - 106:21
**standpoint** [1] - 50:21
**start** [8] - 18:18, 100:22, 104:4, 123:14, 123:17, 123:21, 132:11
**starts** [1] - 92:18

**state** [9] - 4:7, 9:20, 27:12, 27:15, 140:7, 140:9, 141:17, 142:12, 143:1
**STATE** [2] - 1:10, 145:1
**State** [9] - 1:20, 6:6, 16:2, 35:21, 36:10, 140:13, 140:15, 145:7, 145:22
**statement** [6] - 24:18, 25:2, 26:3, 73:5, 73:11, 123:24
**statements** [2] - 22:3
**STATES** [1] - 1:1
**stating** [1] - 23:22
**statistical** [1] - 69:6
**status** [4] - 45:3, 67:6, 124:10, 124:12, 140:11, 140:21
**statutes** [1] - 78:10
**statutory** [2] - 78:4, 136:18
**stayed** [2] - 30:2, 37:16
**steal** [1] - 127:13
**step** [1] - 134:20
**stick** [1] - 42:25
**sticking** [1] - 114:18
**Still** [1] - 102:13
**still** [13] - 27:19, 50:22, 51:17, 53:12, 80:8, 95:4, 121:2, 131:25, 137:1, 139:23, 143:25, 144:3, 144:6
**stint** [1] - 4:17
**stipulation** [1] - 137:16
**stop** [15] - 80:19, 97:16, 97:21, 97:23, 98:4, 99:9, 100:8, 101:3, 103:1, 129:4, 141:20, 142:9, 142:17, 142:18, 142:21
**stopped** [5] - 103:6, 120:24, 121:1, 121:7, 129:1
**storage** [4] - 18:17, 18:19, 51:3, 51:14
**stored** [2] - 50:1, 50:4
**story** [2] - 58:7, 58:10
**straight** [1] - 97:8
**strangle** [18] - 33:20, 35:3, 35:12, 66:8, 66:24, 68:3,

68:16, 70:5, 85:17, 92:6, 96:21, 97:1, 100:2, 100:13, 107:11, 107:14, 107:20, 123:5
**strangled** [1] - 102:5
**strangler** [1] - 68:18
**strangulation** [1] - 31:17
**strategy** [1] - 135:24
**street** [2] - 83:15, 111:9
**Street** [3] - 1:21, 2:6, 2:10
**strike** [1] - 51:24
**strikes** [1] - 59:4
**study** [3] - 69:17, 69:21, 69:24
**stupid** [1] - 107:1
**Subject** [1] - 3:4
**subject** [6] - 27:25, 28:13, 59:25, 76:13, 110:11
**subjected** [1] - 141:2
**submission** [2] - 26:12, 26:14
**submissions** [3] - 5:23, 6:2, 95:5
**submit** [1] - 139:9
**submitted** [1] - 6:5
**subpoena** [1] - 51:21
**subsection** [3] - 36:13, 36:16, 36:18
**suburb** [2] - 18:4, 18:5
**successful** [1] - 104:24
**suffer** [2] - 115:8, 115:21
**sufficient** [1] - 35:2
**suggest** [4] - 32:16, 54:10, 100:17, 136:17
**suggested** [3] - 47:8, 52:17, 129:12
**suggesting** [2] - 39:7, 114:2
**suggestion** [1] - 38:21
**suggests** [1] - 69:8
**suicidal** [1] - 65:7
**suicide** [2] - 63:25, 64:2
**Suite** [1] - 2:6
**summary** [3] - 6:6, 94:23, 94:24
**Sunday** [1] - 62:23
**supplying** [1] -

56:8
**support** [3] - 10:16, 33:21, 56:9
**supportive** [2] - 75:15, 76:2
**supports** [1] - 34:13
**suppose** [2] - 38:21, 71:24
**supposed** [1] - 29:19
**Supreme** [2] - 133:22, 134:11
**surprised** [1] - 133:13
**surrounding** [1] - 43:12
**suspect** [2] - 84:19, 127:20
**suspension** [6] - 133:19, 133:21, 133:25, 134:3, 134:9, 134:10
**sustain** [1] - 34:23
**swearing** [1] - 95:1
**sweet** [3] - 96:12, 143:3, 143:8
**swine** [1] - 95:11
**sworn** [1] - 4:3
**Sylvan** [1] - 17:20
**system** [6] - 12:8, 78:8, 90:6, 91:1, 91:7, 91:13
**systemic** [1] - 78:6
**systemically** [1] - 10:12

# T

**taker** [4] - 98:25, 99:3, 99:7, 100:25
**talents** [1] - 105:17
**tall** [2] - 122:6, 127:23
**tangentially** [1] - 135:14
**tasks** [4] - 136:10, 136:14, 136:20, 136:25
**taught** [3] - 16:23, 17:2, 59:11
**teach** [2] - 59:6, 59:14
**teaching** [1] - 59:19
**team** [1] - 10:17
**Ted** [2] - 25:10, 36:25
**TED** [1] - 2:9
**telephone** [3] - 51:15, 82:18, 83:6
**ten** [4] - 17:3, 59:15, 60:18, 107:6
**tenant** [1] - 115:3

**tend** [1] - 7:14
**term** [7] - 7:18, 17:14, 18:4, 64:16, 87:2, 98:7, 98:12
**terms** [7] - 13:25, 25:4, 33:5, 38:25, 41:5, 56:8, 66:20
**test** [1] - 25:14
**testified** [5] - 4:4, 28:9, 66:5, 125:14, 129:20
**testifies** [1] - 24:24
**testify** [10] - 21:25, 23:25, 25:5, 25:11, 25:13, 26:4, 48:13, 49:11, 130:12, 131:20
**testimony** [3] - 25:8, 31:20, 73:9
**Text** [2] - 2:21, 3:4
**text** [80] - 28:15, 39:11, 39:18, 46:9, 48:23, 49:1, 49:6, 49:17, 49:20, 50:4, 50:9, 50:17, 50:20, 50:25, 51:3, 51:7, 51:23, 63:16, 65:3, 66:12, 70:13, 70:19, 70:23, 71:1, 71:4, 71:12, 71:15, 71:20, 74:4, 74:6, 76:12, 76:16, 77:17, 79:25, 80:17, 80:21, 80:25, 81:8, 81:13, 81:15, 81:16, 81:18, 82:1, 82:12, 82:15, 85:5, 88:17, 88:25, 89:2, 89:3, 91:23, 91:24, 94:5, 94:11, 95:16, 95:19, 96:23, 98:6, 112:10, 112:15, 112:16, 114:9, 114:17, 114:25, 128:10, 128:24, 129:4, 129:9, 129:21, 130:3, 139:21, 141:9, 141:12, 142:8, 143:1, 143:14, 143:20, 143:22, 144:5
**texted** [11] - 34:25, 35:1, 35:8, 35:10, 74:3, 93:20, 93:22, 93:24, 94:4, 95:14, 112:14
**texting** [5] - 22:17, 82:14, 96:18, 131:13, 133:2
**texts** [24] - 38:11, 38:18, 39:4, 41:20, 41:23, 43:13, 43:23, 46:3, 54:6, 54:8, 54:9, 69:18, 69:20,

70:2, 70:9, 78:24, 95:23, 102:10, 102:15, 113:25, 129:13, 130:22, 130:24
**THE** [10] - 1:1, 5:1, 5:7, 71:9, 74:17, 110:19, 138:15, 138:17, 138:25, 140:1
**theft** [1] - 12:22
**Theilen** [3] - 45:1, 45:18, 49:1
**THEILEN** [1] - 45:1
**themselves** [8] - 11:11, 40:22, 49:11, 65:4, 65:14, 81:15, 101:16, 101:25
**theory** [1] - 29:10
**they've** [2] - 9:25, 90:25
**thinking** [4] - 55:11, 66:19, 97:3, 104:1
**third** [2] - 91:6, 140:4
**Thompson** [1] - 17:11
**thoughts** [2] - 63:24, 64:2
**three** [8] - 56:1, 57:25, 125:22, 131:3, 131:5, 132:20, 132:25
**throughout** [2] - 10:25, 141:9
**today** [14] - 5:13, 5:16, 31:20, 32:5, 81:1, 94:5, 117:14, 120:23, 125:14, 125:20, 130:11, 136:15, 137:15, 139:15
**together** [1] - 114:3
**Tom** [1] - 48:18
**tomorrow** [2] - 117:18, 118:11
**tongue** [1] - 105:13
**tongue-in-cheek** [1] - 105:13
**took** [10] - 4:18, 13:23, 17:16, 23:18, 31:24, 34:21, 42:17, 105:12, 105:14
**topic** [1] - 24:21
**topics** [1] - 8:7
**TORNEHL** [30] - 2:9, 4:25, 5:6, 21:14, 21:19, 21:23, 22:11, 22:15, 23:7, 23:11, 24:3, 24:8, 25:5, 25:22, 26:5, 33:14, 61:1, 69:18, 69:20,

92:22, 92:24, 93:5, 93:8, 110:16, 133:15, 136:4, 137:17, 137:22, 138:16, 138:23, 139:25
**tornehl** [1] - 138:4
**total** [1] - 81:22
**touch** [4] - 73:20, 73:23, 96:10, 143:6
**touches** [1] - 72:16
**toward** [1] - 33:10
**town** [1] - 18:2
**township** [1] - 20:7
**trace** [2] - 6:11, 8:17
**track** [1] - 41:18
**training** [8] - 7:24, 8:3, 8:8, 8:22, 16:25, 17:1, 59:12, 59:14
**trainings** [2] - 8:6, 8:11
**Transcript** [1] - 3:8
**transcript** [1] - 134:23
**TRANSCRIPT** [1] - 4:1
**treat** [1] - 126:11
**treated** [1] - 37:18
**treatment** [14] - 37:7, 37:12, 37:13, 37:15, 38:17, 39:16, 39:20, 40:2, 40:6, 40:10, 40:11, 40:19, 40:25, 62:19
**trial** [1] - 109:12
**tried** [2] - 43:6, 50:14
**Tried** [1] - 107:14
**trolling** [3] - 98:7, 98:17, 98:22
**true** [13] - 13:19, 13:24, 14:7, 15:13, 15:14, 16:19, 34:20, 55:1, 74:25, 83:9, 84:9, 85:3, 95:2, 95:6, 104:23, 123:7, 128:17, 137:3, 143:17
**trust** [9] - 74:22, 75:3, 75:7, 75:19, 76:1, 76:3, 76:8, 76:14, 92:5
**truth** [2] - 33:22, 116:11
**truthfulness** [5] - 23:24, 24:12, 24:14, 24:18, 25:2
**try** [8] - 8:16, 30:10, 42:25, 66:18, 75:3, 75:6, 75:16, 75:17
**trying** [12] - 30:25,

Case 1:10-cv-00910-WCG   Filed 01/24/13   Page 54 of 56   Document 82-1
BROWN & JONES REPORTING, INC.

54:14, 66:18, 101:18, 101:19, 103:14, 103:21, 103:23, 104:6, 122:15, 122:18, 124:6

**turned** [1] - 132:16
**turns** [1] - 124:17
**TV** [3] - 59:1, 131:24, 133:9
**twenty** [1] - 71:4
**twenty-five** [1] - 71:4
**twice** [2] - 99:8, 101:2
**two** [22] - 7:4, 38:3, 38:21, 39:7, 42:3, 48:19, 81:23, 81:24, 90:18, 94:25, 95:5, 104:16, 110:11, 128:23, 129:8, 129:21, 130:3, 131:7, 131:9, 131:16, 133:4, 138:5
**type** [15] - 9:2, 15:19, 16:1, 16:15, 16:21, 19:14, 68:20, 76:6, 84:24, 88:19, 111:10, 111:17, 112:22, 126:19, 136:19
**types** [23] - 7:12, 7:13, 9:8, 9:10, 10:20, 11:11, 11:20, 14:2, 15:12, 25:15, 54:8, 67:22, 69:2, 69:6, 69:10, 69:19, 70:2, 70:9, 70:23, 74:2, 98:11, 98:13, 130:15
**typically** [4] - 8:6, 12:3, 12:5

## U

**ultimately** [1] - 134:11
**umbrella** [2] - 137:18, 137:22
**unable** [3] - 46:21, 46:22, 53:12
**unclear** [1] - 131:25
**under** [7] - 1:17, 16:1, 24:20, 29:12, 29:13, 32:15, 145:9
**undercut** [1] - 65:15
**underlying** [1] - 40:17
**undermine** [1] - 24:23
**understood** [6] -

28:24, 30:12, 38:13, 43:11, 118:8, 136:8
**undertake** [3] - 33:6, 34:3, 34:17
**undertook** [1] - 33:8
**unethical** [2] - 52:4, 52:21
**unethically** [1] - 52:8
**unfair** [2] - 57:12, 90:13
**unintended** [2] - 15:1, 79:4
**unintentional** [3] - 78:18, 78:22, 78:25
**unintentionally** [1] - 78:7
**unique** [9] - 8:4, 9:7, 10:20, 11:17, 12:7, 12:9, 14:12, 15:3, 15:7
**unit** [2] - 11:5, 14:3
**UNITED** [1] - 1:1
**units** [6] - 9:19, 10:22, 11:3, 11:5, 11:9, 14:8
**University** [1] - 4:9
**unless** [4] - 21:19, 31:24, 125:1, 142:1
**unwanted** [3] - 42:14, 43:14, 60:1
**unwelcome** [2] - 80:14, 98:6
**unwelcomed** [1] - 42:15
**unwilling** [2] - 68:23, 79:18
**up** [26] - 10:1, 20:21, 33:15, 46:24, 53:23, 53:25, 60:4, 67:3, 72:22, 77:8, 77:14, 90:10, 93:16, 94:6, 99:18, 101:9, 101:17, 102:1, 102:11, 117:9, 129:16, 132:17, 133:13, 134:11, 134:16
**upset** [1] - 130:24
**urge** [1] - 47:6
**usual** [1] - 51:13

## V

**van** [1] - 85:19
**Van** [1] - 54:4
**various** [2] - 9:12, 11:15
**version** [4] - 49:2, 138:14, 138:22
**versus** [1] - 34:11
**vet** [1] - 91:11
**vetting** [3] - 90:4,

90:7, 90:24
**Vicodin** [4] - 38:6, 125:10, 125:12, 125:15
**victim** [81] - 9:24, 11:21, 12:2, 12:15, 13:4, 14:4, 14:16, 16:9, 23:2, 25:3, 28:19, 29:18, 29:21, 31:5, 31:16, 32:5, 51:6, 66:5, 66:7, 66:15, 66:22, 67:1, 67:7, 67:11, 67:20, 67:23, 70:14, 70:23, 71:14, 72:4, 72:8, 72:17, 72:18, 73:1, 73:2, 73:5, 73:7, 73:9, 73:12, 73:15, 73:21, 73:22, 73:24, 74:23, 75:4, 75:8, 75:11, 75:20, 75:21, 76:1, 76:9, 77:17, 77:21, 83:24, 84:5, 88:20, 89:4, 89:7, 89:13, 90:4, 90:24, 99:21, 99:22, 105:20, 105:25, 106:1, 106:2, 106:6, 106:12, 106:16, 106:19, 115:10, 122:24, 122:25, 130:12, 130:17, 130:19, 130:21, 140:18, 140:25, 144:2
**Victim's** [1] - 67:6
**victim's** [2] - 78:12, 78:16
**victims** [21] - 7:20, 9:21, 13:21, 59:8, 59:17, 59:18, 59:20, 59:23, 66:1, 67:17, 68:10, 68:11, 69:1, 70:17, 71:18, 72:21, 76:3, 78:4, 90:13, 115:4, 115:20
**videoed** [1] - 19:6
**violated** [3] - 32:7, 36:14, 46:21
**violation** [17] - 32:18, 36:4, 36:10, 44:1, 46:23, 47:13, 52:10, 52:14, 53:9, 53:10, 53:14, 53:18, 54:23, 54:25, 111:7, 131:5, 133:8
**violations** [8] - 55:14, 55:21, 55:23, 56:1, 56:2, 78:15, 131:2, 133:1
**violence** [16] - 8:10, 10:18, 11:1, 12:4, 12:11, 12:20, 13:1, 14:10, 14:23,

15:3, 15:8, 15:25, 59:10, 115:10, 115:15, 115:17
**Violence** [1] - 9:15
**virtually** [2] - 49:21, 50:5
**virus** [1] - 95:11
**vis-à-vis** [1] - 126:21
**visited** [1] - 85:9
**voluntary** [1] - 77:3
**volunteered** [1] - 85:21
**vs** [1] - 1:7
**vulgar** [3] - 131:18, 132:3, 133:5
**vulnerability** [1] - 71:19
**vulnerable** [6] - 67:22, 68:4, 68:19, 69:2, 69:10, 70:18

## W

**Wambach** [2] - 48:3, 48:14
**wanna** [1] - 105:19
**wants** [4] - 25:5, 73:7, 123:22, 142:17
**Water** [2] - 1:21, 2:10
**ways** [1] - 65:20
**weeks** [5] - 81:10, 128:23, 129:8, 129:21, 130:3
**West** [2] - 2:3, 4:10
**whereof** [1] - 145:16
**wife** [5] - 16:12, 17:25, 18:10, 124:1, 124:22
**willing** [1] - 93:6
**WISCONSIN** [3] - 1:2, 1:10, 145:1
**Wisconsin** [20] - 1:20, 1:22, 2:3, 2:7, 2:10, 2:19, 4:10, 6:6, 16:2, 35:21, 36:10, 42:3, 61:10, 76:25, 77:8, 140:13, 140:15, 145:7, 145:18, 145:22
**wisest** [4] - 96:11, 143:2, 143:5, 143:7
**wish** [3] - 93:16, 140:7, 140:20
**wishes** [1] - 75:11
**withdraw** [1] - 33:18
**withdrawn** [1] - 28:25
**witness** [5] - 4:2, 131:19, 132:4,

133:6, 145:16
**WITNESS** [9] - 5:1, 5:7, 71:9, 74:17, 110:19, 138:15, 138:17, 138:25, 140:1
**woman** [16] - 19:8, 19:11, 30:9, 30:11, 42:13, 75:12, 75:20, 81:20, 124:2, 124:9, 124:24, 125:2, 126:10, 126:11, 126:22, 128:12
**women** [7] - 23:16, 26:23, 26:25, 27:4, 27:9, 127:22
**wondering** [1] - 102:13
**word** [9] - 16:7, 46:10, 67:13, 78:15, 78:23, 103:11, 103:13, 112:4, 118:1
**words** [9] - 15:8, 40:18, 43:15, 101:16, 101:25, 108:18, 108:23, 111:8, 112:6
**worker** [1] - 131:19
**workers** [2] - 131:8, 131:9, 131:16
**world** [1] - 68:8
**worried** [4] - 91:22, 105:4, 105:10, 105:13
**worry** [1] - 91:15
**worth** [2] - 102:14, 112:20
**worthy** [1] - 123:12
**write** [10] - 88:16, 91:24, 97:7, 97:13, 114:25, 115:18, 115:19, 119:13, 122:25, 127:11
**writes** [1] - 99:10
**writing** [4] - 98:21, 99:15, 99:23, 145:9
**written** [5] - 49:2, 71:12, 73:11, 99:6, 99:18
**wrote** [2] - 99:12, 113:25

## X

**Xanax** [4] - 38:3, 125:10, 125:11, 125:15

## Y

**year** [7] - 6:17, 8:25, 17:13, 19:12, 45:24, 47:2, 50:16

**years** [21] - 8:12,
10:1, 10:10, 12:6,
13:10, 13:14, 59:15,
67:3, 67:5, 69:5,
69:7, 70:20, 70:22,
71:2, 71:4, 71:18,
74:9, 107:6, 119:9,
119:25
  **yesterday** [2] -
120:24, 121:1
  **young** [2] - 121:11,
122:7
  **yourself** [7] -
67:16, 74:23, 75:4,
76:1, 76:15, 81:12,
135:2

## Z

**zealously** [3] -
78:12, 78:14, 78:15

Case 1:10-cv-00910-WCG   Filed 01/24/13   Page 56 of 56   Document 82-1

BROWN & JONES REPORTING, INC.